## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**Alexander R. Baldwin III,**

      Plaintiff,

vs.                                                            Case No. CIV-25-01052 KWR/KK

**Kari T. Morrissey, Mary Carmack-Altwies,
Andrea Reeb, Jennifer Padgett Macias, The First
Judicial District Attorney's Office, Alexandria
Hancock, Marissa Poppell, Brian Brandle, and
Santa Fe County Board of County
Commissioners,**

      Defendants.

## DEFENDANTS MARY CARMACK-ALTWIES
## AND ANDREA REEB'S MOTION TO DISMISS NO. I:
## PLAINTIFF'S DEFAMATION CLAIM FOR FAILURE TO STATE A CLAIM

Defendants, Mary Carmack-Altwies and Andrea Reeb, through their attorney Robles, Rael

and Anaya, P.C. (Luis Robles), state the following for their Motion to Dismiss No. I: Plaintiff's

Defamation Claim for Failure to State a Claim ("Motion to Dismiss No. I"):[1]

### INTRODUCTION

This case arises from the criminal prosecution of Plaintiff Alexander Baldwin III ("Baldwin"

or "Plaintiff") for the October 2021 shooting death of cinematographer Halyna Hutchins

("Hutchins") on a movie set outside Santa Fe, New Mexico. The State of New Mexico charged

---

[1]      The undersigned counsel did not seek concurrence from Plaintiff's counsel as they
are not required to seek concurrence on this dispositive motion.

Baldwin with the crime of involuntary manslaughter. In July 2024, during the criminal trial, the presiding judge dismissed the involuntary manslaughter charge against Baldwin with prejudice.

In the instant case, Baldwin alleges, in pertinent part, that the prosecutors engaged in various forms of misconduct related to the investigation of the shooting incident, the criminal prosecution itself, and/or their statements to the media. Relevant to this motion, Baldwin asserted a defamation claim against District Attorney Mary Carmack-Altwies and Special Prosecutor Andrea Reeb. Complaint, ¶ 290 (filed Jan. 9, 2025) [Doc. 1-1] (Fifth Claim for Relief) ("Compl."). However, Baldwin's defamation claim must be dismissed with prejudice because there is no applicable waiver of immunity for this tort under the New Mexico Tort Claims Act ("NMTCA").

STATEMENT OF FACTS

As alleged in the Complaint, the following well-pleaded facts are accepted as true solely for purposes of this motion.[2]

### A.    The State Defendants.

Mary Carmack-Altwies ("Carmack-Alwies") is the elected District Attorney for New Mexico's First Judicial District. Compl., ¶ 15.  The First Judicial District Attorney's Office ("FJDA") appointed Andrea Reeb ("Reeb") to serve as Special Prosecutor in connection with Baldwin's criminal case in August 2022, and she formally withdrew from that role in March 2023. Id., ¶ 16.  The FJDA then appointed Kari T. Morrissey ("Morrissey") to serve as Special Prosecutor in connection with Baldwin's case in March 2023. Id., ¶ 14.  Jennifer Padgett Macias ("Padgett Macias") is an Assistant District Attorney for the First Judicial District. Id., ¶ 17.  The individual

---

[2]    A complete statement of Plaintiff's allegations are set forth herein so they will not have to be repeated for State Defendants' additional motion to dismiss that is filed concurrently herewith.

prosecutors are sued in their individual and official capacities. See id., ¶¶ 14-17. The FJDA is also a named Defendant. Id., ¶ 21.

### B.    The 2021 Shooting Incident.

Baldwin, an actor, was cast to play a role in a western movie titled *Rust*. See id., ¶¶ 13, 24, 30. Baldwin was also a producer on the film but his authority was limited to creative decisions. See id., ¶¶ 27, 29. The safe use of firearms on a movie set is the responsibility of the prop master or prop master's designee, which in most cases is the armorer. Id., ¶ 36. Moreover, the first assistant director "is in charge of set safety and is the 'last line of defense' for firearm safety on set." Id., ¶ 37. Actors are not responsible for firearm safety on set. Id., ¶ 39.

Industry guidance provides that "when pointing a gun at another is 'absolutely necessary'" when making a movie, "it should be done in consultation with the Prop Master or his or her designee ...." Id., ¶ 38. Additionally, the term "cold gun" is widely understood in the film industry to refer to a firearm that has been inspected to confirm it does not have any live ammunition. Id., ¶ 40. "The announcement of a 'cold gun by the Armorer or First A[ssistant] D[irector] is meant to assure all present that the gun has been properly checked for the absence of any ammunition, other than 'dummy' rounds, so that cast and crew members may go about their work knowing that the firearm is incapable of causing harm." Id., ¶ 41.[3] Baldwin received approximately 90 minutes of firearm training from the armorer, Hannah Gutierrez-Reed ("Gutierrez-Reed"). Id., ¶ 42. She told Baldwin it was her job to check the gun, not his. Id., ¶ 44.

On October 21, 2021, the cast and crew were filming a scene that involved a close-up view

---

[3]    Dummy rounds "are designed to look like real bullets, but contain no charge (*i.e.*, they cannot detonate and are inert.)." Id., ¶ 35.

of the revolver Baldwin is "holding that he is required to 'cock' (*i.e.*, pull the hammer back). . .." Id. at 46.  To achieve this close up, the unloaded pistol needed to be loaded with dummy rounds so the pistol would not appear on screen to be unloaded. Id., ¶ 49. When the cast and crew broke for lunch, Gutierrez-Reed took the pistol from Baldwin and loaded it "with what she believed to be six dummy rounds." Id., ¶¶ 48-49.  Gutierrez-Reed then brought the pistol to First Assistant Director Dave Halls ("Halls"), advising him that she had loaded it with dummy rounds and rotating the cylinder for him to see. See id., ¶¶ 37, 51.  Halls agreed the gun was safe to handle. Id.  When he handed the gun to Baldwin, Halls "announced that there was a 'cold gun' on set." Id.

Thereafter, the cinematographer, Hutchins, directed Baldwin's movements with the gun to best capture the close-up on screen. See id., ¶¶ 52-55.  With Hutchins' approval, Baldwin cocked the gun. Id., ¶ 55.  "[A] live round discharged from the gun and struck Hutchins, traveling through her body and striking [writer-director, Joel] Souza[,] in the shoulder." Id., ¶ 56.  Hutchins later died from her injuries while Souza was treated at the hospital and recovered. Id., ¶ 62.  "Throughout the [subsequent] investigation, Baldwin repeatedly told investigators that the gun just 'went off.'" Id., ¶ 88.  Baldwin also told ABC News he did not pull the trigger. Id., ¶ 89.

### C.    The Focus of the Investigation.

The Santa Fe County Sheriff's Office ("SFSO") initially focused their investigation on how live ammunition ended up on set, not on Baldwin's handling of the gun. Id., ¶¶ 70-71.  "Prosecutors from the FJDA were heavily involved in SFSO's investigation from the beginning, with investigative decisions being made collectively by a team that included prosecutors." Id., ¶ 74 (internal quotation marks omitted).  As prosecutors became more involved in the case, the focus of the investigation shifted to Baldwin even though "it is not an actor's job to check for live rounds inside a prop gun

that those responsible for gun safety have cleared for use." Id.,¶¶ 76-77. "Driven by the prosecutors'

agenda, SFSO began to ignore critical evidence as to how live ammunition ended up on set." Id., ¶

78; see also id., ¶¶ 79-86. Prosecutors were not interested in pursuing the source of the lethal round

because, if it turned out that the round came from an outside source ... it would be difficult to blame

Baldwin. This was confirmed by two sets of prosecutors, both of whom sought to hold Baldwin

criminally responsible for failing to supervise crew members based on his role as a producer." Id.,

¶ 80.

> **D.    Testing of the Firearm.**

"The gun's condition, "particularly whether it showed signs of damage or modification on

the day of the incident, was an important issue in the investigation and in any potential prosecution."

Id., ¶ 87. "[I]n April 2022, six months after the incident, the SFSO asked the FBI to test the [] gun"

to determine "whether the firearm could fire without a pull of the trigger" to disprove Baldwin's

statement to ABC News that he did not pull the trigger. Id., ¶¶ 89, 93. An FBI agent informed the

SFSO that the testing would subject "the firearm to substantial external impact and was all but

certain to break it." Id., ¶ 90. "Despite knowing this, no one from the prosecutor's office or the

SFSO asked that the FBI lab document the internal components of the firearm before performing the

destructive testing." Id., ¶ 91. The testing caused the trigger and other internal components to break.

Id., ¶ 92. Afterward, the FBI took the gun apart and found signs of alterations and damage unrelated

to the testing. Id., ¶ 94.

> **E.    The First Prosecution Team.**

"Even though Baldwin was not responsible for ensuring the safety of firearms or ammunition

and was told by those who *were* responsible that the prop gun was safe, the District Attorney decided

to criminally charge Baldwin 'pretty close to the beginning' of the investigation." Id., ¶ 98 (emphasis in original). By June 2022, Carmack-Altwies had "privately decided" to appoint the former Ninth Judicial District Attorney, Andrea Reeb, as Special Prosecutor to assist with the Baldwin case. Id., ¶ 101. At the time, Reeb "was actively campaigning for a seat in the New Mexico House of Representatives." Id. "Reeb emailed Carmack-Altwies to assure Carmack-Altwies that she would not disclose to the media that she had been chosen as Special Prosecutor" but also wrote that, at some point, she would want it disclosed because "it might help in my campaign lol." Id., ¶ 102. "Four days later, Carmack-Altwies ... made a contribution to Reeb's campaign." Id., ¶ 103. "On August 3, 2002, the District Attorney's Office announced that Reeb would join the investigative team." Id., ¶ 104. "Reeb immediately became the point of contact for defense counsel and indicated that she was the primary attorney reviewing the SFSO report and handling the investigation. Reeb interviewed witnesses, took proffers, engaged experts, and handled other important matters." Id., ¶ 105. Carmack-Altwies requested $635,000 from the State Board of Finance to pay Reeb's salary and to hire other personnel for the investigation, including a public information officer. Id., ¶ 106. "The State granted the District Attorney's Office $317,750." Id.

### 1.    Carmack-Altwies and Reeb's Statements to the Media.

Carmack-Altwies and Reeb repeatedly violated the ethical standards promulgated by the National District Attorneys Association regarding "bringing and public commenting on criminal cases." See id., ¶107-111. On October 26, 2021, five (5) days after the incident, "Carmack-Altwies started giving media interviews regarding the investigation" and "began characterizing the evidence (e.g., that there 'were an enormous amount of bullets on this set')." Id., ¶ 112. "Throughout the end of 2021 and first half of 2022, the FJDA repeatedly gave nationally televised interviews and issued

public statements that improperly commented on important but contested facts in the case." Id., ¶ 113. "[S]even days after the incident, Carmack-Altwies stated on NBC News that Baldwin was 'the one that pulled the trigger,' without any objective basis to have reached that conclusion and long before any testing had been done to determine how or why the firearm had discharged." Id.

By August 2022, Reeb and Carmack-Altwies "were preparing for a full-scale media blitz[.]." Id., ¶ 114. On January 18, 2023, the FJDA "announced it would reveal its charging decisions the following day." Id., ¶ 115. The announcement featured photos of Carmack-Altwies and Reeb, and stated there would 'be no news conference or public appearances by [FJDA]' in connection with the decision[.]" Id. The following day, "the State" issued a press release, announcing "that it planned to charge Baldwin with two counts of involuntary manslaughter, plus a sentencing enhancement for the use of a firearm" and indicated "that '[t]he firearm enhancement makes the crime punishable by a mandatory five years in jail.'" Id., ¶ 116. "The press release did not explain why Carmack-Altwies and Reeb ... announce[d] the charged before they were actually filed." Id.

"Carmack-Altwies and Reeb immediately appeared on national television programs to comment on the evidence, their legal theories of Baldwin's culpability, the impending charges, and Baldwin's possible sentence." Id., ¶ 117. "Less than an hour after the [FJDA] announced its decision to charge Baldwin, Carmack-Altwies appeared on CNN and discussed Baldwin's responsibilities as an actor and producer and with respect to firearms safety on the *Rust* set." Id., ¶ 118. Carmack-Altwies stated "Baldwin 'didn't do any of the things that he was supposed to do to make sure ... that anyone around him was safe,' that Baldwin 'should have checked that gun, checked those projectiles,' and that as a producer, Baldwin 'had a duty to make sure the set was safe,' and 'should have been aware that safety was an issue' on set." Id. These statements were untrue and not

"necessary to serve any legitimate law enforcement purpose." <u>Id.</u>

"That same day, Carmack-Altwies discussed 'key pieces of evidence' with a reporter from the *Santa Fe New Mexican*" and "appeared with Reeb on Fox News, stating ... 'it was not a safe set' and asserting ... it was Baldwin's responsibility to ensure the set's safety." <u>Id.</u>, ¶ 119. "Reeb stated that a lab report ... confirmed that 'definitely the trigger was pulled'" and "made baseless assertions about Baldwin's mental state, including that 'Baldwin knows everything that goes on the set,' including concerns that others had brought to 'management.'" <u>Id.</u> "Reeb omitted that the lab report referred to" the FBI's testing that broke the gun "by hitting it repeatedly with a mallet." <u>Id.</u> Further, she did not mention the "'informal testing'" the FJDA conducted, "which demonstrated that a single action revolver can discharge without the trigger being pulled." <u>Id.</u>, ¶ 120.

During a January 19, 2023 interview with NBC News, Reeb stated Baldwin "'is somebody who committed a crime'" and Carmack-Altwies stated "'we know from the FBI report that he pulled the trigger.'" <u>Id.</u>, ¶ 121. That day, Bryan Carpenter, an expert witness retained by the State, "appeared on Fox News to vouch for the prosecution team as being 'unbiased' and having done an 'excellent job.'" <u>Id.</u>, ¶ 122. "The State later disclosed that Carpenter billed the State $800 for each day of such interviews." <u>Id.</u>

"On January 21, 2023, Reeb again appeared on Fox News, where she commented on the contents of the FBI report and Baldwin's prior statements, noting that 'all those statements' 'would be admissible' and would be 'used against' Baldwin." <u>Id.</u>, ¶123. "[I]n these national media appearances, Reeb and Carmack-Altwies repeatedly stated that Baldwin was facing many years in

prison." Id.[4]

### 2. Prosecutorial Conduct by District Attorney Carmack-Altwies and Special Prosecutor Reeb.

"On January 31, 2023, the State filed an Information charging Baldwin with two alternative felony counts of involuntary manslaughter" with the alternative count stating: "'This offense shall be enhanced pursuant to the firearm enhancement statute. . ..'" Id., ¶ 124. The probable cause statement faulted Baldwin, as an actor, for "'letting the armorer leave the church against protocol,' 'not dealing with safety complaints on the set, not making sure the protocol of safety meetings was occurring,' and 'not using a replica firearm for the unscheduled rehearsal' - without any objective basis to conclude that Baldwin had such authority." Id. It also asserted, that as a producer, "Baldwin 'was in a position to manage, oversee, commence, and require safety training to industry standards'" and alleged he "'allowed, through acts or omissions, the hiring of [an] inexperienced and unqualified Gutierrez-Reed," "failed to mitigate or establish more precautions to protect against Gutierrez-Reed's inexperience, or failed to demand the minimum safety standards, protocols, and requirements on set.'" Id., ¶ 125.

The State's expert, Bryan Carpenter, who had "no legal training, played an active role in developing the State's theory of prosecution, including by 'marking up'" the probable cause statement with his edits. Id. The State also announced the following charges against "the self-described 'last line of defense[,]'" First Assistant Director Dave Halls: "negligent use of a deadly weapon, a petty misdemeanor that carries a maximum sentence of six months in jail and a fine of up to $500." Id., ¶¶ 37, 127.

---

[4]    Paragraphs 291(a)-(i) of the Complaint assert largely the same allegations as those outlined in this section of the motion.

In February 2023, "Baldwin moved to disqualify Reeb as the Special Prosecutor because her dual service as a member of the Legislature and a Special Prosecutor violated the separation-of-powers provision of the New Mexico Constitution." Id., ¶ 128.  Baldwin also moved to dismiss the firearm enhancement, asserting it violated the U.S. Constitution's *ex post facto* clause. Id., ¶ 129. "The State eventually conceded to both motions."[5]  Id., ¶ 130.  "On March 15, 2023, [Rebb] withdrew as Special Prosecutor." Id., ¶ 135.  At this point "[s]he had won her election and had assumed elected office." Id.  "On March 29, 2023, Carmack-Altwies also withdrew, after a hearing at which the judge challenged Carmack-Altwies's ability to remain alongside *any* special prosecutor" because the relevant statute "allows for the appointment of a special prosecutor only when the 'district attorney  ... cannot prosecute a case for ethical reasons or other good cause.'" Id., ¶ 136 (emphasis in original).

**F.    The Second Prosecution Team, Led by Special Prosecutor Kari Morrissey.**

In March 2023, Carmack-Altwies appointed Kari Morrissey to lead the prosecutions arising from the shooting incident. Id., ¶ 137. After meeting with Baldwin's counsel in April 2023, "Morrissey agreed to dismiss the case without prejudice" acknowledging "the prior prosecution's 'producer theory' lacked merit[.]" Id., ¶ 138.

**1.    The Reports Issued by the State's Firearm Experts.**

Morrissey retained firearm experts Lucien Hagg and Michael Hagg (collectively "the Haggs")

---

[5]    "On February 16, 2023, Reeb emailed Baldwin's counsel demanding that he withdraw the *ex post facto* motion and threatened sanctions for its filing[,]" then sent another email stating "she hadn't actually evaluated this issue because she was too busy serving in the legislature," and "three hours after the first email," admitted "she '100 percent agree[d]' that charging the firearm enhancement violated the *ex post facto* clause ...." Id., ¶ 133. The State filed an Amended Information removing the firearm enhancement. Id.

to interpret the FBI's findings about the gun and conduct further analysis. Id., ¶ 139.  In August 2023, the Haggs issued three reports. Id.  The final report "undermined the State's case against Baldwin, [but] they kept him from knowing about it or seeing it until late Spring 2024." Id.  In their first and second reports, the Haggs respectively opined that "Baldwin pulled the trigger" and "the revolver 'functioned properly and as designed and intended by the manufacturer.'" Id., ¶¶ 140-141.  The purpose of the Haggs' "third report  was to identify the origin of 'unexplained toolmarks present on the working surface and sides of the evidence trigger/sear' and to determine whether they existed when the gun was on … set." Id., ¶ 142.  The report "concluded that it is 'unlikely … these toolmarks are the result of the damage incurred during the FBI's impact testing' and that they 'do not appear to be original manufacturing marks or use and abuse toolmarks. . ..'" Id.  The State promptly disclosed the Haggs' first report but failed to disclose the second and third reports "until months later, and months after Morrissey had obtained a grand jury indictment in which she had concealed the Third Hagg Report from the grand jury and presented it only with a select set of the Haggs' opinions." Id., ¶ 143.

### 2.    The Grand Jury Proceeding.

"On October 5, 2023, Morrissey told Baldwin she intended to present the case to the grand jury." Id., ¶ 144.  On October 24, 2023, Morrissey served Baldwin with a target letter "that omitted the standard 48-hour deadline for the target to provide a grand jury alert letter" "that identified the evidence about which the target believes the [prosecutor] has a duty to alert the grand jury." Id., ¶¶ 145-146.  Further, Morrissey rejected Baldwin's request to postpone the grand jury proceeding. See

id., ¶¶ 147-150.[6]  Moreover, "the State filed an expedited motion to shorten Baldwin's time to present exculpatory evidence[,]" falsely representing he had "continuous access to its investigative file since April 2023" and was "'aware of all possible directly exculpatory evidence'" even though the Haggs' third report had not been disclosed. Id., ¶ 152.  "The only plausible inference to be drawn from the State's approach ... is that [it] wanted to make it harder for Baldwin to alert the grand jury to relevant and exculpatory evidence." Id., ¶ 153. The State also requested "to conduct a one-sided voir dire of the grand jury" "to control ... the 'significant amount information ... being made available to prospective jurors' through the media." Id., ¶ 154. "The State's motion failed to acknowledge, however, is that the media environment surrounding the incident–particularly the coverage most prejudicial to Baldwin–was primarily the result of *the State's* unethical press campaign, which had begun with Carmack-Altwies and Reeb and had continued under Morrissey." Id., ¶ 154 (emphasis in original). The court denied both motions. Id., ¶ 155.

On November 14, 2023, 48 hours before the grand jury was set to begin, Baldwin submitted an alert letter, identifying six witnesses and dozens of documents "that would disprove the charges against Baldwin[.]" Id., ¶¶ 156-158(a)-(f).  The alert letter also requested the State provide a specific instruction to the grand jury regarding the criminal negligence standard. Id., ¶ 159.  The next day, the State filed an expedited motion to "'preclude' nearly all" the witnesses and documents, and the requested instruction identified in Baldwin's alert letter. Id., ¶ 160.  The court rescheduled the grand jury to January 18, 2024 to give itself time to review the parties' submissions. Id., ¶ 161.  At the hearing, the court "expressed deep concern" that the State's disclosure to the media of information

---

[6]     Unlike her treatment of Baldwin, Morrissey served a target letter on Gutierrez-Reed that included the 48-hour deadline, giving her "four days more than Baldwin to submit exculpatory material." Id., ¶ 151.

about the grand jury date and process "created a risk of prejudice." Id. The court "ordered the parties not to disclose information about the grand jury process or what happened during that day's hearing[,]" but the State violated the court's order "by disclosing details of the hearing to the press, including the new grand jury date...." See id., ¶¶ 161-162.  In response, Baldwin filed a motion for sanctions and contempt, prompting the State to violate the "Court's Order again by making improper disclosures about those filings." Id., ¶ 162. NBC News reported that "a source familiar with the case said the special prosecutors have had discussions in which they said they hope the trial will 'humble' Baldwin" and serve as a "'teachable moment[,]'" citing to his run-ins with paparazzi, public comments that were not about the case, and arrogance. Id., ¶¶ 163-164.

On January 11, 2024, the court ruled "that all six of Baldwin's proposed witnesses must be made available to the grand jury, as well as 20 out of the 21 documents the State had sought to exclude." Id., ¶ 166.  During the grand jury proceeding, Morrissey "knowingly: (1) elicit[ed] false[, incomplete] and contradictory testimony from the State's witnesses, (2) prevent[ed] the State's witnesses from saying anything favorable to Baldwin (often by cutting them off mid-sentence or redirecting them to a different topic), (3) prevent[ed] the grand jury from seeing or hearing from the exculpatory documents and witnesses that the Court had ordered her to make 'readily available' to the grand jury, and (4) conceal[ed]–from both Baldwin and the grand jury–exculpatory opinions by the State's own expert." Id., ¶ 167; see also id., ¶¶ 170-201 (providing specific instances of Morrissey's conduct during grand jury proceeding); id., ¶ 203 ("Morrissey intentionally misled" the grand jury to a finding of "probable cause that Alec Baldwin committed the crime of involuntary manslaughter[.]").  Of the seven witnesses the State presented to the grand jury, "three were paid to testify," two were sheriff's officers, and one was suing Baldwin for money. Id., ¶ 168. Only one

witness–the one suing Baldwin–was on set when the incident occurred. <u>Id.</u>

"On January 19, 2024, the grand jury returned an indictment." <u>Id.</u>, ¶ 202. "The grand jury did not receive the favorable or exculpatory testimony and documents that Morrissey had an obligation to present. Nor was the grand jury told it had the right to review and the obligation to request this information." <u>Id.</u>

### 3.    The State's Discovery Disclosure Obligations.

The State intentionally failed to comply with its expert witness and other discovery disclosure obligations in the months leading up to the trial that was set for July 9, 2024. <u>Id.</u>, ¶¶ 204-206.

> It delayed its disclosure of important evidence for weeks and months after receiving it, or failed to disclose it at all. It failed and refused to respond to inquiries from Baldwin's attorneys about evidence and the State's disclosure obligations. ...[T]he State lied to Baldwin and to the Court to cover up what it was doing. ... Defendants' conduct was the result of a calculated and malicious plan by the State to obtain a conviction through illicit means.

<u>Id.</u>, ¶ 206; <u>see also</u> <u>id.</u>, ¶¶ 207-210, 218 (specifying Morrissey's failure to timely disclose experts' opinions and communications that were favorable to Baldwin's defense); <u>id.</u>, ¶¶ 211, 219 (stating that, after deadline for witness disclosures passed, Morrissey disclosed dozens of interviews conducted by the State's investigator over the prior year, including the interview of a camera operator that was favorable to Baldwin); <u>id.</u>, ¶ 212 (despite repeated requests, Baldwin had to wait months before the State disclosed text messages from witnesses that were favorable to his defense); <u>id.</u>, ¶ 213 (stating the State waited until May 2024 to disclose dozens of previously undisclosed lapel videos from the SFSO); <u>id.</u>, ¶ 14 (stating "[t]he State engaged in haphazard and careless disclosure methods, such as uploading materials to a shared drive without notifying Baldwin, what, when, or where new materials were being uploaded."); <u>id.</u>, ¶ 216 (stating Morrissey terminated defense

counsel's interview of an expert based on an "arbitrary two-hour limit."); id., ¶¶ 216-221(providing additional instances of the State's or Morrissey's failure and refusal to accurately respond to defense counsel's inquiries about evidence and the State's disclosure obligations).

On June 27, 2024, Baldwin's counsel separately emailed Morrissey's colleague, Erlinda Johnson ("Johnson"), who is not a Defendant in this case, to demand Brady or Giglio information or material. Id., ¶ 222. Between June 27-29, "the State disclosed over *1,100 pages* of documents that it had been withholding for months and, in many cases, for more than a year." Id., ¶ 224 (emphasis in original). "Johnson expressly conceded that these communications were required to be disclosed." Id. The State had violated its disclosure obligations under Rule 5-501 NMRA and the Court's Scheduling Order. Id., ¶ 225; see also id., ¶ 226 (stating the trial court subsequently recognized that the State had continually made late disclosures despite Morrissey having filed a Certificate of Compliance maintaining she had produced to defense counsel "all materials and documents in her possession" enumerated in Rule 5-501).

### 4.    The Criminal Trial.

"Morrissey made clear she intended to argue that Baldwin was criminally liable for Hutchins' death because he was a producer of the film, even though she had previously dismissed that theory as lacking merit." Id., ¶ 228; see also id., ¶¶ 138, 229-231. At the hearing on motions in limine, the court ruled that the State would be barred "from referencing Baldwin's status as a producer" at trial which was set to begin on July 10, 2024. Id., ¶¶ 227, 232. This "left Morrissey's case hanging by a thread." Id., ¶ 233. To prove the State's case, Morrissey therefore sought to establish that "Gutierrez-Reed was the source of the live ammunition," and that, because of her "age and supposed inexperience," "Baldwin was ... aware of the risk that she might bring live ammunition to the set."

Id. "Evidence that tended to show Gutierrez-Reed was not the source of the live ammunition ...
would have undermined Morrissey's key basis for linking Baldwin to Hutchins' death." Id., ¶ 234.
"When that evidence emerged, Morrissey decided to bury it." Id., ¶ 235; see also id., ¶ 253.

"By at least November 1, 2021, the State was aware a man named Troy Teske ["Teske"] ...
had a cache of ammunition that could have been the source of the live round that ultimately made
its way to [the movie set]." Id., ¶ 236. Teske delivered the rounds to the sheriff's office on March
6, 2024, including "rounds that matched the live round that killed Hutchins[.]" Id., ¶¶ 239-240. The
rounds "were not inventoried in the *Rust* case." Id., ¶ 241. Instead, after a discussion between SFSO
personnel and Morrissey, the parties jointly and deliberately decided to log the ammunition under
a separate case number. Id., ¶¶ 241-242. The State never disclosed or provided this ammunition or
the related supplemental report, "recounting the importance and details of this evidence," to the
defense. Id., ¶ 243. "The State's primary justification for withholding the evidence–that there was
no indication it matched the live ammunition on set, or that it was unclear whether it was really tied
to *Rust*–was belied not only by the physical evidence itself but by the SFSO's own report." Id., ¶ 244;
see also id., ¶¶ 247, 249 (quoting portions of the SFSO report).

"Morrissey knowingly elicited false testimony from [SFSO Crime Scene Technician Marissa
Poppell ("CST Poppell")] that the rounds did not match those from the [movie] set." Id., ¶ 245; see
also id., ¶ 19 (identifying Defendant Marissa Poppell's employer and position). CST Poppell's false
testimony was rebutted the following day by the testimony of SFSO Corporal Alexandria Hancock.
Id., ¶ 246; see also id., ¶ 18 (identifying Defendant Alexandria Hancock's employer and position).
"The State's cover up crumbled at trial." Id., ¶ 247. "The State knew that the rounds matched–the
three matching rounds were the first ones logged into the hidden [SFSO] report. . .." Id., ¶ 247; see

also id., ¶ 248 (stating CST Poppel admitted as much the next day in response to questioning by the court); id., ¶ 249 (stating SFSO report "made clear" that ammunition Teske turned in was from the same as the batch of the ammunition that killed Hutchins). Nonetheless, the State and Morrissey still tried to justify, "minimize and sanitize" their actions by providing various inconsistent explanations for logging the ammunition Teske provided under a separate case number. See id., ¶¶ 250-252. After testimony from SFSO personnel and Morrissey herself, the court concluded: "'The State's willful withholding of this information was intentional and deliberate. If this conduct does not rise to the level of bad faith, it certainly comes so near to bad faith as to show signs of *scorching prejudice*.'" Id., ¶ 254 (emphasis in original). The court also concluded that, "'given the State's egregious discovery violations constituting misconduct and the false testimony elicited during trial, dismissal with prejudice is the appropriate remedy.'" Id.

## STANDARD OF REVIEW

Motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure test the "legal sufficiency of the allegations contained within the four corners of the complaint." Jojola v. Chavez, 55 F.3d 488, 494 (10th Cir. 1995) (citation omitted). The court's objective in reviewing a motion to dismiss "is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint *alone* is legally sufficient to state a claim for which relief may be granted." Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009) (internal quotation marks and citation omitted, emphasis added). As the United States Supreme Court has phrased it, a complaint must contain sufficient factual allegations to show that the plaintiff has a plausible, not merely possible, claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Determining whether a complaint states a plausible, as opposed to merely possible, claim for relief, is "a context-specific

task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 663. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'-'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

As a rule, when a court reviews a motion to dismiss, it must accept all well-pleaded factual allegations as true, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006). A court is under no mandate to accept a plaintiff's conclusory allegations or legal conclusions couched as factual allegations. See Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991); Papasan v. Allain, 478 U.S. 265, 286 (1986).

## LEGAL ARGUMENT

Based on the foregoing allegations, Baldwin asserts several causes of action, including a claim for defamation *per se*[7] against Carmack-Altwies and Reeb. See Compl., ¶¶ 289-295 (Fifth Claim for Relief). Baldwin does not specify whether his defamation claim is being asserted under federal or state law. See id.; see also id., p. 1 (caption). This motion presumes it is brought under state law. Moreover, the Complaint does not specify whether it is being asserted against Carmack-Atlwies and Reeb in their individual or official capacities, or both. This motion presumes the claim

---

[7]    Baldwin alleges that Carmack-Altwies and Reeb's statements to the media constitute defamation *per se* or, alternatively, defamation *per quod*. These alternate theories are irrelevant to this motion. "Defamation classified as 'per se' historically has been actionable without proof of harm, as injury is presumed based on the nature of the communication[,]" while "[d]efamation classified as 'per quod' ... is not defamatory on its face, and therefore extrinsic facts must be shown to prove its defamatory nature before recovery is allowed." Smith v. Durden, 2012-NMSC-010, ¶ 9, 276 P.3d 943 (citation omitted); see also id., ¶¶ 20, ¶ 22 (explaining that New Mexico no longer allows presumed damages in defamation cases).

is being asserted against Carmack-Altwies and Reeb in both their individual and official capacities. Based on these assumptions and accepting the Complaint's well-pleaded allegations as true for purposes of this motion, Carmack-Altwies and Reeb are immune from Plaintiff's defamation claim because they were acting within the scope of their duties and there is no applicable waiver of immunity under the New Mexico Tort Claims Act ("NMTCA").

## I.    The New Mexico Tort Claims Act.

In New Mexico, the "potential tort liability of governmental entities and public employees is limited by the [NMTCA]." Archibeque v. Moya, 1993-NMSC-079, ¶ 5, 116 N.M. 616 (citation omitted).  The NMTCA is the "exclusive remedy" for any alleged tort against a governmental entity and its public employees. See NMSA 1978, §§ 41-4-2(A), 41-4-4(A), 41-4-17. Governmental entities and public employees acting within their "scope of duty are granted immunity from liability for any tort except as waived by ... Sections 41-4-5 through 41-4-12." NMSA 1978, § 41-4-4(A).[8] A waiver of immunity under the NMTCA may not be implied, but must be specifically found within one of the Act's exceptions. See Hydro Conduit Corp. v. Kemble, 1990-NMSC-061, ¶ 17, 110 N.M. 173; Ward v. Presbyterian Healthcare Servs., 72 F. Supp.2d 1285, 1292 (D.N.M. 1999) ("With the adoption of the NMTCA, New Mexico's appellate courts concluded that a cause of action does not exist against the State or governmental entity unless immunity has been specifically waived."). Thus, the NMTCA shields governmental entities and public employees from tort liability unless immunity is specifically waived by the Act. See Archibeque, 1993-NMSC-079, ¶ 5; see also

---

[8]    "'[P]ublic employee' means an officer, employee or servant of a governmental entity ... including: (1) elected or appointed officials; [and] ...(3) persons acting on behalf of in service of a governmental entity in any official capacity, whether with or without compensation[.]" NMSA 1978, §41-4-3(F).  Clearly, Carmack-Altwies as the elected district attorney and Reeb, the appointed special prosecutor, fit within the definition of a public employee. See Compl., ¶¶ 15-16.

Rutherford v. Chaves Cnty., 2003-NMSC-010, ¶ 11, 133 N.M. 756 ("Statutory provisions purporting to waive governmental immunity are strictly construed.") (citation omitted).

As discussed in turn below, Carmack-Altwies and Reeb are immune from Baldwin's defamation claim because they were acting within the scope of their duties when they made statements to the media about him and there is no applicable waiver of immunity for defamation.

## II.    For Purposes of the NMTCA, Carmack-Altwies and Reeb Acted Within the Scope of Their Duties When They Made Statements to the Media Arising from or Related to the Prosecution of Plaintiff.

Baldwin claims Carmack-Altwies' and Reeb's statements to the media "were made beyond the scope of their statutory authority and prosecutorial function and outside of any judicial forum." Compl., ¶ 294. However, relevant authorities support the conclusion that Carmack-Altwies' and Reeb's statements to the media were within the scope of their duties for purposes of the NMTCA.

"Scope of duty" is defined as "performing any duties that a public employee is requested, required or authorized to perform by the governmental entity, regardless of the time and place of performance." Id. § 41–4–3(G). The statutory scope of duties standard established by the NMTCA is far broader than the common-law scope of employment test and covers many more types of actions than does the latter test. See Celaya v. Hall, 2004-NMSC-005, ¶¶ 22-25, 135 N.M. 115; Risk Management Div. v. McBrayer, 2000-NMCA-104, ¶ 2, 129 N.M. 778 (acknowledging that "the phrase 'scope of duties' in the [NM]TCA differs from the common law term 'scope of employment.'"), cert. denied 130 N.M. 17; Garcia v. Martinez, 414 F. Supp. 3d 1348, 1358 (D.N.M. 2019) ("The NMTCA standard is much broader than the traditional 'scope of employment' standard.") (citing cases and footnote omitted).  Courts look to whether "there is 'a connection between the public employee's actions at the time of the incident and the duties the public employee

was requested, required or authorized to perform.'" Seeds v. Lucero, 2005-NMCA-067, ¶ 10, 137

N.M. 589 (quoting Celaya, 2004-NMSC-005, ¶ 26).  Actions may be related or incidental to an

employee's duties even if they are tortious, malicious, or criminal. See Celaya, 2004-NMSC-005,

¶ 25 ("[T]he [NM]TCA clearly contemplates including employees who abuse their officially

authorized duties, even to the extent of some tortious and criminal activity"); Seeds, 2005-NMCA-

067, ¶ 10 ("Our case law establishes that a public employee may be within the scope of authorized

*duty* even if the employee's acts are fraudulent, intentionally malicious, or even criminal") (emphasis

in original); Bolduc v. Bd. of Cnty. Commissioners of Luna Cnty., No. CIV 09-371 BB/WPL, 2010

WL 11626628, at *2 (D.N.M. Jan. 4, 2010) ("If a government employee performs an act that in any

way arises from duties he is requested, required, or authorized to perform, it does not matter if he

performs that act out of malice, or tortiously, or in a criminal manner; the [NM]TCA will still afford

him immunity for that act, provided none of the waivers of immunity found in the [NM]TCA

apply.").[9]

Specifically with regard to prosecutors, the New Mexico Constitution states that each district

attorney is "the law officer of the state and of the counties within his district, ... and shall perform

such duties ... as may be prescribed by law." N.M. Const. art. VI, § 24. State statute sets forth the

duties of district attorneys, stating, in part, that they shall "prosecute and defend for the state in all

courts of record of the counties of his district all cases, criminal and civil, in which the state or any

---

[9]    See also, e.g., Seeds, 2005-NMCA-067, ¶ 13 (holding that city officials "utilizing the machinery of city government" against private individuals for personal motives would be covered by the NMTCA); Vigil v. State Auditor's Office, 2005-NMCA-096, ¶ 14, 138 N.M. 63 (holding that the a state auditor conducting audits in violation of statute, and making false audits, would be covered by the NMTCA); Henning v. Rounds, 2007-NMCA-139, ¶¶ 6-23, 142 N.M. 803 (holding that a principal's allegedly false and misleading comments and evaluations of a teacher were actions committed within the scope of duty).

county in his district may be a party or may be interested." NMSA 1978, § 36-1-18(A)(1).  Further,

"[e]ach district attorney may, when he cannot prosecute a case for ethical reasons or other good

cause, appoint a practicing member of the bar of this state to act as special assistant district attorney.

Any person so appointed shall have authority to act only in the specific case or matter for which the

appointment was made." NMSA 1978, §36-1-23.2; see also State v. Surratt, 2016-NMSC-004, ¶ 30,

363 P.3d 1204 (concluding that the duly appointed special prosecutor stepped into the shoes of

elected district attorney "for all matters relating to the prosecution of this specific case."); State v.

Cherryhomes, 1996-NMSC-072, ¶ 6, 122 N.M. 687 (holding that strict compliance with appointment

and oath provisions of statute governing appointment of special prosecutors is not required.).

Moreover, the New Mexico Rules of Professional Conduct, adopted by the Supreme Court of the

State of New Mexico, also contemplate that prosecutors will give statements to the media regarding

their cases. See Rule 16-308(F) SCRA (stating, in part, that "[t]he prosecutor in a criminal case

shall[,]" "except for statements that are necessary to inform the public of the nature and extent of the

prosecutor's action and that serve a legitimate law enforcement purpose, refrain from making

extrajudicial comments that are false or create a clear and present danger of prejudicing a criminal

proceeding[.]"), preempted on other grounds by United States v. Supreme Court of New Mexico,

824 F.3d 263 (10th Cir. 2016); see also Rule 16-306 SCRA ("A lawyer shall not make any

extrajudicial or out-of-forum statement in a proceeding that may be tried to a jury that the lawyer

knows or reasonably should know: (1) is false; or (2) creates a clear and present danger of

prejudicing the proceeding.); see also State v. Robinson, 2008-NMCA-036, ¶ 18, 143 N.M. 646

("The Code of Professional Conduct recognizes that prosecutors are unique among attorneys in our

adversarial system and contains a provision describing the special responsibilities of a prosecutor.").

Of specific relevance here is the New Mexico Supreme Court's decision in <u>Candelaria v.</u> <u>Robinson</u>, 1980-NMCA-003, 93 N.M. 786. <u>Candelaria</u> involved a suit for defamation by a sheriff's office employee against a special assistant district attorney and the district attorney. 1980-NMCA-003, ¶¶1-4, 17-18. The complaint alleged, in part, that the district attorney made *unspecified* comments at a press conference, defaming plaintiff. <u>Id.</u>, ¶ 4 (emphasis added). With regard to the district attorney's press conference, the court stated: "[t]o the extent [the district attorney's] press conference informed the public of action taken within the scope of the district attorney's duties, [the district attorney] was immune from liability for alleged defamation at the press conference." <u>Id.</u>, ¶ 29. The court proceeded to conclude that it could not analyze whether immunity under the NMTCA applied to the district attorney's statements at the press conference because the complaint did not specify what was said or the context of the alleged defamatory remarks. <u>Id.</u>, ¶ 30.

Here, the Complaint alleges that Carmack-Altwies and Reeb made statements to the media about the shooting incident, the subsequent investigation, the prosecution of Baldwin, and his criminal culpability that were unethical, false, and improperly motivated. <u>See</u>, <u>e.g.</u>, Compl., ¶¶ 1, 4, 107-121, 123, 130-132, 134, 291-292. Carmack-Altwies' and Reeb's alleged wrongful motives are irrelevant as long as there is a connection between their statements to the media and the duties a prosecutor is requested, required or authorized to perform. <u>See</u> <u>Celaya</u>, 2004-NMSC-005, ¶ 26 (internal quotation marks and citation omitted). Given that their statements to the media were all related to the shooting incident, the subsequent investigation, the prosecution of Baldwin, and his criminal culpability, Carmack-Altwies' and Reeb's actions were within the scope of their duties as prosecutors or, at a minimum, incidental to the discharge of their duties as prosecutors. <u>See</u> N.M. Const. Art. VI, § 24, <u>supra</u>; NMSA 1978, § 36-1-18(a)(1), <u>supra</u>; NMSA 1978, § 36-1-23.2, <u>supra</u>;

Rule 16-308(F) SCRA; see also Candelaria, 1980-NMCA-003, ¶ 22 (the district attorney's statutory duty to prosecute criminal cases includes the duty to investigate to determine whether a criminal charge should be filed [.]").  Notably, Baldwin's Complaint acknowledged that making statements to the media is within a prosecutor's scope of duty. See Compl., ¶ 107 ("Carmack-Altwies and Reeb, like all prosecutors in New Mexico, are bound by ethical rules in ... publicly commenting on criminal cases.").  For the foregoing reasons, the Court must find that Carmack-Altwies and Reeb acted within the scope of their duties and are therefore entitled to immunity under the NMTCA unless a specific waiver applies. As set forth below, there is no applicable waiver of immunity for Baldwin's defamation claim against these prosecutors.

### III.    There Is No Applicable Waiver of Immunity under the NMTCA for the Alleged Defamation Committed by the Prosecutors in this Case.

Because they were acting within the scope of their duty, Carmack-Altwies and Reeb are immune from liability for defamation unless the NMTCA provides a specific waiver of immunity for this cause of action. NMSA 1978, § 41-4-4(A); see also Pemberton v. Cordova, 1987-NMCA-020, ¶ 6, 105 N.M. 476 ("If no specific waiver of immunity can be found in the [NMTCA], plaintiffs' complaint must be dismissed as to the governmental defendant.") (citation omitted). The only waiver of immunity for defamation can be found in § 41-4-12 of the NMTCA. This section waives immunity:

> for personal injury, bodily injury, wrongful death or property damage resulting from ... defamation of character ... when caused by law enforcement officers while acting within the scope of their duties. For purposes of this section, "law enforcement officer" means a public officer or employee vested by law with the power to maintain order, to make arrests for crime or to detain persons suspected of or convicted of committing a crime, whether that duty extends to all crimes or is limited to specific crimes.

NMSA 1978, §41-4-12;[10] see also Scarbrough v. Alvarez, No. Civ. 98-0141 JC/RLP, slip op. at *5

(D.N.M. Sept. 25, 1998) [Doc. 19] (stating "the only waiver in the NMTCA for a defamation claim

applies to claims against a 'law enforcement officer[.]'").

The plain language of the NMTCA quoted above and caselaw construing the Act demonstrate

that prosecutors are *not* "law enforcement officers" for purposes of Section 41-4-12. To determine

if an individual is a "law enforcement officer" for purposes of the NMTCA, "simply requires that

the defendants' principal duties, those duties to which they devote a majority of their time, be of a

law enforcement nature." Weinstein v. City of Santa Fe, 1996-NMSC-021, ¶ 12, 121 N.M. 646

(citing Anchondo v. Corrections Dept., 1983-NMSC-051, ¶ 8, 100 N.M. 108). This requires a

"review of the employee's day-to-day duties, responsibilities, and activities" which are then

compared to "the duties and actives performed by law enforcement officers." Coyazo v. State, 1995-

NMCA-056, ¶ 13,120 N.M. 47. New Mexico courts construe the definition of a law enforcement

officer strictly. See Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-633 JB/DJS, 2008 WL

5992269, at *4 (D.N.M. Oct. 17, 2008).

In Coyazo, for example, the plaintiff brought a false imprisonment claim against the district

attorney who was alleged to have "maliciously and knowingly offer[ed] a plea bargain which

included more habitual offender time than allowed under the applicable statutes. Id. at ¶ 6. The

Court of Appeals stated that the comparison to be drawn is "between the primary activities of the

---

[10]    See also NMSA 1978, § 41-4-3(D) (stating that for purposes of the NMTCA, "'law enforcement officer' means a full-time salaried public employee of a governmental entity, or a certified part-time salaried police officer employed by a governmental entity, whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes, or members of the national guard when called to active duty by the governor[.]").

public employee in question and the normal commonplace activities of, for example, a police officer on patrol ...." Id. at ¶ 18.  Following this reasoning, the Court of Appeals held that the district attorney and staff were not law enforcement officers for purposes of NMTCA because they are not "engaged in the same activities as the officer on patrol when involved in the judicial phase of the criminal process." Id. at ¶ 19; see also Reynolds v. Bd. of County Comm'ers of the County of Otero, et al., CIV No. 00-168 LFG/RLP, 2001 WL 37125324 at *4 (D.N.M. Jan. 16, 2000) (recognizing that a prosecutor "is not a law enforcement officer for whom immunity has been waived" under the NMTCA); Griffin v. City of Artesia, No. CV 23-215 GJF/JHR, 2023 WL 8530157, at *5 (D.N.M. Dec. 8, 2023) (dismissing plaintiff's NMTCA claims with prejudice, in part, because state employees such as the district attorney is not a law enforcement officer.); Rowley v. Eighth Jud. Dist. Attorney's Off., No. CIV. 98-1154 SC/LFG, 1999 WL 35809401, at *13 (D.N.M. Aug. 13, 1999) (acknowledging that "district attorneys have been held in New Mexico caselaw not to be law enforcement officers under various factual scenarios[.]") (citations omitted).

Here, the Complaint makes no allegations about Carmack-Altwies' or Reeb's primary duties, and instead focuses on their acts in relation to Baldwin's prosecution.  However, even construing the Complaint in Baldwin's favor, there is no factual basis from which this Court can conclude that Carmack-Altwies' or Reeb's primary duties were "to maintain order, to make arrests for crime or to detain persons suspected of or convicted of committing a crime." See NMSA, §41-4-12.  Thus, Carmack-Altwies or Reeb cannot be considered law enforcement officers under the NMTCA. Because the waiver immunity for defamation set forth in § 41-4-12 does not apply these prosecutors, Carmack-Altwies and Reeb are immune, in their individual and official capacities, from Baldwin's defamation claim.

## CONCLUSION

The NMTCA applies to Baldwin's defamation claim because Carmack-Altwies and Reeb were public employees acting within the scope of their duties. However, there was no applicable waiver of immunity for Baldwin's defamation claim because prosecutors are not law enforcement officers as defined in § 41-4-12.

**WHEREFORE,** Defendants, Mary Carmack-Altwies and Andrea Reeb, respectfully request that this Court grant their Motion to Dismiss No. I, dismiss Baldwin's defamation claim (Fifth Claim for Relief) with prejudice against them in their individual and official capacities, and grant all other relief this Court deems just and proper.

Respectfully submitted,

**ROBLES, RAEL & ANAYA, P.C.**


By:   /s/ Luis Robles
Luis Robles
*Attorney for State Defendants*
500 Marquette Ave., NW, Suite 700
Albuquerque, New Mexico 87102
(505) 242-2228
(505) 242-1106 (facsimile)
luis@roblesrael.com

I hereby certify that the foregoing was
electronically filed through the CM/ECF
on this 28th day of October 2025, which will
cause service to the following:

Lukas Nikas
Alex Spiro
Quinn Emanuel Urquhart & Sullivan, LLP
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
lukenikas@quinnemanuel.com
alexspiro@quinnemanuel.com

Robert M. Schwartz
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
robertschwartz@quinnemanuel.com

Sara Clark
Quinn Emanuel Urquhart & Sullivan, LLP
700 Louisiana St., Ste. 3900
Houston, TX 77002
(713) 221-7000
saraclark@quinnemanuel.com

Heather M. LeBlanc
LeBlanc Law LLC
823 Gold Ave. SW
Albuquerque, NM 87102
(505) 331-7222
heather@leblanclawnm.law

*Attorneys for Plaintiff*


 /s/ Luis Robles
Luis Robles