IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**Alexander R. Baldwin III,**

       Plaintiff,

vs.                                                                              Case No. CIV-25-01052 KWR/KK

**Kari T. Morrissey, Mary Carmack-Altwies,
Andrea Reeb, Jennifer Padgett Macias, The First
Judicial District Attorney's Office, Alexandria
Hancock, Marissa Poppell, Brian Brandle, and
Santa Fe County Board of County
Commissioners,**

       Defendants.

**DEFENDANTS KARI MORRISSEY AND THE FIRST JUDICIAL DISTRICT
ATTORNEY'S OFFICE'S MOTION TO DISMISS NO. III: PLAINTIFF'S § 1983 AND
NEW MEXICO CIVIL RIGHTS ACT CLAIMS ON THE BASIS OF ABSOLUTE
PROSECUTORIAL IMMUNITY FOR MORRISSEY'S ACTIONS WHICH WERE
TAKEN IN HER ROLE AS AN ADVOCATE AND RELATED TO THE INITIATION
AND PURSUIT OF THE CRIMINAL CHARGES AGAINST PLAINTIFF**

       Defendants, Kari T. Morrissey and The First Judicial District Attorney's Office, through their

attorney Robles, Rael & Anaya, P.C. (Luis Robles), state the following for their Motion to Dismiss

No. III: Plaintiff's § 1983 and New Mexico Civil Rights Act Claims on the Basis of Absolute

Prosecutorial Immunity for Morrissey's Actions Which Were Taken in Her Role as an Advocate and

Related to the Initiation and Pursuit of the Criminal Charges Against Plaintiff ("Motion to Dismiss

No. III):[1]

---

[1]     The undersigned counsel did not seek concurrence from Plaintiff's counsel as they
are not required to seek concurrence on this dispositive motion.

**INTRODUCTION**

This case arises from the criminal prosecution of Plaintiff Alexander R. Baldwin III ("Baldwin") for the October 2021 shooting death of cinematographer Halyna Hutchins ("Hutchins") during the rehearsal of a shootout scene on a movie set outside Santa Fe, New Mexico. The gun Baldwin was holding for this scene was supposed to be loaded with dummy rounds. However, a live round discharged from Baldwin's gun and struck Hutchins, traveling through her body, exiting, and then striking writer-director Joel Souza ("Souza") in the shoulder. Hutchins died from her injuries.

Subsequently, First Judicial District Attorney Mary Carmack-Altwies ("Carmack-Altwies") appointed attorney Andrea Reeb ("Reeb") to serve as a special prosecutor to assist with the various prosecutions resulting from the shooting incident. Both Carmack-Altwies and Reeb later withdrew from the cases. Carmack-Altwies then appointed attorney Kari Morrissey ("Morrissey") as a special prosecutor to lead the various prosecutions.

In the instant civil case wherein he seeks monetary damages, Baldwin alleges that Morrissey engaged in misconduct during the underlying criminal prosecution when she: (1) made statements to the media; (2) had involvement in law enforcement's investigation of the shooting incident; and (3) took action related to the initiation and pursuit of the criminal charges against Baldwin. The Complaint includes numerous factual allegations about Morrissey's conduct that are false, incomplete or misleading. However, as required by Federal Rule of Civil Procedure 12(b)(6), Morrissey must accept the Complaint's allegations as true for purposes of this motion only. Examples of the Complaint's false, incomplete or misleading allegations include the following: Morrissey hired firearms experts but allegedly did not disclose all their reports. She then presented the case to a grand jury in an allegedly misleading and incomplete manner. Consequently, the grand

jury indicted Baldwin on the crime of involuntary manslaughter. The Complaint further alleges that Morrissey failed to comply with the State's disclosure obligations and the trial court's scheduling order. During the criminal trial, the judge dismissed the case with prejudice against Baldwin, in part, because of the State's alleged disclosure violations.

Based on the foregoing allegations, Baldwin asserted claims under 42 U.S.C. § 1983 and the New Mexico Civil Rights Act ("NMCRA"), NMSA 1978, § 41-4A-1, *et seq.*, against Morrissey and the First Judicial District Attorney's Office ("FJDA"), respectively, for Morrissey's actions. This motion does *not* seek the dismissal of Baldwin's §1983 and NMCRA claims to the extent they are based on Morrissey's statements to the media or her involvement with law enforcement's investigation of the shooting. Instead, this motion only seeks the dismissal of Baldwin's §1983 and NMCRA claims that are based on Morrissey's actions related to the initiation and pursuit of the criminal charges against Baldwin. In these instances, Morrissey was acting as advocate for the State and performing duties intimately associated with the judicial process and is thus entitled to absolute prosecutorial immunity for such actions.

## STATEMENT OF FACTS AND STANDARD OF REVIEW

As allowed by D.N.M.LR-Civ. 7.1(a), Morrissey and the FJDA hereby incorporate by reference the Statement of Facts and Standard of Review set forth in *Defendants Mary Carmack-Altwies and Andrea Reeb's Motion to Dismiss No. I: Plaintiff's Defamation Claim for Failure to State a Claim*, pp. 2-17 (filed October 28, 2025) [Doc. No. 7], as though fully set forth herein.

## LEGAL ARGUMENT

Baldwin asserts the following causes of action that are relevant to this motion: (1) conspiracy to cause malicious prosecution and deprivation of civil rights pursuant to 42 U.S.C. § 1983 against

all Defendants, which includes Morrissey, and (2) violation of N.M. Const. art. II, §§ 4, 18, 19 against the FJDA under the NMCRA, in part, for Morrissey's conduct. See Complaint, ¶¶ 256-269 and 296-310 (First and Sixth Claims for Relief) [Doc. No. 1-1] ("Compl."). Morrissey is entitled to absolute immunity for her conduct taken in her role as an advocate and related to the initiation and pursuit of the criminal prosecution against Baldwin. Thus, Baldwin's § 1983 and NMCRA claims against Morrissey and the FJDA, respectively, should be dismissed with prejudice to this extent.

## I.    ABSOLUTE PROSECUTORIAL IMMUNITY SHIELDS SPECIAL PROSECUTOR KARI MORRISSEY FROM LIABILITY FOR § 1983 DAMAGES FOR INITIATING AND PROSECUTING THE STATE CRIMINAL ACTION AGAINST BALDWIN.

"[A] prosecutor enjoys absolute immunity from § 1983 suits for damages when he acts within the scope of his prosecutorial duties." Imbler v. Pachtman, 424 U.S. 409, 420 (1976). "Absolute prosecutorial immunity attaches only to those activities 'intimately associated with the judicial phase of the criminal process.'" England v. Henricks, 880 F.2d 281, 285 (10th Cir. 1989) (quoting Imbler, 424 U.S. at 430). "[A]bsolute immunity may not apply when a prosecutor ... is instead engaged in other tasks ... [like] investigative or administrative tasks." Van de Kamp v. Goldstein, 555 U.S. 335, 342 (2009). However, "absolute immunity may attach even to ... administrative or investigative activities when these functions are necessary so that a prosecutor may fulfill his function as an officer of the court." Mink v. Slithers, 482 F.3d 1244, 1261 (10th Cir. 2007) (internal quotation marks and citation omitted). "To determine whether a prosecutor is entitled to absolute ... immunity, the determinative factor is advocacy because that is the prosecutor's main function." Hinton v. Dennis, 362 F. App'x 904, 907 (10th Cir. 2010)  (internal quotation marks and citation omitted).

Determining whether to grant a prosecutor absolute immunity requires courts to take a functional approach, "focus[ing] on the conduct for which immunity is claimed, not on the harm that

the conduct may have caused or the question of whether it was lawful." Buckley v. Fitzsimmons, 509 U.S. 259, 271 (1993).  These activities generally involve "actions that cast [the prosecutor] in the role of an advocate initiating and presenting the government's case." Mink, 482 F.3d at 1261; see also Buckley, 509 U.S. at 273 ("[A]cts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity.").

As the Tenth Circuit has "summarized, 'Prosecutors are entitled to absolute immunity for their decisions to prosecute, their investigatory or evidence-gathering actions, their evaluation of evidence, their determination of whether probable cause exists, and their determination of what information to show the court.'" Chilcoat v. San Juan Cnty., 41 F.4th 1196, 1209 (10th Cir. 2022) (quoting Nielander v. Bd. of Cnty. Comm'rs, 582 F.3d 1155, 1164 (10th Cir. 2009)).  Therefore, a prosecutor has absolute immunity for "the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made." Buckley, 509 U.S. at 273. The scope of prosecutorial immunity is broad. See Hammond v. Bales, 843 F.2d 1320, 1321 (10th Cir. 1988) ("Since Imbler, courts have broadly defined the scope of a prosecutor's absolute immunity.").

It is also significant that prosecutorial immunity does not turn on the impropriety of a prosecutor's acts, but only whether such acts are part of the prosecutor's role as an advocate. See id., 509 U.S. at 271.  For example, in Imbler, a prosecutor was accused of conspiracy, knowingly using false testimony, and suppressing material evidence in initiating and pursuing a criminal prosecution against the plaintiff and in presenting the state's case. 424 U.S. at 416.

> The gravamen of [the plaintiff's] complaint against [the prosecutor] was that he had "with intent, and on other occasions with negligence" allowed [a witness] to give false testimony as found by the District Court, and that the fingerprint expert's suppression of evidence was "chargeable under federal law" to [the prosecutor]. In addition [the plaintiff] claimed that [the prosecutor] had prosecuted him with knowledge of a lie detector test that had "cleared" [the plaintiff], and that [the prosecutor] had used at trial a police artist's sketch of [the victim's] killer made shortly after the crime and allegedly altered to resemble [the plaintiff] more closely after the investigation had focused upon him.

Id. Even with these factual allegations that the prosecutor engaged in misconduct, the Court in

Imbler concluded that the plaintiff's claims were barred by absolute immunity because the

prosecutor's "activities were intimately associated with the judicial phase of the criminal process."

Id. at 430; see also Cleavinger v. Saxner, 474 U.S. 193, 199-200 (1985) ("Such immunity applies

however erroneous the act may have been, and however injurious in its consequences it may have

proved to the plaintiff.") (citation omitted); Burns v. Reed, 500 U.S. 478, 485 (1991) (absolute

immunity extends to a prosecutor's "knowing use of false testimony before the grand jury and at

trial.") (citation omitted); Martinez v. Winner, 771 F.2d 424, 437 (10th Cir. 1985) (holding that

prosecutors were immune, despite "grossly improper" conduct, which included a "meeting between

the judge and prosecutors to discuss the government's strategy."), modified in part, 778 F.2d 553,

cert. granted, 475 U.S. 1138 (1986) (vacating and remanding on other grounds).[2]

---

[2]    See also Burns, 500 U.S. at 489–90 ("prosecutors and other lawyers were absolutely immune from damages liability at common law for making false or defamatory statements in judicial proceedings (at least so long as the statements were related to the proceeding), and also for eliciting false and defamatory testimony from witnesses.") (citations omitted); Rowe v. City of Ft. Lauderdale, 279 F.3d 1271, 1279-80 (11th Cir. 2002) ("even if prosecutor knowingly proffered perjured testimony and fabricated exhibits at trial, he is entitled to absolute immunity from liability for doing so.).

Moreover, under a functional approach, a prosecutor's motives for acting are irrelevant to a determination of whether his actions are entitled to prosecutorial immunity. See Lerwill v. Joslin, 712 F.2d 435, 441 (10th Cir. 1983) (holding prosecutor is entitled to absolute immunity even though the court recognized that the prosecutor "rather than mistakenly citing the wrong statute in prosecuting the Lerwills, might have intentionally or even maliciously done so in order to harm them."). "[S]ince absolute immunity spares the official any scrutiny of his motives, an allegation that an act was done pursuant to a conspiracy has no greater effect than an allegation that it was done in bad faith or with malice, neither of which defeats a claim of absolute immunity." Dorman v. Higgins, 821 F.2d 133, 139 (2nd Cir. 1987); see also Miller v. Glanz, 948 F.2d 1562, 1570 (10th Cir. 1991) (a prosecutor's absolute immunity extends to "conspiracies to present false testimony.").

Pursuant to § 1983, Baldwin alleges that "Defendants conspired to procure a groundless indictment against Baldwin and to maliciously bring about or advance Baldwin's trial and conviction[.]" Compl., ¶ 257. Regardless of the alleged impropriety of her conduct or her underlying motivation(s), Morrissey's actions taken in her role as an advocate and related to her initial dismissal of the charges against Baldwin without prejudice, retention of firearms experts, discovery disclosure violations, conduct in preparation for and during the grand jury proceeding, and conduct in preparation for and during the trial are all protected by absolute prosecutorial immunity. Morrissey's actions within each of these categories is addressed in turn below.

## A.    As a Preliminary Matter, Morrissey's Alleged Motive(s) for Prosecuting Baldwin Are Irrelevant to the Absolute Immunity Inquiry.

In March 2023, Carmack-Altwies appointed Morrissey as a special prosecutor to lead the prosecutions arising from the shooting incident on the movie set. Compl., ¶ 137.  Carmack-Altwies

allegedly appointed Morrissey "with the understanding that she would advance Baldwin's malicious prosecution ... ." Id., ¶ 258(e).  Morrissey allegedly "wanted to teach Baldwin 'a lesson' because she deemed him to be an 'arrogant prick.'" Id., ¶ 4; see also id., ¶¶ 163-164 (alleging that "special prosecutors have ... said they hope the trial will 'humble' Baldwin" and serve as a "'teachable moment'" and that they were "targeting Baldwin because they think he's 'arrogant.'"); see id., ¶ 260 (alleging that Defendants, including Morrissey, were driven by ill motives and to accomplish illegitimate ends, including to harass or 'humble' Baldwin, ... or to further their own personal agendas or professional ambitions.").  However, Morrissey's motives are irrelevant to this Court's prosecutorial immunity analysis.  Even assuming for purposes of this motion only that Morrissey maliciously prosecuted Baldwin with the intent to harm him, this is still irrelevant to the absolute immunity inquiry before the Court. See Lerwill, 712 F.2d at 441 (holding absolute immunity applied even though the prosecutor "intentionally or even maliciously" prosecuted the plaintiffs "in order to harm them."). Therefore, Morrissey's alleged motivations need not be addressed further.

**B.    Morrissey's Initial Dismissal of the Charges Against Baldwin is Protected by Prosecutorial Immunity Because the Dismissal of Cases Are at the Very Heart of a Prosecutor's Function as an Advocate for the State.**

After meeting with Baldwin's counsel in April 2023, Morrissey "agreed to dismiss the case without prejudice," allegedly acknowledging "the prior prosecution's 'producer theory' lacked merit[.]" Compl., ¶ 138.  It is clearly established that such action does not subject a prosecutor to liability for monetary damages under § 1983.  "[A] prosecutor's decision as to when to dismiss charges is entitled to absolute prosecutorial immunity because it is 'intimately associated with the judicial phase of the criminal process.'" Joseph v. Yocum, 53 F. App'x 1, 3 (10th Cir. 2002) (quoting Imbler, 424 U.S. at 430 and citing Brodnicki v. City of Omaha, 75 F.3d 1261, 1268 (8th

Cir.1996) ("The decisions relating to the ... dismissal of cases are at the very heart of a prosecutor's function as an advocate for the state, and absolute immunity thus attaches to those decisions.")). Therefore, Morrissey is absolutely immune for her initial decision to dismiss the case against Baldwin.

<strong>C.    Prosecutorial Immunity Applies to Morrissey's Decision to Retain Firearms Experts, Lucien Hagg and Michael Hagg, and Her Alleged Failure to Disclose All Their Reports to the Defense.</strong>

The Complaint alleges that, shortly after dismissing the charges without prejudice in April 2023, Morrissey retained firearm experts Lucien Hagg and Michael Hagg (collectively "the Haggs") to interpret the FBI's findings about the gun[3] and conduct further analysis. Compl., ¶ 139.  In August 2023, the Haggs issued three (3) reports. Id.  In their first and second reports, the Haggs respectively opined that "Baldwin pulled the trigger" and "the revolver 'functioned properly and as designed and intended by the manufacturer.'" Id., ¶¶ 140-141.  The Haggs' third report concluded that it was unlikely that toolmarks on the gun were the result of the damage incurred during the FBI's impact testing did not appear to be original manufacturing marks or use and abuse toolmarks Id., ¶ 142.  The State promptly disclosed the Haggs' first report but allegedly failed to disclose the second and third reports "until months later, and months after Morrissey had obtained a grand jury indictment." Id., ¶ 143; see also id., ¶ 139 (alleging the State kept the third report from Baldwin until late Spring 2024.).

_____

[3]    The FBI's forensic examiner "found signs of modification of the gun's internal components", including that "the hammer had been rounded such that the sear would no longer stay lodged in the full-cock notch, and other notches ... also appear[ed] reduced in depth when compared to intact parts." Id., ¶ 94; see also id., ¶ 92.

By the time she retained the Haggs, Morrissey had probable cause to believe that Baldwin had committed one or more criminal offenses based on the shooting incident and was thus acting as an advocate for the State. See Buckley, 509 U.S. at 274 ("A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested."). "Probable cause exists when facts and circumstances within the officers' knowledge are adequate to warrant a person of reasonable caution to believe that an offense has been or is being committed." State v. Goss, 1991-NMCA-003, ¶ 17, 111 N.M. 530.   "[T]he existence of probable cause is reviewed within the realm of probabilities rather than in the realm of certainty." State v. Henz, 2022-NMCA-031, ¶ 8, 514 P.3d 1(internal quotation marks and citation omitted).

Here, it is undisputed that, at a minimum, Baldwin was holding the gun in the direction of Hutchins and cocked it when it discharged a live round, fatally injuring Hutchins and striking Souza in the shoulder. See Compl., ¶¶ 53-56, 62, 67.  It is also undisputed that  Baldwin did not check the gun himself before aiming it in the direction of Hutchins and cocking it. See id., ¶¶ 47-51, 69 (indicating that others inspected the gun, but Baldwin did not).   Baldwin did not personally check the gun even though he was familiar with guns, having received gun training throughout his career and again after he arrived on this movie set. See id., ¶¶ 42-43.  This alone is sufficient to establish probable cause that Baldwin committed one or more crimes, including involuntary manslaughter or negligent use of a deadly weapon. See, e.g., NMSA 1978, § 30-2-3(B) (involuntary manslaughter); NMSA 1978, § 30-7-4 (A) (negligent use of a deadly weapon).[4]

---

[4]    See, e.g., NMSA 1978, § 30-2-3(B) ("Involuntary manslaughter consists of manslaughter committed ... in the commission of a lawful act which might produce death ... without due caution and circumspection."); NMSA 1978, § 30-7-4 (A) ("Negligent use of a deadly weapon
(continued...)

Probable cause is not negated in this case by Baldwin's assertion that it was not his job to check the gun for live ammunition. See Young, 2021-NMCA-049, ¶ 28 (concluding that a reasonable jury could convict the defendant of negligent use of a firearm even though he was friends with the victim and claimed he did not know the gun was loaded when he pulled the trigger because he had previously observed his roommate eject the bullet from the chamber and remove the magazine); see also Goss, 1991-NMCA-003 at ¶ 17 ("Where the evidence is conflicting it is for the trial court to resolve disputed factual issues.") (citation omitted).  Finally, it is notable that "[p]rosecutors are entitled to absolute immunity for ... their determination of whether probable cause exists." Chilcoat, 41 F.4th at 1209 (internal quotation marks and citation omitted).

Because Morrissey had probable cause to believe Baldwin had committed a criminal offense, her decision to retain the Haggs to assess the FBI's findings and conduct further analysis is protected by prosecutorial immunity because this action is tantamount to analyzing the evidence and preparing to present evidence during a judicial proceeding. See Chilcoat, 41 F.4th at 1209 ("'Prosecutors are entitled to absolute immunity for their decisions to prosecute, their investigatory or evidence-gathering actions, their evaluation of evidence, their determination of whether probable cause exists, and their determination of what information to show the court.'") (citation omitted);

---

[4](...continued)

consists of: (1) discharging a firearm into any building ... or so as to knowingly endanger a person ...; [or] ... (3) endangering the safety of another by handling or using a firearm or other deadly weapon in a negligent manner[.]"); State v. Young, 2021-NMCA-049, ¶¶ 15 and 20, 495 P.3d 1189 ("Criminal negligence exists where the defendant acts with willful disregard of the rights or safety of others and in a manner which endangers any person or property," and the same *mens rea* is required for involuntary manslaughter and negligent use of a firearm.) (internal quotation marks and citation omitted); UJI 14-231 NMRA (defining "criminal negligence" for purposes of involuntary manslaughter as existing where the defendant (1) was aware of the danger or risk his actions posed to the victim, and (2) acted with willful disregard for the safety of the victim).

see also Buckley, 509 U.S. at 273 (stating absolute prosecutorial immunity extends to "acts undertaken ... in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of [the prosecutor's] role as an advocate for the State."); Ireland v. Tunis, 113 F.3d 1435, 1447 (6th Cir.1997) ("Absolute prosecutorial immunity will likewise attach to administrative or investigative acts necessary for a prosecutor to initiate or maintain the criminal prosecution.").

Likewise, Morrissey's alleged failure to timely disclose the Haggs' second and third reports, while arguably improper, is within the exercise of prosecutorial discretion that is intimately associated with the judicial process. See Imbler, 424 U.S. at 431 n. 34 (the "deliberate withholding of exculpatory information" is included within the "exercise of prosecutorial discretion"); see also Robinson v. Volkswagenwerk AG, 940 F.2d 1369, 1373 n. 4 (10th Cir.1991) ("Whether the claim involves withholding evidence, failing to correct a misconception or instructing a witness to testify evasively, absolute immunity from civil damages is the rule for prosecutors.").[5]  Further, "[t]rial court discovery orders [do] not displace Imbler immunity." Reid, 56 F.3d at 337.  Based on the foregoing, Morrissey is entitled to prosecutorial immunity for her decision to retain the Haggs as experts and her alleged failure to timely disclose the Haggs second and third reports, even though the third report was allegedly exculpatory and even though the reports were arguably subject to the trial court's discovery orders.

_____

[5]        "[U]nder Imbler it is now [a] well-settled rule that a prosecutor cannot be held personally liable for the knowing suppression of exculpatory information." Reid v. State of N.H., 56 F.3d 332, 336–37 (1st Cir. 1995)(internal quotation marks and citations omitted). "The Imbler rule has been applied where prosecutors failed to disclose exculpatory evidence specifically requested by the defense, ... and where prosecutors misled the trial court in order to conceal their failure to disclose exculpatory evidence[.]" Id. (citations omitted).

**D.    Prosecutorial Immunity Applies to Morrissey's Decision to Present the Case to the Grand Jury, Her Preparation for the Grand Jury Proceeding, and Conduct During the Grand Jury Proceeding, Including the Selection of the Testimony and Evidence to Be Presented to the Grand Jurors, Because All Such Actions Are Intimately Associated with the Judicial Phase of the Criminal Process.**

"On October 5, 2023, Morrissey told Baldwin she intended to present the case to the grand jury." Compl., ¶ 144.  On October 24, 2023, Morrissey served Baldwin with a target letter that allegedly "omitted the standard 48-hour deadline for the target to provide a grand jury alert letter," identifying evidence of which the target believes the prosecutor has a duty to alert the grand jury. Id., ¶¶ 145-146.  Further, Morrissey rejected Baldwin's request to postpone the grand jury proceeding. See id., ¶¶ 147-150.[6]  Instead, "the State filed an expedited motion to shorten Baldwin's time to present exculpatory evidence[,]" allegedly misrepresenting to the court that Baldwin had "continuous access to its investigative file since April 2023" and was "'aware of all possible directly exculpatory evidence'" even though the Haggs' third report had not been disclosed. Id., ¶ 152.  The State allegedly "wanted to make it harder for Baldwin to alert the grand jury to relevant and exculpatory evidence." Id., ¶ 153. The State also requested "to conduct a one-sided voir dire of the grand jury." Id., ¶ 154. The court denied both motions. Id., ¶ 155.

On November 14, 2023, Baldwin submitted an alert letter, identifying six witnesses and dozens of documents "that would disprove the charges against Baldwin[.]" Id., ¶¶ 156-158(a)-(f). The alert letter also requested the State provide a specific instruction to the grand jury regarding the criminal negligence standard. Id., ¶ 159.  The next day, the State filed an expedited motion to

---

[6]    Unlike her treatment of Baldwin, Morrissey purportedly served a target letter on Gutierrez-Reed that included the 48-hour deadline, giving her "four days more than Baldwin to submit exculpatory material." Id., ¶ 151.

"'preclude' nearly all" the witnesses and documents, and the requested instruction identified in Baldwin's alert letter. <u>Id.</u>, ¶ 160. On January 11, 2024, the court ruled "that all six of Baldwin's proposed witnesses must be made available to the grand jury, as well as 20 out of the 21 documents the State had sought to exclude." <u>Id.</u>, ¶ 166.

The Complaint alleges that, during the grand jury proceeding, Morrissey "knowingly: (1) elicit[ed] false[, incomplete] and contradictory testimony from the State's witnesses, (2) prevent[ed] the State's witnesses from saying anything favorable to Baldwin (often by cutting them off mid-sentence or redirecting them to a different topic), (3) prevent[ed] the grand jury from seeing or hearing from the exculpatory documents and witnesses that the Court had ordered her to make 'readily available' to the grand jury, and (4) conceal[ed]–from both Baldwin and the grand jury–exculpatory opinions by the State's own expert." <u>Id.</u>, ¶ 167; <u>see also id.</u>, ¶¶ 168, 170-203 (alleging specific instances of Morrissey's misconduct during the grand jury proceeding and claiming she intentionally misled the grand jury). "On January 19, 2024, the grand jury returned an indictment," finding probable cause that Baldwin committed the crime of involuntary manslaughter. <u>Id.</u>, ¶¶ 202-203.

Morrissey's decision to initiate a prosecution against Baldwin by presenting the case to the grand jury is clearly protected by prosecutorial immunity. <u>See</u> <u>Imbler</u>, 424 U.S. at 431 (holding that a prosecutor is immune for "initiating a prosecution and in presenting the State's case."); <u>Norton v. Liddel</u>, 620 F.2d 1375, 1379 (10th Cir. 1980) (stating it is clear that plaintiffs "have no right to civil redress" against a prosecutor "in connection with his initiation of criminal charges against plaintiffs" even though the prosecutor's "actions may have been undertaken maliciously, intentionally, and in bad faith [.]"). Likewise, Morrissey is protected for the actions she took in preparation for the grand

jury proceeding, including filing motions, appearing before the court at motions hearing(s), and deciding what witnesses to call and what evidence to present during the grand jury proceeding as they involve her role as an advocate for the State. See Burns, 500 U.S. at 490 (stating that prosecutorial immunity extends to "any hearing before a tribunal which performed a judicial function."); see also id. at 491 ("The prosecutor's actions at issue here–appearing before a judge and presenting evidence in support of a motion for a search warrant–clearly involve the prosecutor's role as advocate for the State[.]") (internal quotation marks and citation omitted); Imbler, 424 U.S. at 431 n.33 (prosecutorial immunity also extends to "questions of ... which witnesses to call, and what other evidence to present."); Buckley, 509 U.S. at 273 (a prosecutor has absolute immunity for "the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation ... before a grand jury after a decision to seek an indictment has been made.").

Prosecutorial immunity applies even though the Complaint makes inflammatory allegations that Morrissey knowingly elicited false, incomplete and contradictory testimony from the State's witnesses, prevented the State's witnesses from saying anything favorable to Baldwin, prevented the grand jury from seeing or hearing from the exculpatory documents and witnesses that the Court had ordered her to make 'readily available' to the grand jury, and concealed–from both Baldwin and the grand jury–exculpatory opinions by the State's own expert. See Imbler, 424 U.S. at 416, 430 (concluding that absolute immunity applied to a prosecutor who was accused of conspiracy, knowingly using false testimony, and suppressing material evidence in initiating and pursuing a criminal prosecution against the plaintiff and in presenting the state's case because his actions "were intimately associated with the judicial phase of the criminal process."); see also Miller v. Spiers, 434 F. Supp.2d 1064, 1067-1068 (D.N.M. 2006) (holding that prosecutor's request that grand jury

consider suspect as a target for indictment, refusal to present exculpatory evidence to grand jury, and refusal to allow witnesses to testify who could establish an alibi for Defendant were all actions that were entitled to absolute immunity); Sheridan v. Dickens, No. 18-CV-780 JCH-SMV, 2020 WL 3412472, at *2 (D.N.M. June 22, 2020) (concluding prosecutor was entitled to absolute immunity for refusal to allow target to present evidence to the grand jury); Turner v. Delaney, No. 10-2533-JWL, 2015 WL 4066637, at *7 (D. Kan. July 2, 2015) (stating prosecutor "is entitled to absolute immunity for his decisions about what questions to ask witnesses testifying before the grand jury.") (citation omitted); Fields v. Wharrie, 740 F.3d 1107, 1115 (7th Cir. 2014) (stating that a prosecutor would be entitled to absolute immunity if, in the course of a judicial proceeding, the prosecutor urged a witness to lie because such conduct would be intimately associated with the judicial phase of the criminal process).

Finally, Morrissey does not lose prosecutorial immunity even though the Complaint alleges that some of her actions violated the trial judge's order that the State make certain testimony and documents requested by Baldwin available to the grand jury. See Reid, 56 F.3d at 337 (stating that "[t]rial court discovery orders [do] not displace Imbler immunity."); Lerwill, 712 F.2d at 438 ("Prosecutorial immunity applies to a determination by a prosecutor that a witness need not appear to testify, even if that advice is wrong."); Goings v. Sumner Cnty. Dist. Attorney's Off., No. 13-1107-RDR, 2013 WL 6440267, at *4 (D. Kan. Dec. 9, 2013) ("Plaintiff's claim that [the prosecutor] advised subpoenaed [witnesses] not to appear at the hearings at which plaintiff attempted to compel their attendance is also barred by prosecutorial immunity."), aff'd and remanded in part, 571 F. App'x 634 (10th Cir. 2014). Therefore, under the great weight of the case law, it is clear that

Morrissey is entitled to prosecutorial immunity for all her actions related to the grand jury proceeding, except for her statements to the media about the forthcoming grand jury proceeding.[7]

### E. Morrissey Is Entitled to Absolute Immunity under Imbler for Her Alleged Role in Violating the State's Discovery Disclosure Obligations.

The Complaint alleges that the State intentionally failed to comply with its expert witness and other discovery disclosure obligations in the months leading up to the trial that was set for July 9, 2024. See Compl., ¶¶ 204-214, 216-221, 225-226.  Specifically, the Complaint alleges that Morrissey failed to disclose or timely disclose exculpatory information, ignored defense counsel's specific requests for information, failed to comply with the State's discovery disclosure obligations under New Mexico law and the trial court's scheduling order, and falsely certified to the trial court that the State had satisfied its disclosure obligations. See id. This alleged conduct occurred during the course of the underlying criminal proceeding, including during Morrissey's preparation for Baldwin's grand jury proceeding and criminal trial. See id.

As previously stated, absolute prosecutorial immunity extends to claims that a prosecutor willfully suppressed evidence. See Imbler, 424 U.S. at 431 n. 34; see also Robinson, 940 F.2d at 1372 n. 4 (it is a "well-settled rule that a prosecutor cannot be held personally liable for the knowing suppression of exculpatory information.") (internal quotation marks omitted); Goings, 2013 WL 6440267, at *3 (finding that absolute immunity applies to prosecutor's discovery decisions); U.S. ex rel. Price v. McFarland, 2004 WL 3171649 at * 7 (D.Kan.2004) (absolute immunity applies to allegations that prosecutor hindered plaintiffs' access to discovery in state court proceedings).  "The

---

[7]    In this motion, Morrissey does *not* seek prosecutorial immunity for the alleged statements she made to the media about the upcoming grand jury proceeding. Compl., ¶¶ 160-164.

Imbler rule has [even] been applied where prosecutors failed to disclose exculpatory evidence specifically requested by the defense " "and where prosecutors misled the trial court in order to conceal their failure to disclose exculpatory evidence." Reid, 56 F.3d at 336-37 (citations omitted). Absolute immunity is not displaced by a prosecutor's violation of the trial court discovery orders. Id. at 337. Similarly, a prosecutor's false certification to the court that he has complied with the state's disclosure obligations does not negate his entitlement to absolute immunity for discovery disclosure violations. See Robinson, 940 F.2d at 1373 n. 4 ("In this circuit, absolute immunity has been upheld even given allegations that a prosecutor allegedly lied and filed a false affidavit in the course of a criminal proceedings.") (citation omitted); Kamienski v. Ford, 844 F. App'x 520, 525 (3d Cir. 2021) (prosecutor entitled to absolute immunity for filing inaccurate briefs and making misleading statements at oral argument because his conduct was "intimately associated with the judicial phase of the criminal process while presenting the State's case[.]"). Finally, this "immunity is no less available if the prosecutor's discovery decisions are made pursuant to a standing policy, rather than on an individual basis." Goings, 2013 WL 6440267, at *3. Based on the foregoing, it is clear that prosecutorial immunity extends to Morrissey's discovery disclosure decisions in the underlying criminal proceeding – no matter how improper or maliciously motivated the Complaint alleges them to be – because such decision were made in her role as a prosecutor in preparation for and during the underlying criminal prosecution.

### F. Morrissey's Actions in Preparation for Baldwin's Criminal Trial and During the Trial Itself Are Protected by Prosecutorial Immunity as She Was Acting as an Advocate in Presenting the State's Case.

The Complaint alleges that "Morrissey ... intended to argue that Baldwin was criminally liable for Hutchins' death because he was a producer of the film, even though she had [allegedly]

previously dismissed that theory as lacking merit." Compl., ¶ 228; see also id., ¶¶ 138, 229-231. At the hearing on motions in limine, the court ruled that the State would be barred "from referencing Baldwin's status as a producer" at trial which was set to begin on July 10, 2024. Id., ¶¶ 227, 232. Thereafter, Morrissey sought to prove the State's case by establishing that the armorer, Gutierrez-Reed, was the source of the live ammunition and that, because of her "age and supposed inexperience," "Baldwin was ... aware of the risk that she might bring live ammunition to the set." Id., ¶ 233. "Evidence that tended to show Gutierrez-Reed was not the source of the live ammunition ... would have [allegedly] undermined Morrissey's key basis for linking Baldwin to Hutchins' death." Id., ¶ 234. The Complaint alleges that, when such evidence emerged, Morrissey decided to suppress it. Id., ¶ 235; see also id., ¶ 253.

According to the Complaint, a man named Troy Teske ("Teske") had rounds of ammunition that could have been the source of the live round that was in Baldwin's gun. Id., ¶ 236. Teske delivered the rounds to the Santa Fe County Sheriff's Office ("SFSO") on March 6, 2024, including "rounds that matched the live round that killed Hutchins[.]" Id., ¶¶ 239-240. The rounds "were not inventoried in the *Rust* case." Id., ¶ 241. Instead, after an alleged discussion between SFSO personnel and Morrissey, the parties jointly decided to log the ammunition under a separate case number. Id., ¶¶ 241-242. It is alleged that the State never disclosed this ammunition or the related supplemental report to the defense. Id., ¶ 243. "The State's primary justification for withholding the evidence–that there was no indication it matched the live ammunition on set, or that it was unclear whether it was really tied to *Rust*–was allegedly belied not only by the physical evidence itself but by the SFSO's own report." Id., ¶ 244; see also id., ¶¶ 247, 249 (quoting portions of the SFSO report).

The Complaint also alleges that, at trial, "Morrissey knowingly elicited false testimony from [SFSO Crime Scene Technician Marissa Poppell ("CST Poppell")] that the rounds did not match those from the [movie] set." Id., ¶ 245. CST Poppell's purportedly false testimony was rebutted the following day by the testimony of SFSO Corporal Alexandria Hancock. Id., ¶ 246. According to the Complaint, the State's alleged "cover up" fell apart at trial. Id., ¶ 247. Allegedly, "[t]he State knew that the rounds matched–the three matching rounds were the first ones logged into the hidden [SFSO] report ... ." Id., ¶ 247; see also id., ¶ 248 (claiming CST Poppel admitted as much the next day in response to questioning by the court); id., ¶ 249 (claiming the SFSO report "made clear" that the ammunition Teske turned in was from the same as the batch of ammunition that killed Hutchins). Nonetheless, the State and Morrissey allegedly still tried to justify, minimize, and sanitize their actions by providing various purportedly inconsistent explanations for logging the ammunition Teske provided under a separate case number. See id., ¶¶ 250-252. Morrissey called herself to the stand and gave allegedly perjurious testimony in an attempt to justify her actions. Id., ¶ 6; see also id., ¶¶ 251-252 (alleging Morrissey "offered increasingly inconsistent explanations for their failure to disclose the existence of the ammunition to Baldwin" and "further tried to minimize and sanitize the State's actions, attempting to justify the State's failure to allow the defense to view the ammunition[.]"). After testimony from SFSO personnel and Morrissey herself, the Complaint alleges that the court concluded: "'The State's willful withholding of this information was intentional and deliberate. If this conduct does not rise to the level of bad faith, it certainly comes so near to bad faith as to show signs of *scorching prejudice*.'" Id., ¶ 254 (emphasis in original). The court also allegedly concluded that, "'given the State's egregious discovery violations constituting

misconduct and the false testimony elicited during trial, dismissal with prejudice is the appropriate remedy.'" Id.

Based on the foregoing allegations, this motion does *not* seek prosecutorial immunity for Morrissey's agreement with the SFSO that Teske's ammunition should be logged under separate case number. See id., ¶¶ 241-242. This motion only seeks prosecutorial immunity for the Complaint's allegations that Morrissey's selection of the theory the State would pursue at trial, her failure to disclose Teske's ammunition and the related SFSO report to the defense, her conduct at trial, including eliciting false testimony from CST Poppell, providing the court various inconsistent explanations for logging the Teske's ammunition under a separate case number, and calling herself to the stand and giving perjurious testimony in an attempt to justify the State's failure to allow the defense to view the ammunition. It is beyond question that a prosecutor has absolute immunity for his role as an advocate in preparing for and representing the state in criminal trials. See Buckley, 509 U.S. at 273 ("[A]cts undertaken by a prosecutor in preparing ... for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity."). Therefore, Morrissey is absolutely immune for selecting or advancing theories that Baldwin claims lack merit. See generally Becker v. Kroll, 494 F.3d 904, 925 (10th Cir. 2007) ("This immunity applies even if the prosecutor files charges knowing he lacks probable cause."). As fully discussed in Section I(E) of this motion, absolute immunity also extends to Morrissey's alleged failure to disclose Teske's ammunition and the SFSO report to the defense in the months leading up to the trial. See Imbler, 424 U.S. at 431 n. 34.

With regard to Morrissey's conduct at trial wherein she allegedly elicited false testimony from CST Poppell, provided the court various inconsistent explanations for logging Teske's

ammunition under a separate case number, and took the stand and perjured herself as to why the ammunition was not made available to the defense, these actions were all taken in her role as an advocate in presenting the State's case.  The Tenth Circuit has explained that:

> "It is clear that a prosecutor's courtroom conduct falls on the advocacy side of the line," Mink, 482 F.3d at 1261, and a prosecutor's arguments in court are quintessential advocacy–whether at trial, Imbler, 424 U.S. at 424 [], or at a preliminary hearing, Burns, 500 U.S. at 487 [].

Chilcoat, 41 F.4th at 1210.

Moreover, the application of absolute immunity does not turn on the impropriety of Morrissey's alleged actions as long she was acting in her role as an advocate in presenting the State's case.  See Buckley, 509 U.S. at 271.  Here, Morrissey's alleged actions at trial are tantamount to presenting false evidence or concealing exculpatory evidence in the course of a criminal proceeding, both of which the United States Supreme Court has held are protected by absolute prosecutorial immunity.  See Imbler, 424 U.S. at 431 n. 34.  Therefore, Morrissey is entitled to absolute immunity for such conduct even though it was allegedly improper.  Prosecutorial immunity also extends to Morrissey's alleged inconsistent explanations to the court and her alleged perjurious testimony about why the State did not allow the defense to view the ammunition.  See Chilcoat, 41 F.4th at 1210 (a prosecutor's alleged misrepresentations to the court "were made as part of traditional courtroom advocacy" and therefore covered by "prosecutorial immunity even if the statements were false."); Robinson, 940 F.2d at 1373 n. 4 ("In this circuit, absolute immunity has been upheld even given allegations that a prosecutor allegedly lied and filed a false affidavit in the course of a criminal proceedings.") (citation omitted); Fortner v. United States, No. CIV 06CV02148 LTBBNB, 2008 WL 410385, at *2 (D. Colo. Feb. 12, 2008) ("Russell's alleged actions in making statements of the

facts to the Court, whether accurate or not, were within the scope of his duties as a prosecutor and advocate for the government.  Accordingly, his actions are protected by absolute immunity.").[8]

Finally, even accepting the Complaint's allegations as true for purposes of this motion only that, she conspired with the other Defendants to wrongfully continue the prosecution against Baldwin by failing to disclose Teske's ammunition and the SFSO report to the defense, eliciting false testimony from CST Poppell, and perjuring herself when she took the stand, Morrissey would nonetheless be entitled to absolute immunity because this immunity extends to conspiracies to suppress exculpatory evidence and present false testimony. See Miller, 948 F.2d at 1570 (a prosecutor's absolute immunity extends to "conspiracies to present false testimony."); Dorman, 821 F.2d at 139 ("[S]ince absolute immunity spares the official any scrutiny of his motives, an allegation that an act was done pursuant to a conspiracy has no greater effect than an allegation that it was done in bad faith or with malice, neither of which defeats a claim of absolute immunity.").  Therefore, Baldwin cannot pursue his § 1983 claims against Morrissey based on her conduct in preparation for trial or in representing the State during Baldwin's trial.

## II.    ABSOLUTE PROSECUTORIAL IMMUNITY APPLIES TO BALDWIN'S CLAIMS ASSERTED PURSUANT TO THE NEW MEXICO CIVIL RIGHTS ACT.

Baldwin's NMCRA claims are asserted against the FJDA for the alleged misconduct of the individual Defendants, including Morrissey. See Compl., ¶¶ 296-310 (Sixth Claim for Relief).  The

---

[8]    Alternatively, Morrissey's own testimony during Baldwin's criminal trial is protected by absolute witness immunity. See Briscoe v. LaHue, 460 U.S. 325, 329–36 (1983) (extending absolute § 1983 immunity to the function of serving as a witness); Rehberg v. Paulk, 566 U.S. 356, 367 (2012) ("[A] trial witness has absolute immunity with respect to any claim based on the witness' testimony."); Hughes v. Long, 242 F.3d 121, 125 (3d Cir. 2001) ("Witnesses, including public officials and private citizens, are immune from civil damages based upon their testimony.").

NMCRA provides, in relevant part, that a public body shall be held liable for the "deprivation of any rights, privileges or immunities secured pursuant to the bill of rights of the constitution of New Mexico" caused by "individuals acting on behalf of, under color of or within the course and scope of the authority of the public body." NMSA 1978, § 41-4A-3 (2021). Here, however, prosecutorial immunity relieves the FJDA from liability under the NMCRA for Morrissey's actions as a special prosecutor that were necessary to initiate or maintain the criminal prosecution against Baldwin.

Absolute prosecutorial immunity is not explicitly addressed in the NMCRA. See NMSA 1978, §41-4A-1, *et seq*. However, the NMCRA does preserve certain immunities. According to §41-4A-10, the prohibition on the use of the defense of qualified immunity and the waiver of sovereign immunity under the NMCRA "shall not abrogate judicial immunity, legislative immunity, or any other constitutional, statutory, or common law immunity." See NMSA 1978, §41-4A-10.

Absolute prosecutorial immunity is a common law immunity and also quasi-judicial immunity. The Supreme Court in Imbler recognized absolute immunity for prosecutors based on the common law tradition, which granted prosecutors immunity from common-law tort actions related to their prosecutorial functions. See Van de Kamp, 555 U.S. at 341-42 (citing Imbler, 424 U.S. at 417-426); see also Candelaria v. Robinson, 1980-NMCA-003, ¶ 7, 93 N.M. 786 (in a defamation suit brought against district attorney and assistant district attorney, the court acknowledged that the issue of absolute immunity for the prosecutors involved, in part, the concept of judicial immunity because the office of the district attorney is a quasi-judicial office.). Therefore, §41-4A-10 demonstrates that other forms of immunity, including prosecutorial immunity, are still viable defenses under the NMCRA. See Bolen v. NM Racing Comm'n, 2024-NMCA-056, ¶ 12, 553 P.3d 492 (concluding that, in "[r]eading Sections 41-4A-10, -2, and -3(C) together," "a public body

that is sued under the [NM]CRA may raise judicial immunity, as well as quasi-judicial immunity, as a defense."), <u>aff'd in relevant part</u>, No. S-1-SC-40427, WL 1553704, ¶¶ 24, 48 (N.M. June 2, 2025) (affirming that a public body may raise judicial immunity as a defense to NMCRA claims and acknowledging that "the same considerations underlying the immunity of judges–broadly, upholding the 'independence' and 'usefulness' of the office ...–also form the basis for immunity of ... prosecutors.") (citations omitted); <u>see also</u> <u>State ex rel. Ward v. Romero</u>, 1912-NMSC-011, ¶ 22, 17 N.M. 88 (stating that under the New Mexico Constitution, the district attorney is a part of the judicial system of the state and is a quasi judicial officer."); <u>Robertson v. New Mexico</u>, No. 2:25-CV-00077-KRS, 2025 WL 754126, at *3 (D.N.M. Mar. 10, 2025) (concluding that the plaintiff's claims under the NMCRA against state-court judges "are legally frivolous because, among other things, they are against persons (including judges) who enjoy absolute immunity from suits for damages.") (citing <u>Stump v. Sparkman</u>, 435 U.S. 349 (1978) (judges) and <u>Buckley</u>, 509 U.S. 259 (prosecutors for acts associated with judicial process)).  Further, prosecutorial immunity was so well established when the NMCRA was enacted that this Court should presume that the State legislature would have specifically so provided had it wished to abolish it, just as it did with qualified immunity. <u>See</u> <u>Pierson v. Ray</u>, 386 U.S. 547, 554–555 (1967) (Certain immunities were so well established in 1871, when § 1983 was enacted, that "we presume that Congress would have specifically so provided had it wished to abolish" them.).  Thus, it is evident that prosecutorial immunity is a viable defense against Baldwin's NMCRA claims.

The next question is whether Morrissey's alleged actions are protected by prosecutorial immunity under New Mexico law.  While State Defendants' research did not reveal a published decision specifically applying the doctrine of prosecutorial immunity to NMCRA claims, New

Mexico Courts have indicated that the functional approach applied to § 1983 claims should also be utilized for absolute immunity inquiries arising from State law claims.  For example, in determining whether a guardian ad litem was cloaked with quasi-judicial immunity for alleged malpractice in settling a child and parents' medical malpractice action, the New Mexico Supreme Court followed the lead of the United States Supreme Court and agreed that a functional approach "should be employed in answering the question[.]" Collins on Behalf of Collins v. Tabet, 1991-NMSC-013, ¶ 16, 111 N.M. 391, abrogated on other grounds by State v. Mares, 2024-NMSC-002, ¶ 16, 543 P.3d 1198.[9]  In Collins, the State Supreme Court also acknowledged that, "[i]n cases involving whether prosecutors may properly claim immunity for acts taken in the performance of their duties, courts are faced with issues of characterization not unlike that to be decided in determining whether [the guardian ad litem] is entitled to claim immunity in this case." Id., ¶ 41 (relying on Imbler and other federal case law.); see Bolen, 2025 WL 1443704, ¶ 41 (citing Collins and indicating that the function of the challenged conduct must be examined and immunity applies when it "is integral to a judicial or quasi-judicial proceeding."); Kimbrell v. Kimbrell, 2014-NMSC-027, ¶¶ 2, 13-14, 17, 331 P.3d 915 (holding that the guardian ad litem was entitled to immunity to the extent that her actions did not clearly fall outside of "the scope of [the district court's] appointment.").

In light of the above, the functional approach used to analyze Morrissey's assertion of prosecutorial immunity for Baldwin's § 1983 claims is equally applicable to his NMCRA claims against the FJDA and  leads to the same conclusions.  Baldwin's NMCRA claims against the FJDA

---

[9]     See Trujillo v. State, No. 30,840, 2011 WL 5040834, at *2 (N.M. Ct. App. Aug. 15, 2011) (unpublished opinion stating that "[i]n Collins ex rel. Collins v. Tabet, our Supreme Court discussed that ... prosecutorial ... functions require absolute immunity.") (citation omitted).

should therefore be dismissed to the extent they are based on Morrissey's actions in her role as an advocate and related to the initiation and pursuit of the criminal charges against Baldwin.

## CONCLUSION

The Court should grant State Defendants' Motion to Dismiss No. III because Morrissey's alleged actions that were taken in her role as an advocate and related to the initiation and pursuit of criminal charges against Baldwin are protected by absolute prosecutorial immunity.

**WHEREFORE,** State Defendants respectfully request that this Court:

A.     Grant their Motion to Dismiss No. III;

B.     Dismiss Plaintiff's §1983 and NMCRA claims with prejudice against Kari T. Morrissey and the First Judicial District Attorney's Office, respectively, on the grounds of absolute prosecutorial immunity for Morrissey's alleged conduct taken in her role as an advocate and related to her initial dismissal of the charges against Baldwin, retention of firearms experts, discovery disclosure violations, preparation for and representation of the State during the grand jury proceeding and trial; and

C.     Grant all other relief this Court deems just and proper.

Respectfully submitted,

**ROBLES, RAEL & ANAYA, P.C.**


By:     /s/ Luis Robles
Luis Robles
*Attorney for State Defendants*
500 Marquette Ave., NW, Suite 700
Albuquerque, New Mexico 87102
(505) 242-2228
(505) 242-1106 (facsimile)
luis@roblesrael.com

I hereby certify that the foregoing was
electronically filed through the CM/ECF
on this  29th  day of October 2025, to all
counsel of record.


 /s/ Luis Robles
Luis Robles