IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ALEXANDER R. BALDWIN, III,

     Plaintiff,

vs.                                              No. 1:25-CV-01052 KWR/LF

KARI T. MORRISSEY, MARY
CARMACK-ALTWIES, ANDREA REEB,
JENNIFER PADGETT MACIAS, THE
FIRST JUDICIAL DISTRICT
ATTORNEY'S OFFICE, ALEXANDRIA
HANCOCK, MARISSA POPPELL, BRIAN
BRANDLE, AND SANTA FE COUNTY
BOARD OF COUNTY COMMISSIONERS.

     Defendants.

## RESPONSE TO COUNTY DEFENDANTS'
## MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

Defendants Alexandria Hancock, Marissa Poppell, Brian Brandle, and the Santa Fe

County Board of County Commissioners (collectively, "County Defendants") have moved for

dismissal of Plaintiff Alexander Baldwin's federal civil-rights claims against them.  After staking

out a claim to absolute immunity against "any civil claims based on any grand jury and trial

testimony," Motion for Partial Judgment on the Pleadings at 3 (June 22, 2026) (Doc. 48)

[hereinafter Motion], they argue for qualified immunity from any federal claims that remain.

They maintain that qualified immunity protects them from Baldwin's malicious prosecution

claims under 42 U.S.C. § 1983 – the subject of Count I of the complaint – because, they say, the

prosecution was based on probable cause and they did nothing to "cause" it.  See Motion at 13–

22.  And they enjoy qualified immunity on the suppression-of-evidence claims in Count II, they

continue, because their efforts to secure a conviction against Baldwin collapsed when their concealment scheme was exposed at trial and the prosecution was dismissed.  See id. at 22–23.

Baldwin will concede the motion in one respect:  he agrees that local governing bodies such as Defendant Board of County Commissioners of Santa Fe County are not subject to respondeat superior liability, and that Counts I and II of his complaint contain no allegations suggesting that the constitutional violations at issue resulted from a county "policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the county commissioners]," or from a county "custom."  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690–91.  To the extent that Count I purports to state claims "[a]gainst [a]ll [d]efendants," it misspeaks.  Santa Fe County is therefore entitled to judgment on that count.  See Motion at 2–3.

In all other respects, however, the motion should be denied.  While it is certainly true that Hancock cannot be held civilly liable for perjuring herself – and while Poppell, too, is absolutely immune from liability for harm caused by her own testimony, just as Brandle is with respect to his – their bid for absolute immunity against "any civil claims based on any … testimony," Motion at 3, sweeps too broadly.  It would, for example, foreclose liability for pre-probable-cause plans to manufacture or disappear evidence, including by way of false testimony.

Regarding qualified immunity as to Count I, the argument that County Defendants could not have "caused" the prosecution without having "pressured or misled" the prosecutors, id. at 14, ignores a third alternative that Baldwin has adequately pled:  that County Defendants and the prosecutors agreed to suppress evidence tending to exonerate Baldwin.  And the notion that probable cause supported the prosecution – and that County Defendants' efforts to distort the evidence did nothing to "vitiate" that support, see id. at 15–17 – proceeds from the demonstrably faulty premise that criminal liability for involuntary manslaughter can rest on "'ordinary'

2

negligence," id. at 11.    Meanwhile, County Defendants' attack on Count II relies on pigeonholing the suppression of evidence as "a Brady claim," id. at 22–23, when it could as easily be classified as an act of malicious prosecution.  And finally, County Defendants' fallback contention on the subject of qualified immunity – that the unconstitutionality of their conduct was not "clearly established" when they acted, see 21–23 – disregards decades of well-settled law.  There is, in short, no basis for wholesale dismissal of Baldwin's federal civil-rights claims against County Defendants.  The claims should proceed to discovery.

## Argument

### I.    The Court should exercise caution in defining the scope of any absolute immunity.

County Defendants contend that they "are entitled to absolute immunity for any civil claims based on any grand jury and trial testimony, including any allegations that their testimony was part of a conspiracy with the State to conduct a malicious prosecution against Baldwin." Motion at 3.  But an all-encompassing decree of that sort would go too far.

The two kernels of truth contained in County Defendants' cursory discussion of absolute witness immunity, see id. at 8–9, are that Baldwin's complaint recounts their grand-jury and trial testimony in some detail, and that the Supreme Court has afforded comprehensive immunity to law-enforcement officers for the consequences of their testimony in various judicial proceedings. See Rehberg v. Paulk, 566 U.S. 356 (2012); Briscoe v. LaHue, 460 U.S. 325 (1983).  And in Rehberg, the Court cautioned that "this rule may not be circumvented by claiming that a grand jury witness conspired to present false testimony or by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution." 566 U.S. at 369.  Yet there is less to the Court's "any other § 1983 claim" language than may meet the eye.

3

In the first place, it does not necessarily protect the absolutely immune witness's co-conspirators. In the Supreme Court, Rehberg concerned the immunity of a single defendant, see 566 U.S. at 359–61, and what the Court specifically endorsed was the Eleventh Circuit's observation that that defendant "was entitled to absolute immunity, not only with respect to claims based on his grand jury testimony, but also with respect to the claim that he conspired to present such testimony," id. at 360–61; see id. at 369.[1] In other contexts, after all, collaborating with an absolutely immune state actor to deprive a person of his constitutional rights does not qualify the collaborator for a get-out-of-damages-free card. See, e.g., Dennis v. Sparks, 449 U.S. 24 (1980) (holding that private party could be held accountable for corrupt conspiracy with absolutely immune state-court judge, and rejecting arguments that private party's liability would erode judge's immunity). And the Tenth Circuit has expressly declared that "state and federal officers are liable under § 1983 when they conspire to procure groundless state indictments and charges against a citizen based upon fabricated evidence or false, distorted, perjurious testimony presented to official bodies in order to maliciously bring about a citizen's trial or conviction." Bledsoe v. Carreno, 53 F.4th 589, 609 (10th Cir. 2022) (internal quotation marks omitted; emphasis added); see, e.g., id. at 611–12 ("Bledsoe adequately alleged a conspiracy to frame Bledsoe for Camille's murder … [by] fabricat[ing] Tom's testimony against Bledsoe …."). Indeed, far from enveloping the Bledsoe defendants in the invincibility cloak of absolute immunity, the Tenth Circuit refused to accord them even qualified immunity against the

---

[1] To be sure, the Eleventh Circuit had gone further. See Rehberg v. Paulk, 611 F.3d 828, 841 (11th Cir. 2010) (extending immunity to co-conspirator). But after the Supreme Court's decision, even cases within the Eleventh Circuit limited Rehberg's reach to the facts considered by the High Court. See, e.g., Pombert v. Glock, Inc., 171 F. Supp. 3d 1321, 1333–34 (N.D. Ga. 2016) (noting that Rehberg "did not state that absolute immunity extends to every other actor in a conspiracy," and rejecting contention that defendants other than witness himself were "absolutely immune from civil liability for a conspiracy to falsify grand jury testimony").

4

conspiracy that the plaintiff alleged.  But see Miller v. Glanz, 948 F.2d 1562, 1570–72 (10th Cir. 1991) (granting absolute immunity to witnesses who allegedly conspired to testify falsely).

In the second place, the Supreme Court did not mean to suggest "that absolute immunity extends to all activity that a witness conducts outside of the grand jury room [or courtroom]." Rehberg, 566 U.S. at 370 n.1.  "For example, we have accorded only qualified immunity to law enforcement officials who … fabricate evidence concerning an unsolved crime …." Id.  Pre-indictment conspiracies to falsify evidence are equally actionable, even if they eventuate in – and are consummated by – false testimony at trial.  See, e.g., Buckley v. Fitzsimmons, 509 U.S. 259, 262–64, 272 (1993) (testimony by notoriously mendacious expert before grand jury and at trial); Bledsoe, 53 F.4th at 609.  That is because the Supreme Court's functional approach to absolute immunity "focuses on the conduct for which immunity is claimed, not the harm that the conduct may have caused."  Buckley, 509 U.S. at 271.  Conspiracies to fabricate evidence during the investigative phase of the criminal process fall outside the functions traditionally and properly performed by witnesses.

Contrary to County Defendants' contentions, see Motion at 18–21, Baldwin's complaint sufficiently alleges such a conspiracy.  It recounts Defendant Hancock's remark that prosecutors "were heavily involved in [County Defendants'] investigation 'from the beginning,' with investigative decisions being made 'collectively' by a 'team' that included prosecutors." Complaint ¶ 74 (Jan. 9, 2025) (Doc. 21-1).  It alleges that County Defendants "began to ignore critical evidence as to how live ammunition ended up on the set," because they were "[d]riven by the prosecutors' agenda."  Id. ¶ 78.  To substantiate that charge, the complaint offers specific examples of evidence-collection opportunities that Defendant Hancock deliberately bypassed, thereby allowing key evidence to be hidden or lost.  See id. ¶¶ 79–86.  It goes on to allege that

5

County Defendants' investigation of the condition of the prop gun on the day of Halyna Hutchins's death "was calculated to hide the facts and resulted in the intentional destruction of the gun," id. ¶ 87, and it provides abundant support for that accusation as well, see id. ¶¶ 88–97. And for good measure it describes a crucial piece of exculpatory evidence that came into County Defendants' hands four months before trial and that all of them – Hancock, Poppell, and Brandle – decided in consultation with the prosecutors to bury.  See id. ¶¶ 241–242.  These and other richly detailed allegations flesh out Baldwin's more general claims that County Defendants coordinated with prosecutors "to procure a groundless indictment against Baldwin and to maliciously bring about … Baldwin's conviction" by shaping their investigation to implicate Baldwin, by destroying or concealing evidence essential to his defense, and – in the case of Defendants Hancock and Poppell – by delivering perjurious testimony from the witness stand. See id. ¶¶ 257, 258(a)–(b), (f), (h); see id. ¶¶ 171, 172–176, 245–246 (describing testimony). They were more than adequate to state a malicious-prosecution claim against County Defendants under Section 1983.  See Bledsoe, 53 F.4th at 594–95, 600, 609–10 (claim that prosecutors and law-enforcement officers agreed to frame plaintiff for murder by "purposefully neglecting to search for evidence that would implicate [the actual killer]" and "suppressing evidence that would tend to exculpate [plaintiff]" "were sufficient to allege the existence of a conspiracy to violate [plaintiff's] constitutional rights" by maliciously prosecuting him).[2]

---

[2] Nor do the allegations of concerted action by County Defendants and the prosecutors lack "plausibility."  Motion at 6; see id. at 4–5, 21.  To the contrary, they exist "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007).  Beyond Defendant Hancock's admission that prosecutors and law-enforcement officers worked "collectively" as a "team" "from the beginning," Complaint ¶ 74 – and Baldwin's specific allegation that Defendants Hancock, Poppell, and Brandle met with the prosecutors to determine how to dispose of the material evidence brought to them by Troy Teske, see id. ¶¶ 241–242 – structural realities support Baldwin's claim that the two sets of defendants were collaborating

Finally, even if absolute witness immunity meant that a deprivation of constitutional rights accomplished or abetted by testimony before a grand jury or at trial could never be redressed, the Court should still hesitate to hold that Baldwin "may not use … testimonial allegations for his Section 1983 claims."  Motion at 9.  Quite apart from whether County Defendants' testimony could have caused compensable harm, it may have evidentiary value.  The prevarications of Defendants Hancock and Poppell under oath, for example, tend to show that their investigative activities were the product of malice aforethought rather than Keystone Cops bumbling.  And it was County Defendants' testimony at trial that exposed much of what we now know about the misconduct of Defendant Morrissey and of County Defendants themselves, and that ultimately persuaded Judge Sommer to throw the prosecution out of court.  See, e.g., Complaint ¶¶ 6–7, 246, 248, 252.  At a minimum, claims "based on trial testimony" in that sense, Motion at 9, should never be ruled out.

## II.    County Defendants are not entitled to qualified immunity with respect to Count I.

Count I of Baldwin's complaint charges County Defendants with a malicious prosecution and deprivation of civil rights under Section 1983.  To prove a Section 1983 malicious-prosecution claim in the Tenth Circuit, a plaintiff must show that "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the arrest, confinement, or prosecution; (4) the defendant acted maliciously; and (5) the plaintiff sustained damages."  Coones v. Bd. of Cnty.

---

against him.  Indeed, that alliance is baked into New Mexico law by statutes providing that "[i]t is the duty of every sheriff[ and] deputy sheriff[] … to cooperate with and assist the … district attorney or other prosecutor … in all reasonable ways," NMSA 1978, § 29-1-1 (1979), on pain of removal from office, see id. § 4-37-4(A)(3) (1975), at the behest of the district attorney herself, see id. § 10-4-1 (2018); id. § 10-4-17 (1909).  It was therefore entirely plausible for the detective in State v. Baroz, 2017-NMSC-030, 404 P.3d 769, to brag to the defendant that law-enforcement officers and prosecutors "work hand in hand and 95 percent of the time [the officers are] sitting there at the table when it goes to court," id. ¶ 39.

Comm'rs of Unified Gov't, 166 F.4th 1, 25 (10th Cir. 2026) (internal quotation marks omitted). County Defendants contest two of these elements – the first, that they "caused" Baldwin's prosecution, and the third, that probable cause for the prosecution was lacking. They are wrong in both respects.

> **A.      County Defendants "caused" Baldwin's prosecution by conspiring with the prosecutors.**

The gist of County Defendants' argument with respect to the causation prong of malicious prosecution is that the complaint fails to fulfill that element because, when a grand jury returns an indictment, a law-enforcement officer can be considered to have "caused" the prosecution in only one of two ways – by pressuring the prosecutor or duping her – and Baldwin alleges neither. See Motion at 14–15. But that argument represents an unduly cramped view of Tenth Circuit law. In both Shrum v. Cooke, 60 F.4th 1304 (10th Cir. 2023), and Taylor v. Meacham, 82 F.3d 1556 (10th Cir. 1996), cited in Motion at 13–14, indictments against the plaintiffs "broke the chain of causation" because the plaintiffs failed to specifically allege that the defendant law-enforcement officers had played any part in the malicious prosecutions; instead the officers stood accused of having effectuated wrongful arrests. See Shrum, 60 F.4th at 1312–13; Taylor, 82 F.3d at 1564. Baldwin, by contrast, has elaborately detailed the ways in which County Defendants acted in cahoots with the prosecutors to concoct a criminal case against him. See supra pp. 5–6. Those allegations easily suffice to state a claim against County Defendants for malicious prosecution under Section 1983. See, e.g., Bledsoe, 53 F.4th at 594–95, 600, 609–10.

Finding causation under such circumstances makes perfect sense. The common law – the starting point for the formulation of constitutional torts, see Pierce v. Gilchrist, 359 F.3d 1279, 1288 (10th Cir. 2004) – posits prosecutors who exercise "uncontrolled" discretion and

independent judgment in assessing information about potential criminal conduct. Restatement (Second) of Torts § 653 cmt. d (1977). Because the buck stops with the prosecutor, the prosecutor's charging decision ordinarily insulates informants from liability by severing the causal link between their conduct and the plaintiff's harm; in that situation, a subsequent grand-jury indictment is merely another nail in the causation coffin. But when an informant "procure[s]" charges by "inducing" the prosecutor to file them, id., the informant can reasonably be deemed a cause of the harm. And while political strong-arming and material misrepresentations are among the most common ways of "inducing" a prosecutor to act, they are hardly the only ones. A law-enforcement officer willing to facilitate the prosecutor's own illegitimate objectives by conspiring with her to fabricate or suppress evidence can prove equally persuasive. She cannot escape liability for malicious prosecution.

And in a federal civil-rights case, as in most cases, "[c]ausation is generally a question of fact for the jury." Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 778 (10th Cir. 2013). Determining whether information supplied to a prosecutor "caused" an unconstitutional prosecution by "inducing" the prosecutor to file charges "is not a decision this Court can make as a matter of law." Goton v. Pestak, No. CIV 12-0194, 2013 WL 12334157, at *10 (D.N.M. Apr. 18, 2013). That it arises in this case on a motion to dismiss makes the question all the more premature.

**B.**    **<u>There was no probable cause for Baldwin's prosecution, and County Defendants' actions helped obscure that deficiency.</u>**

The linchpin of County Defendants' insistence that the prosecution was imbued with probable cause from the start is their contention that New Mexico law defines involuntary manslaughter in a way that includes "'ordinary' negligence in the use of a weapon." Motion at 11. They cite State v. Grubbs, 1973-NMCA-096, 85 N.M. 365, 512 P.2d 693, and State v.

Yarbrough, 1995-NMCA-116, 120 N.M. 669, 905 P.2d 209.   But Yarbrough held that "a showing of criminal negligence is required for conviction of involuntary manslaughter, whether based on the 'unlawful act' or 'lawful act' portion of the statute, and irrespective of the underlying statutory basis for the conviction." Id. ¶ 20 (emphasis added).   And it noted that the contrary holding of Grubbs – that "ordinary civil negligence" sufficed – had been "implicitly overruled." Id. ¶ 19.   County Defendants also fail to mention that the supreme court affirmed Yarbrough in an opinion declaring that felony convictions in general – and involuntary-manslaughter convictions in particular – "[must] be based upon more than ordinary negligence." 1996-NMSC-068, ¶ 20, 122 N.M. 596, 930 P.2d 131.   And New Mexico's appellate courts have repeatedly reiterated that principle in the years since.   "This Court has made clear" – but not clear enough for County Defendants, apparently – "that the criminal negligence standard applies to all three categories of involuntary manslaughter." State v. Skippings, 2011-NMSC-021, ¶ 18, 150 N.M. 216, 258 P.3d 1008.   "Yarbrough explicitly rejected an ordinary, civil negligence standard for involuntary manslaughter …." State v. Ward, No. S-1-SC-40503, slip op. ¶ 35, 2026 WL 732160, at *7 (N.M. Sup. Ct. Mar. 16, 2026).   Yet County Defendants tout Yarbrough for the opposite proposition.

"Criminal negligence exists where the defendant acts with willful disregard of the rights or safety of others and in a manner which endangers any person or property." Skippings, 2011-NMSC-021, ¶ 18 (internal quotation marks and brackets omitted).   "To be convicted of involuntary manslaughter, a defendant must have been aware of the risk caused by his or her conduct and continued to act." State v. Henley, 2010-NMSC-039, ¶ 16, 148 N.M. 359, 237 P.3d 103.   He must "consciously realize, in his own mind, the risk he is creating." Ward, No. S-1-SC-40503. slip op. ¶ 43, 2026 WL 732160, at *8 (internal quotation marks omitted).   In other words,

he must possess "<u>subjective knowledge</u>" of the danger.  Id. ¶ 45, 2026 WL 732160, at *9. (internal quotation marks omitted).  Accordingly, "the standard for involuntary manslaughter has always been one of recklessness."  Id. ¶ 43, 2026 WL 732160, at *8.  And recklessness is a far cry from mere negligence, which, as County Defendants acknowledge, was the lax standard underlying "the State's two theories about how the crime occurred."  Motion at 11.

Never mind what an omniscient being would have known, or what a defendant sued for civil damages arguably should have taken into account.  What did Baldwin, a defendant facing charges of criminal negligence, "consciously realize, in his own mind, [about] the risk he [was] creating"?  Ward, No. S-1-SC-40503, slip op. ¶ 43, 2026 WL 732160, at *8.  County Defendants emphasize Baldwin's allegations (1) that he was holding a gun in the direction of Halyna Hutchins and cocking it when it discharged a bullet that killed Hutchins, (2) that he was familiar with guns and had received gun training on previous movie shoots, and (3) that despite his familiarity with guns and prior training, he never checked the gun himself to determine whether the chamber contained a live round.  See Motion at 15–16.

But these facts did not begin to establish probable cause that Baldwin possessed "subjective knowledge of the danger or risk to others posed by his … actions," Skippings, 2011-NMSC-021, ¶ 18 (internal quotation marks omitted), given what the investigators also knew – namely, that Baldwin was an actor handling a prop gun on a movie set, that property masters or armorers and directors (rather than actors) are responsible for ensuring that live ammunition is never loaded into prop guns, that the announcement of a "cold gun" by one of these individuals provides further assurance that the gun contains only dummy ammunition, that the armorer on the day of the shooting loaded the gun herself, that the assistant director announced a "cold gun," and that Hutchins was a cinematographer who had directed Baldwin to cock the gun and point it

11

in her direction in order to capture the action specified by the script.  See, e.g., Complaint ¶¶ 24–55, 63, 66, 70–71, 75, 77, 80, 82–83.    Nor did probable cause support the prosecutors' "producer" theory of criminal liability – that Baldwin had subjective knowledge of the risks posed by the hiring of an "inexperienced and unqualified" armorer but failed to mitigate them by "establish[ing] more precautions," id. ¶ 125 – in the absence of any evidence that Baldwin had authority over hiring decisions or safety protocols on the set, and in the face of considerable evidence to the contrary, see id. ¶¶ 27, 29, 126, 158(c).    "In evaluating probable cause, the relevant question is whether a substantial probability existed that the suspect committed the crime, requiring something more than a bare suspicion."    Coones, 166 F.4th at 28 (internal quotation marks omitted).    And the relevant perspective is that of a "reasonable" observer, Motion at 15, not a partisan free to pick and choose her most powerful arguments.  "Officers must consider the totality of the evidence known to them when considering probable cause, and in cases where they have both inculpatory and exculpatory evidence they must not ignore the exculpatory evidence in order to find probable cause."    Coones, 166 F.4th at 28–29 (internal quotation marks omitted).    But ignoring the exculpatory evidence – and later hiding it from the grand jury and trying to hide it from Judge Sommer and the petit jury – is precisely what County Defendants did.  See supra pp. 5–6.

Because probable cause was absent from the prosecution at the outset, the Court need not concern itself with County Defendants' convoluted argument that the complaint fails to accuse them of having "vitiated" probable cause at a later date.  See Motion at 16–17.  But the fact is that their knowingly destructive testing of the gun in 2022, see Complaint ¶¶ 87–97, and their joint decision to misfile the Teske ammunition in March 2024, see id. ¶¶ 232–252, prolonged Baldwin's legal jeopardy by keeping his "continued … prosecution" on track for trial.  Coones,

166 F.4th at 25.  The destructive testing "deprived Baldwin of critical information that would have allowed Baldwin to test a component of the prosecution's eventual theory …:  whether the firearm was defective when the accident occurred and could have discharged a round without the trigger being pulled."  Complaint ¶ 97.  A faulty firearm, in addition to rendering all the more unreasonable an inference that Baldwin had "subjective knowledge of the danger or risk to others posed by his … actions," Skippings, 2011-NMSC-021, ¶ 18, would have called into serious question whether Baldwin's conduct was a "significant cause" of the shooting.  Rule 14-134 NMRA; see Rule 14-231 NMRA; cf. also State v. Nichols, 1930-NMSC-032, ¶¶ 14–15, 34 N.M. 639, 288 P. 407 (holding that when defendant "did not discharge the revolver" and when the discharge was instead "the result of an unforeseen accident," involuntary-manslaughter verdict was "not supported by any evidence," was "contrary to law," and was "fundamental error"). And the concealment of the Teske ammunition in a different case file propped up the prosecutors' "producer" theory of involuntary manslaughter by deceptively perpetuating the idea that the source of the live ammunition was the inexperienced armorer whom Baldwin allegedly had authority to exclude from the set.  See Complaint ¶¶ 79–83, 86, 232–252.  But at any rate, and even if probable cause had been present when the prosecution began or when the grand jury issued an indictment, the argument that County Defendants' destruction and suppression of evidence before and after those events could not have "vitiated" probable cause would depend on complex factual determinations ill-suited to a motion for judgment on the pleadings.  See supra p. 9.

### C.    The relevant law was clearly established.

Regarding the second step of the qualified-immunity inquiry – whether the constitutional rights that County Defendants violated were "clearly established," Harlow v. Fitzgerald, 457

U.S. 800, 818 (1982) – County Defendants argue that there is no "clearly established" authority

for the propositions (1) that a detective's decision to "subject[] [a] firearm to destructive testing

to investigate a statement by plaintiff concerning the gun's propensity to discharge" might

"form[] the basis for a County law enforcement officer's liability for a malicious prosecution

conducted by a State prosecutor," and (2) "that after issuance of indictment, a County officer

allegedly filing evidence under a different case number establishes a conspiracy to maliciously

prosecute a defendant when a State Prosecutor later fails to disclose the evidence to a criminal

defendant just before or during a criminal trial." Motion at 21–22. By framing the issue this

way, County Defendants not only ignore much of what Baldwin's complaint alleges against

them,[3] but state the applicable test at an almost comical level of rigor. Because "a general

constitutional rule already identified in the decisional law may apply with obvious clarity to the

specific conduct in question," Taylor v. Riojas, 592 U.S. 7, 9 (2020) (per curiam) (internal

---

[3] The complaint alleges, for example, that when Defendant Hancock assumed responsibility for the investigation shortly after the shooting, the investigation's focus changed from identifying the source of the live ammunition to building a case against Baldwin; that Hancock herself allowed the likely supplier of the ammunition to dispose of the evidence, and later lied about it; and that Hancock and the sheriff's office and prosecutors made investigative decisions about the Baldwin case as a "team." See Complaint ¶¶ 70, 72–83, 86, 236–238. While other investigative actions are attributed more generically to "investigators" or "SFSO," see, e.g., id. ¶¶ 71, 84–85, Hancock can reasonably be considered responsible for them in light of the allegation that she "took over" the investigation "[w]ithin a matter of days," id. ¶¶ 72–74. For that matter, "Defendants" can all be considered jointly liable for Baldwin's malicious prosecution, see id. ¶ 257, in light of well-supported allegations that investigators and prosecutors devised strategies in concert, see, e.g., id. ¶¶ 74, 241. Notwithstanding County Defendants' suggestion that a civil-rights complaint must specify in exacting detail the role of each defendant in a conspiracy, see Motion at 7, the case law "do[es] not create an absolute rule requiring the utmost precision from plaintiffs…. [F]air notice [under Rule 8(a)(2)] does not require particularized, actual notice, but constructive notice." Ferguson v. Bd. of Cnty. Comm'rs, Nos. 11-1001, -1080, 2013 WL 12334214, at *4 (D.N.M. Apr. 2, 2013) (citing Briggs v. Johnson 274 F. App'x 730 (10th Cir. 2008)). "[It is] reasonable to infer that the officers working on the investigation shared information throughout its course, and, ultimately, worked together to accomplish the alleged constitutional deprivations." Bledsoe, 53 F.4th at 611 (internal quotation marks omitted). "If [a defendant] did not actually participate in the alleged violation, then he will be able to present such evidence either at summary judgment or at trial." Ferguson, 2013 WL 12334214, at *5.

14

quotation marks omitted), "our analysis is not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law," Luethje v. Kyle, 131 F.4th 1179, 1188 (10th Cir. 2025) (internal quotation marks omitted). Instead, "defendants are required to make reasonable applications of the prevailing law to their own circumstances." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001) (internal quotation marks omitted).

The pertinent constitutional principle at the proper level of abstraction is this: "[A] § 1983 conspiracy claim for using fabricated or false evidence was clearly established before 1999." Bledsoe, 53 F.4th at 609. "[S]tate and federal officers are liable under § 1983 when they conspire to procure groundless state indictments and charges against a citizen based upon fabricated evidence or false, distorted, perjurious testimony presented to official bodies in order to maliciously bring about a citizen's trial or conviction." Id. (quoting Anthony v. Baker, 767 F.2d 657, 662 (10th Cir. 1985); ellipsis omitted). Thus, allegations of a conspiracy between prosecutors and law-enforcement officers to frame the plaintiff for a crime committed by someone else, including by "purposefully neglecting to search for evidence that would implicate [the culprit]" and by "suppressing evidence that would tend to exculpate [the plaintiff]," are "sufficient to allege the existence of a conspiracy to violate [the plaintiff's] constitutional rights" through malicious prosecution. Id. at 594–95, 600, 609–10.

Baldwin has alleged just such a conspiracy in this case, and has pled it with enough specificity to survive a motion for judgment on the pleadings. Whether any previous federal case alleging a civil-rights conspiracy to conduct a malicious prosecution specifically involved the deliberately destructive testing of a firearm in a manner that prevented the plaintiff from developing exculpatory evidence before the filing of charges, or the bureaucratic burial of such

evidence "after issuance of indictment," see Motion at 21–22, is not the question.[4]  Qualified-immunity jurisprudence does not require lightning to strike twice.  Regardless of the particular harm caused by the suppression of evidence, or the timing of such conduct in relation to an indictment or trial, "a reasonable official would have understood that what he [was] doing" was unconstitutional and wrong.  Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (internal quotation marks omitted).  That is all that matters.

**III.   County Defendants are not entitled to qualified immunity with respect to Count II.**

Count II of Baldwin's complaint, alleging a deprivation of his federal civil rights through "Suppression of Evidence," focuses solely on County Defendants' decision to mis-file the Teske ammunition and withhold it from Baldwin.  See Complaint ¶ 271.  County Defendants categorize this count as a Brady claim, see Brady v. Maryland, 373 U.S. 83 (1963), and argue that it fails without "the requisite threshold of constitutional injury" – namely, "a conviction resulting in loss of liberty."  Motion at 22 (quoting Becker v. Kroll, 494 F.3d 904, 924 (10th Cir. 2007) (internal quotation marks omitted)).  That indeed appears to be the tenor of Tenth Circuit law, though from time to time the Supreme Court has spoken more generally of "prejudice" as the "essential element[] of a Brady claim," Banks v. Dretke, 540 U.S. 668, 691 (2004) (internal quotation marks omitted), and Baldwin suffered plenty of that, see Complaint ¶ 275 ("legal expenses, loss of income, severe emotional distress, mental anguish, and embarrassment"); see also id. ¶ 254 (Judge Sommer:  "scorching prejudice").  Indeed, a "loss of liberty" – liberty from the jurisdiction of the criminal court, from the conditions the court imposes, from the attention its

---

[4] But see Bledsoe, 53 F.4th at 610 (finding that plaintiff had sufficiently stated malicious-prosecution claim against officer who, among other things, had suppressed key evidence "until [plaintiff's] release from custody" after trial).

processes demand – accompanies any prosecution of significant length.  And this prosecution lasted a year and a half at least.

But the debate need not detain this Court.  Active suppression of exculpatory evidence, as Baldwin has shown, is an aspect of malicious prosecution.  See, e.g., Coones, 166 F.4th at 33 (holding that detectives' suppression of exculpatory evidence contributed to showing of "malice"); Bledsoe, 53 F.4th at 594–95, 600, 609–10 ("purposefully neglecting to search for evidence that would implicate [another suspect]" and "suppressing evidence that would tend to exculpate [plaintiff]").  If suppression of evidence fails to constitute a constitutional claim on its own under the current facts, Defendants may nevertheless be liable for it under a different rubric.

### Conclusion

Absolute immunity cannot entirely curtain County Defendants' dishonest testimony from the factfinder.  Qualified immunity likewise offers County Defendants no refuge.  Baldwin has adequately alleged a malicious prosecution that County Defendants "caused" by conspiring with the prosecutors – a prosecution that was never founded on probable cause, and whose lack of probable cause County Defendants repeatedly strove to conceal.  Accordingly, except to the extent that it seeks dismissal of Baldwin's federal civil-rights claims against Defendant Santa Fe County Board of County Commissioners, the Court should deny County Defendants' motion.

17

RODEY DICKASON SLOAN AKIN & ROBB, P.A.

By:    */s/ Kip Purcell*
Nelson Franse
Linda Vanzi
Charles K. Purcell
Krystle Thomas
Andrew C. Efaw
Kara Murphy
P.O. Box 1888
Albuquerque, New Mexico 87103
(505)765-5900
nfranse@rodey.com
lvanzi@rodey.com
kpurcell@rodey.com
kthomas@rodey.comsw
aefaw@rodey.com
kmurphy@rodey.com

*Attorneys for Plaintiff Alexander R. Baldwin III*


CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2026, I filed the foregoing pleading electronically through the CM/ECF system, which caused all parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By    */s/ Kip Purcell*
        Charles K. Purcell