IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ALEXANDER R. BALDWIN, III,

    Plaintiff,

vs.                                          No. 1:25-CV-01052 KWR/LF

KARI T. MORRISSEY, MARY
CARMACK-ALTWIES, ANDREA REEB,
JENNIFER PADGETT MACIAS, THE
FIRST JUDICIAL DISTRICT
ATTORNEY'S OFFICE, ALEXANDRIA
HANCOCK, MARISSA POPPELL, BRIAN
BRANDLE, AND SANTA FE COUNTY
BOARD OF COUNTY COMMISSIONERS.

    Defendants.

**RESPONSE TO SANTA FE COUNTY'S**
**MOTION FOR DISMISSAL OF COUNT VI**

Plaintiff Alexander Baldwin spent the better part of three years defending himself against involuntary-manslaughter charges arising out of an accidental shooting with a prop gun on a movie set. The charges were relentlessly pursued by a succession of state prosecutors who were variously motivated by their political ambitions, see, e.g., Complaint ¶¶ 101–104 (Jan. 9, 2025) (Doc. 21-1), and their determination to "humble" a defendant they regarded as an "arrogant prick," id. ¶¶ 163–165, 167. And the prosecutors were aided and abetted by Santa Fe County sheriff's officers who, in consultation with the prosecutors, repeatedly ignored, suppressed, or destroyed vital exculpatory evidence along the way. See, e.g., id. ¶¶ 73–97, 232–242. By working in concert to conceal the lack of probable cause for the charges, see, e.g., Response to County Defendants' Motion for Partial Judgment on the Pleadings at 9–13 (July 6, 2026) (Doc. 49), the prosecutors and sheriffs' officers kept Baldwin in legal jeopardy for 33 months, until the

presiding judge – appalled by the revelation of Defendants' "willful withholding of … information," "egregious discovery violations," and "false testimony" – dismissed the charges with prejudice while the trial was underway, see Complaint ¶ 254.

In the wake of the sheriff's officers' motion to dismiss Baldwin's federal civil-rights claims against them, see Motion for Partial Judgment on the Pleadings (June 22, 2026) (Doc. 48), the officers' employer – Defendant Santa Fe County Board of County Commissioners ("the County") – now asserts that Baldwin's claims under the New Mexico Civil Rights Act ("the NMCRA") must meet the same fate. See Santa Fe County Board of County Commissioners' Motion for Dismissal of Count VI (July 22, 2026) (Doc. 51) [hereinafter Motion]. The NMCRA claims are contained in Count VI of Baldwin's complaint, which alleges that "Defendants' action violated the constitutional rights guaranteed to Baldwin by Article II, sections 4, 18, and 19 of the New Mexico Constitution." Complaint ¶ 301. The County primarily argues that federal constitutional law fails to sustain those claims under the facts alleged, and that there is no "principled basis" for concluding that the New Mexico Constitution affords Baldwin any greater protection. See Motion at 2–3. Both steps of that argument are missteps. Yet if the County is correct about the futility of Baldwin's federal claims against the County and its employees, only his state-law claims against them will remain – in which case basic precepts of comity and federalism will strongly counsel against any further adjudication in this Court. The motion, in short, is as unripe as it is unavailing, and the Court should hold the motion in abeyance if the Court does not deny it outright.

I.      **Baldwin has adequately pled a due-process claim under Article II, Section 18 of the New Mexico Constitution.**

A.      **Interstitial analysis is neither required nor even appropriate.**

New Mexico's due-process clause appears in Article II, Section 18 of the state constitution.  Similarly to its federal counterpart, it provides in pertinent part that "[n]o person shall be deprived of life, liberty or property without due process of law."  But the linguistic resemblance between the federal and state guarantees does not dictate that they be interpreted in lockstep.  New Mexico courts are "not bound to give the same meaning to the New Mexico Constitution as the United States Supreme Court places upon the United States Constitution, even in construing provisions having wording that is identical."  State v. Gomez, 1997-NMSC-006, ¶ 17, 122 N.M. 777, 932 P.2d 1 (internal quotation marks omitted); accord, e.g., Payless Shoe Source, Inc. v. Travelers Cos., 585 F.3d 1366, 1375 (10th Cir. 2009) (Gorsuch, J.) ("[S]tate constitutions containing equal protection and due process guarantees – with language often identical to that found in the federal Constitution – are regularly given entirely different content by state courts.").

The County does not argue otherwise.  Instead, the County's effort to defeat Baldwin's due-process claims revolves around the "interstitial" method of state constitutional analysis first described in State v. Gomez, pursuant to which "the court asks first whether the right being asserted is protected under the federal constitution.  If it is, then the state constitutional claim is not reached.  If it is not, then the state constitution is examined."  Gomez, 1997-NMSC-006, ¶ 19.  A court that reaches the second step of the interstitial method "may diverge from federal precedent for three reasons:  a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics."  Id.

The County contends that interstitial analysis "controls" the question whether Baldwin's state constitutional rights were violated.  Motion at 11.  But it does not.  Three years ago, the New Mexico Supreme Court announced that Gomez "does not bind th[e] Court as to [its] analysis of state constitutional questions," and the Court solicited "thoughtful and reasoned argument in the future addressing whether the interstitial approach is the proper method to ensure the people of New Mexico the protections promised by their constitution."  Lujan Grisham v. Van Soelen, 2023-NMSC-027, ¶ 19 n.7, 539 P.3d 272.  Reiterating that invitation just last month, the court emphasized that "the interstitial approach is not law," but merely an interpretive "tool."  State v. Morgan, No. S-1-SC-40449, 2026 WL 2106691, at *3 n.2 (N.M. July 13, 2026).

The court's apparent dissatisfaction with the interstitial method is not difficult to understand.  Where an inquiry into meaning ends depends to a large degree on where it begins. The frame of reference unavoidably colors the thinking that follows.  To make the United States Supreme Court's construction of the federal Constitution the starting point of the investigation is to risk treating New Mexico's constitution as an analytical afterthought.  And it stunts the creative development of state constitutional rights by dispensing with independent analysis of those rights altogether whenever the federal Constitution is deemed sufficient to get the job at hand done.  Little wonder that the New Mexico Supreme Court refuses to be straitjacketed by the interstitial method and, in an appropriate case, might well prefer the "primacy" approach, under which the state constitutional guarantee would be evaluated initially and in its own right, instead of as a fallback and in comparison with the federal right.  See Gomez, 1997-NMSC-006, ¶ 18.

But the New Mexico Supreme Court's growing uneasiness with the interstitial approach is not the only reason to reject the method's deployment here.  An even more fundamental reason for casting it aside is that the conditions that make it possible are missing.  Specifically, "Gomez

4

… require[s] clarity as to the existence of federal protection as a prerequisite to reaching the second stage of interstitial analysis," Van Soelen, 2023-NMSC-027, ¶ 16, because "the framework's utility is significantly diminished when federal precedent is unclear," id. ¶ 15. No such "clarity as to the existence [or nonexistence] of federal protection" is available in this case. Despite the County's insistence that the case against a federal due-process right not to be maliciously prosecuted under state criminal law is open and shut, see Motion at 13–17, it is anything but. See infra pt. I(B).

> **B.** **Federal due-process jurisprudence in this area is unclear.**

The County asserts that in Albright v. Oliver, 510 U.S. 266 (1994), the Supreme Court held that "substantive due process does not furnish a general constitutional right to be free from prosecution without probable cause." Motion at 13. The plaintiff in Albright, facing a warrant for his arrest, surrendered to a police detective, posted bond, and was released from custody. The court found probable cause at his preliminary hearing to bind him over for trial, but dismissed the charges at a subsequent hearing on the ground that they failed to state an offense under state law. The plaintiff then sued the police detective under 42 U.S.C. § 1983 for an alleged deprivation of his substantive due process right under the Fourteenth Amendment "to be free from prosecution except upon probable cause." 510 U.S. at 268–69. He did not allege a deprivation of his rights under the Fourth Amendment, even though his surrender to the detective had amounted to a seizure. See id. at 271.

The district court dismissed the lawsuit, the court of appeals affirmed, and a splintered Supreme Court upheld the dismissal. "The Court's judgment of affirmance [was] supported by five different opinions. Significantly, … none of them command[ed] a majority." Albright, 510 U.S. at 316 (Stevens, J., dissenting). Chief Justice Rehnquist's plurality opinion for four Justices

– two of whom filed separate concurring opinions – declared, as the County now maintains, that a malicious prosecution claim under Section 1983 is cognizable exclusively under the standards of the Fourth Amendment.  510 U.S. at 274.  The plurality reasoned that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."  Id. at 273 (internal quotation marks omitted).

Justice Ginsburg joined the plurality opinion but filed a concurring opinion arguing that the plaintiff could have stated a valid claim under the Fourth Amendment had he chosen to do so, despite the fleeting nature of his detainment at the hands of the state.  "A person facing serious criminal charges is hardly freed from the state's control upon his release from a police officer's grip," she wrote.  Id. at 278 (Ginsburg, J., concurring).

> He is required to appear in court at the state's command.  He is often subject … to the condition that he seek formal permission from the court (at significant expense) before exercising what would otherwise be his unquestioned right to travel outside the jurisdiction.  Pending prosecution, his employment prospects may be diminished severely, he may suffer reputational harm, and he will experience the financial and emotional strain of preparing a defense.

Id.  Those impacts, Justice Ginsburg believed, qualified as harms compensable under the Fourth Amendment, because "[s]uch a defendant is scarcely at liberty; he remains apprehended, arrested in his movements, indeed 'seized' for trial, so long as he is bound to appear in court and answer the state's charges."  Id. at 279.

In a dissenting opinion joined by Justice Blackmun, Justice Stevens echoed Justice Ginsburg's reality-based perspective on the burdens of prosecution, even in the absence of actual arrest or pretrial detention:

6

> The initiation of a criminal prosecution, regardless of whether it prompts an arrest, immediately produces a wrenching disruption of everyday life.  [It is] … a public act that may seriously interfere with the defendant's liberty, … and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.

510 U.S. at 295–96 (Stevens, J., dissenting) (internal quotation marks and citation omitted).  But in Justice Stevens's view, those "deprivation[s] of liberty" were properly regarded as potential due-process violations under the Fourteenth Amendment.  Id. at 296.

In yet another separate opinion, Justice Souter agreed that the particular claims before the Court arose under the Fourth Amendment, but he refused to rule out the possibility of "exceptional cases where some quantum of harm occurs in the interim period after groundless criminal charges are filed but before any Fourth Amendment seizure," and where the deprivation of liberty is sufficiently "substantial" to contravene due process rights.  510 U.S. at 291 (Souter, J., concurring in the judgment).  And Justice Kennedy, speaking for himself and Justice Thomas, was willing to concede that in the absence of an appropriate tort remedy under state law, "there would be force to the argument that the malicious initiation of a baseless criminal prosecution infringes an interest protected by the Due Process Clause and enforceable under § 1983."  510 U.S. at 286 (Kennedy, J., concurring in the judgment).

Not surprisingly, lower courts have found the precise significance of Albright difficult to divine.  See, e.g., Benavidez v. Shutiva, 2015-NMCA-065, ¶ 16, 350 P.3d 1234 ("The law governing malicious prosecution under the Fourth and Fourteenth Amendments is convoluted.").  Justice Stevens argued that "in the aggregate," the five distinct opinions issued by seven of his colleagues "d[id] not reject [the notion that] the Due Process Clause of the Fourteenth Amendment constrains the power of state governments to accuse a citizen of an infamous

crime." Albright, 510 U.S. at 316 (Stevens, J., dissenting). And indeed, just four years later in County of Sacramento v. Lewis, 523 U.S. 833 (1998), cited in Motion at 14, the Court emphasized that "[s]ubstantive due process analysis is … inappropriate … only if [the plaintiff's] claim is 'covered by' the Fourth Amendment," in the sense that it involves a Fourth Amendment seizure. Id. at 843. That way of framing the issue suggests that when the state's malicious misuse of criminal process fails to result in arrest or incarceration or conviction, the Due Process Clause provides a remedy for it.

To be sure, in Becker v. Kroll, 494 F.3d 904 (10th Cir. 2007), cited in Motion at 3, 16–17 – a case alleging an unfounded prosecution that, in contrast with Baldwin's, was dismissed before trial, see id. at 922 – the Tenth Circuit examined Albright and found "unavoidable" the conclusion that "no § 1983 claim will arise from filing criminal charges without probable cause under the substantive due process protections of the Fourteenth Amendment." Id. at 918; accord Benavidez, 2015-NMCA-065, ¶ 18 (expressing belief that Albright "foreclosed" substantive due process claims in malicious prosecution cases). But in Bledsoe v. Carreno, 53 F.4th 589 (10th Cir. 2022), the Tenth Circuit had no trouble identifying substantive due process as the controlling constitutional principle in a lawsuit claiming that the defendants had conspired to maliciously prosecute the plaintiff, fabricate evidence against him, and suppress evidence tending to exonerate him. See id. at 594–95, 600, 612–15. Far from treating the Fourth Amendment as the sole permissible basis for a malicious prosecution claim, the court merely remarked that the Fourth Amendment supported claims concerning the plaintiff's pretrial detention. See id. at 614 & n.22.

Perhaps most importantly, the Supreme Court itself seems unconvinced that Albright settled anything. In Thompson v. Clark, 596 U.S. 36 (2022), the Court considered a malicious

8

prosecution claim under the Fourth Amendment but acknowledged the "argu[ment] that the Due Process Clause could be an appropriate analytical home" for it.  Id. at 43 n.2.  "If so," the Court mused, "the plaintiff presumably would not have to prove that he was seized as a result of the malicious prosecution."  Id.  Instead of squelching the argument under Albright, the Court left its resolution for another day.  See id.

The Court's apparent willingness to entertain the argument has not gone unnoticed. "[T]he question remains:  may a plaintiff bring a malicious prosecution claim under the Fourteenth Amendment?"  Susselman v. Washtenaw Cnty. Sheriff's Off., 109 F.4th 864, 870–71 (6th Cir. 2024); accord, e.g., Ash v. City of Aurora, No. 24-2774, 2026 WL 446968, at *2 (7th Cir. Feb. 17, 2026) (nonprecedential) ("[T]he Supreme Court has not yet decided whether a claim for malicious prosecution exists under the Due Process Clause …."); Johnson v. McCallum, No. 23-cv-7879, 2025 WL 665644, at *2 n.5 (S.D.N.Y. Jan. 24, 2025) ("[W]hether malicious prosecution claims are exclusively housed under the Fourth Amendment remains a somewhat unsettled issue …."), adopted, 2025 WL 486939 (S.D.N.Y. Feb. 13, 2025).  Under these circumstances, "clarity as the existence of federal protection" is absent, and an interstitial approach to the adjudication of state constitutional rights is infeasible.  See Van Soelen, 2023-NMSC-027, ¶¶ 15–16.  The Court should not attempt it.

### C.    Baldwin has adequately alleged violations of his state due-process rights.

Because interstitial analysis of New Mexico's due-process clause is inappropriate and indeed impossible in this context, the Court should consider the clause from scratch instead of regarding it as a stepchild of the federal right.  In various settings, "Article II, Section 18 of the New Mexico Constitution affords broader protection than the United States Constitution."  State v. Martinez, 2021-NMSC-002, ¶ 85, 478 P.3d 880 (concerning admission of eyewitness

identification evidence).[1]  And the courts of New Mexico have recognized that "due process is a

… malleable principle which must be molded to the particular situation." State ex rel. Torrez v.

Whitaker, 2018-NMSC-005, ¶ 87, 410 P.3d 201 (internal quotation marks omitted).   The

amorphousness of the concept is no reason to recoil from it; its adaptability is one of its greatest

strengths.  Nor is there anything "[un]principled," Motion at 11, about its ability to shape-shift in

response to the perceived needs of a given case.  "[F]undamental fairness, the touchstone of due

process," State v. Godinez, 2022-NMCA-029, ¶ 14, 511 P.3d 369 (internal quotation marks

omitted), aff'd, 2025-NMSC-005, 563 P.3d 854, is a sufficiently "ascertainable standard[ for]

public bodies and courts," Motion at 13; prosecutors and sheriff's officers alike should know it

when they see it.  See Godinez, 2025-NMSC-005, ¶¶ 2, 39 (preferring "case-by-case analysis" to

"bright-line rule[s]").

But in any event, the argument that Baldwin must bring his constitutional claims of

malicious prosecution under the Fourth Amendment or not at all, see Motion at 13–17, has little

to do with whether due-process guarantees provide adequate guidance to the prosecutors and

law-enforcement officers charged with respecting them.  That prosecuting a defendant without

probable cause could deprive him of substantive due process was clearly established more than

---

[1] That greater breadth of protection stems at least in part from Article II, Section 4 of the constitution, which provides that "[a]ll persons are born equally free, and have certain natural, inherent and inalienable rights, among which are the rights of enjoying and defending life and liberty, of acquiring, possessing and protecting property, and of seeking and obtaining safety and happiness."  See Morris v. Brandenburg, 2016-NMSC-027, ¶ 51, 376 P.3d 836; Cal. First Bank v. State, 1990-NMSC-106, ¶ 44, 111 N.M. 64, 801 P.2d 646.  It is for this reason that Baldwin's complaint cites Article II, Section 4 as a source of his state constitutional rights.  See Complaint ¶¶ 297, 301.  He does not mean to argue that Article II, Section 4 serves as a "standalone damages provision," Motion at 9, and he agrees with the County that current New Mexico law would not support such an argument, see id. at 8–10 – though the supreme court's grant of certiorari in Atencio v. State, 2026-NMCA-011, 584 P.3d 985, cert. granted, No. S-1-SC-40980 (N.M. Nov. 10, 2025), could conceivably signal the court's willingness to treat the clause as something more than an aspirational statement.

20 years before the County began investigating him.  See Bledsoe, 53 F.4th at 614–15.  The inherent wrongfulness of evidence fabrication and suppression was equally well understood.  See id. at 612–14.

And even if federal constitutional law requires an "adverse trial outcome" before the suppression of evidence becomes actionable (as the County claims, see Motion at 15–17), there is no reason to suppose that New Mexico law follows suit; the unjust prolongation of prosecution may be "adverse" enough.  In Albright, after all, at least two Justices believed that "the burdens of prosecution" by themselves, id. at 16 – "interfere[nce] with the defendant's liberty, … disrupt[ion of] his employment, [consumption of] his financial resources, curtail[ment of] his associations, subject[ion] to public obloquy, and creat[ion of] anxiety in him, his family and his friends," 510 U.S. at 296 (Stevens, J., dissenting) (internal quotation marks omitted) – were collectively "of sufficient magnitude to qualify as a deprivation of liberty meriting constitutional protection" under the Due Process Clause, id.  A third Justice agreed that the impacts of prosecution were of constitutional dimension in their own right, though she located the source of protection in the Fourth Amendment.  See 510 U.S. at 278–79 (Ginsburg, J., concurring).  And other courts have found her Fourth Amendment analysis "compelling."  Gallo v. City of Philadelphia, 161 F.3d 217, 223 (3d Cir. 1998).[2]

---

[2] The County pointedly notes that Count VI of Baldwin's complaint does not cite Article II, Section 10, "New Mexico's specific search-and-seizure provision."  Motion at 14.  That is true, but not significant.  If Baldwin has chosen the wrong doctrinal nesting place for the constitutional rights he asserts, leave to amend his complaint should be "freely give[n]" at this early stage of the lawsuit.  Fed. R. Civ. P. 15(a)(2).  And indeed, there is much to commend the view that a wrongful prosecution by itself, even without a conviction – or the wrongful perpetuation of such a prosecution through the concealment or concoction of evidence – constitutes a "seizure" in violation of Article II, Section 10.  New Mexico courts "have given independent meaning to the protections from unreasonable searches and seizures articulated in Article II, Section 10."  Gomez, 1997-NMSC-006, ¶ 35.  They have "interpreted this clause to provide a broad right to be free from unwarranted government intrusions, which often results in

11

The notion that New Mexico's due process guarantees (or for that matter its search-and-seizure provisions) concern themselves with government misconduct imposing significant practical restraints on individual liberty – and not just with wrongful arrests, false imprisonments, and other consummated miscarriages of justice – seems particularly "compelling" in a state with one of the highest poverty rates in the nation.  Relatively modest restrictions on travel and brief absences from the workplace have outsized economic and emotional consequences in such an environment.  And while Baldwin does not claim that the restraints on his own freedom cut quite so close to the bone (though they certainly inflicted considerable financial and psychic harm), constitutional rights are not tailored to the individual; they protect everyone alike, even persons possessed of substantial means to protect themselves.

Moreover, while the "inherent rights" clause of New Mexico's constitution lacks the force of law in isolation, see supra note 1, it remains a useful lens through which to compare the state and federal due-process guarantees.  That clause brings to mind "the more intimate relationship existing between a state government and its people," Cal. First Bank, 1990-NMSC-106, ¶ 44, and thus the state's special solicitude for individual welfare.  Criminal conviction may be the most serious injury resulting from malicious abuses of the criminal process, but it is not the only one – and a state intent on promoting the "safety and happiness" of persons within its borders, see N.M. Const. art. II, § 4, need not ignore unsuccessful attempts to inflict that ultimate injury, or the lesser injuries that occur along the way.

---

significantly greater protections than those afforded under the Fourth Amendment."  State v. Wright, 2022-NMSC-009, ¶ 23, 503 P.3d 1161 (citation omitted).  Presumably, then, they would not hesitate to join the Third Circuit in likening a pending prosecution to a "seizure" under the Supreme Court's most relaxed definition of that term – "a show of authority that restrains the liberty of a citizen."  Gallo, 161 F.3d at 223; see also, e.g., State v. Adame, 2020-NMSC-015, ¶ 23, 476 P.3d 872 (affirming that "an individual is seized when a reasonable person would not feel free to leave").

12

Finally, it is of no constitutional moment that state tort law may already provide a remedy against malicious prosecution by law-enforcement officers.  <u>See</u> NMSA 1978, § 41-4-12 (2020) (Tort Claims Act); Motion at 16.  The availability of state tort remedies may bear on the existence of <u>federal</u> constitutional claims in a federalist system that sometimes prizes comity over complete vindication of constitutional rights.  <u>See, e.g.</u>, <u>Albright</u>, 510 U.S. at 285–86 (Kennedy, J., concurring in the judgment).  But no such considerations are relevant under the NMCRA, which explicitly provides that its remedies "shall be in addition to any other remedies prescribed by law."  NMSA 1978, § 41-4A-3(E) (2021).

**II.      <u>The allegations of the complaint would support an equal-protection claim.</u>**

Like its federal cousin the Fourteenth Amendment, Section 18 of the New Mexico bill of rights contains guarantees of equal protection as well as due process.  N.M. Const. art. II, § 18. The County briefly argues that equal protection has no role to play here.  <u>See</u> Motion at 17–18. In fact, while Baldwin's claims fit most neatly within the due-process clause, they also give rise to equal-protection concerns.

The Supreme Court has endorsed "equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  <u>Vill. of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000) (per curiam).  New Mexico courts likewise recognize class-of-one equal-protection claims when a plaintiff shows "(1) that a public official inflicts a cost or burden on one person without imposing it on those who are similarly situated in material respects, and (2) that there is no conceivable basis other than a wholly illegitimate motive for the official's actions."  <u>Gentry v. Shug</u>, 2012-NMCA-019, ¶ 9, 270 P.3d 1286 (internal quotation marks omitted).  Baldwin has alleged both things:  that he was treated uniquely harshly in

13

comparison with other criminal defendants, see, e.g., Complaint ¶¶ 146–147, 150–154, and that the treatment was not merely irrational, but malicious, see, e.g., id. ¶¶ 163–164, 167.  He has also alleged – entirely plausibly – that the County's employees worked in concert with the prosecutors to impair Baldwin's defense.  See, e.g., id. ¶¶ 6, 72–97, 170–176, 234–254; see also Bledsoe, 53 F.4th at 594–95, 600, 609–10 (claim that prosecutors and law-enforcement officers agreed to frame plaintiff for murder by "purposefully neglecting to search for evidence that would implicate [the actual killer]" and "suppressing evidence that would tend to exculpate [plaintiff]" "were sufficient to allege the existence of a conspiracy to violate [plaintiff's] constitutional rights" by maliciously prosecuting him).  These allegations suffice to make out an equal-protection claim.

III.    **The Court should avoid deciding difficult issues of state constitutional law unless and until such decisions become necessary.**

As the foregoing pages suggest, the County has asked the Court to wade into murky doctrinal waters.  Determining whether federal law supports a substantive due-process claim under the circumstances alleged by Baldwin will be challenging enough, see supra pt. I(B); deciding the follow-on state-law questions will be more difficult still, see supra pt. I(C).  And while deciding hard questions is an everyday responsibility of federal courts, there are special reasons for the Court to refrain from doing so here.

In the first place, of course, "it is important to avoid the premature adjudication of constitutional questions," and federal courts "ought not to pass on questions of constitutionality unless such adjudication is unavoidable."  Matal v. Tam, 582 U.S. 218, 230–31 (2017) (internal quotation marks, brackets, and ellipsis omitted).  And the importance of avoiding premature entanglement with these "notoriously tricky" issues, id. at 239, is only heightened in cases involving unresolved questions of state constitutional law.  Because "states have inherent power

14

as separate sovereigns in our federalist system to provide more liberty than is mandated by the United States Constitution," Gomez, 1997-NMSC-006, ¶ 17; accord, e.g., Glossip v. Oklahoma, 604 U.S. 226, 258 (2025), federal courts should hesitate to preempt that power by undertaking to decide such questions themselves. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966).

The constitutional odyssey on which the County has asked the Court to embark is particularly hazardous. The County insists that that the Court's consideration of New Mexico's due-process clause is "control[led]" by interstitial analysis. Motion at 11. That assertion is fallacious in its own right; "the interstitial approach is not law," Morgan, 2026 WL 2106691, at *3 n.2, and the proper methodology is very much up for grabs under current New Mexico law, especially in a case in which the background federal constitutional law is unclear, see Van Soelen, 2023-NMSC-027, ¶¶ 15–16, 19 n.7; supra pts. I(A)–(B). But if the County is correct about the clarity of federal law and the applicability of interstitial analysis, then the Court will be confronted at the outset by the question whether the federal law's asserted rejection of substantive due process as a basis for malicious-prosecution claims under Section 1983 is "flawed." Gomez, 1997-NMSC-006, ¶ 19. How does a federal court go about deciding that question, and by whose standards? Is it reasonable to expect a judge to step outside the system of constitutional law she inhabits and critique it objectively? Or to decide which interpretation of the law of a "separate sovereign" best suits the sovereign's "distinctive … characteristics" and best serves its citizens? See id. ¶¶ 17, 19. Baldwin does not doubt the Court's capacity for independent thought, and does not deny the Court's intimate familiarity with the laws and conditions of the state in which it sits. Even so, and even though the Court's analysis would

15

likely take the more modest form of an Erie prediction about how New Mexico's high court would rule, the exercise seems intellectually fraught.

At some point, of course, such mental gymnastics may become necessary – but that point is not now. In the first place, interstitial analysis contemplates the assessment of state law only after the Court has satisfied itself about the contours of federal law. But in that scenario, the Court will have disposed of all the federal questions involving the County defendants, and only state-law questions will remain. "Although this is discretionary, [the Tenth Circuit has] said that courts should decline the exercise of jurisdiction in that circumstance. Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." Horocofsky v. City of Lawrence, No. 25-3024, 2026 WL 2130707, at *12 (10th Cir. July 24, 2026) (internal quotation marks, citation, and brackets omitted). Local federal judges have repeatedly invoked that principle in declining to exercise supplemental jurisdiction over NMCRA claims after dismissing all federal claims. See, e.g., L.L. ex rel. Hubbard v. Alamogordo Police Dep't, No. 2:25-cv-00471, 2025 WL 3204696, at *20 (D.N.M. Nov. 17, 2025) ("The [residual state-law claims] require interpretation of the New Mexico Constitution and [NMCRA] better left to New Mexico state courts."); N.M. Trappers Ass'n v. Torrez, No. 23-cv-444, 2025 WL 2597084, at *5 (D.N.M. Sept. 8, 2025) ("The Court finds that the issue of whether Defendants violated the [NMCRA] is best left for a state court's determination."), aff'd, 178 F.4th 561, 571–72 (10th Cir. 2026); Trujillo v. City of Albuquerque, 756 F. Supp. 3d 1200, 1216 (D.N.M. 2024) (remanding NMCRA claims to state court "where they can be more appropriately addressed").

But if federal claims remain in the case (as they should) after the Court has structured its decision-making to adjudicate them first, the Court should still stay its hand until determination

16

of Baldwin's NMCRA claims becomes "unavoidable." Matal, 582 U.S. at 231. In these ways, the Court can maintain proper respect for the sovereignty of New Mexico's courts while also discharging its duty to decide the cases that come before it.

### Conclusion

Baldwin has pled legally sound claims against the County under the NMCRA. If substantive due process under the Fourteenth Amendment affords him no relief – a matter that is by no means clear – then the more supple conception of substantive due process under Article II, Section 18 of the New Mexico Constitution should fill the gap. Equal-protection claims under Section 18 are also available. But the Court need not and should not decide any of these complex questions until they can no longer be deferred. For these reasons, the Court should either deny the County's motion in all material respects[3] or postpone consideration of the motion for the time being.

---

[3] Baldwin would not object to an order (1) dismissing his Article II, Section 19 claim as against the County, since none of his conspiracy allegations implicate the County's employees in the prosecutors' decision to charge Baldwin under a subsequently enacted statute in violation of ex post facto principles, see Motion at 18–19; (2) recognizing the County's absolute immunity to the same extent that its employees are absolutely immune from liability under Section 1983, see Motion at 20–22; Doc. 49, at 3–7, since Baldwin agrees that the NMCRA does not abolish absolute immunity, see NMSA 1978, § 41-4A-10 (2021); and (3) dismissing his request for punitive damages under the NMCRA, see Complaint ¶ 310; Motion at 25, since Baldwin acknowledges that the statute's remedial scope is limited to "actual" damages, § 41-4A-3(B), along with attorneys' fees and costs, see § 41-4A-5.

RODEY DICKASON SLOAN AKIN & ROBB, P.A.

By:    */s/ Kip Purcell*
Nelson Franse
Linda Vanzi
Charles K. Purcell
Krystle Thomas
Andrew C. Efaw
Kara Murphy
P.O. Box 1888
Albuquerque, New Mexico 87103
(505)765-5900
nfranse@rodey.com
lvanzi@rodey.com
kpurcell@rodey.com
kthomas@rodey.comsw
aefaw@rodey.com
kmurphy@rodey.com

*Attorneys for Plaintiff Alexander R. Baldwin III*

CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2026, I filed the foregoing pleading electronically through the CM/ECF system, which caused all parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By    */s/ Kip Purcell*
    Charles K. Purcell