**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

ALEXANDER R. BALDWIN III,

Plaintiff,

v. Case No. 1:25-cv-01052-KWR-LF

KARI T. MORRISSEY, MARY CARMACK-ALTWIES,
ANDREA REEB, JENNIFER PADGETT MACIAS,
THE FIRST JUDICIAL DISTRICT ATTORNEY'S OFFICE,
ALEXANDRIA HANCOCK, MARISSA POPPELL, BRIAN BRANDLE, and
SANTA FE COUNTY BOARD OF COUNTY COMMISSIONERS,

Defendants.

**MEMORANDUM OPINION AND ORDER GRANTING STATE DEFENDANTS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

**THIS MATTER** comes before the Court on Defendants Alexandria Hancock, Marissa Poppell, Brian Brandle, and the Santa Fe County Board of County Commissioners' Motion for Partial Judgment on the Pleadings on Plaintiff's § 1983 Claims for Conspiracy to Cause Malicious Prosecution and Deprivation of Civil Rights (Count I) and Suppression of Evidence and Deprivation of Civil Rights (Count II) **(Doc. 48)**.

Having reviewed the parties' pleadings, briefing, and relevant law, the Court finds that Defendants' Motion is well-taken and, therefore, is **GRANTED**.

## BACKGROUND[1]

For the purposes of this Motion, the Court accepts Plaintiff's well-pled factual allegations as true and draws all reasonable inferences in his favor. *Ullery v. Bradley*, 949 F.3d 1282, 1287 (10th Cir. 2020). As alleged in the Complaint, this case arises from the criminal prosecution of Plaintiff Alexander R. Baldwin III after a gun he was holding discharged and killed cinematographer Halyna Hutchins during the *Rust* film production. **Compl. ¶ 2, Doc. 1**. The pistol was loaded with live rounds instead of "dummy" rounds, inert bullets designed to look like real bullets. ***Id.*** **¶¶ 35, 56**.

The shooting occurred on October 21, 2021, while Plaintiff, Hutchins, writer-director Joel Souza, and crew were setting up a close-up camera shot of Plaintiff pointing and cocking the pistol, which required the use of dummy rounds. ***Id.*** **¶¶ 24, 46–49**. While preparing for the shot, a crew member handed the prop gun to Plaintiff and "announced" that there was a "cold gun"—an inspected gun incapable of firing—on set. ***Id.*** **¶ 51**. Plaintiff never checked the gun himself. ***Id.*** **¶¶ 50–52**. As Plaintiff was rehearsing the shot, Hutchins, who was standing near the camera, directed him to point the gun her way and cock the gun. ***Id.*** **¶¶ 54–55**. Suddenly, the gun "just went off," and a live round unexpectedly discharged from the gun, striking Hutchins and Souza. ***Id.*** **¶¶ 56, 88**. Hutchins died from her injuries. ***Id.*** **¶ 62**.

### I. <u>SFSO's initial investigation, led by Defendant Hancock, ignored evidence pertaining to how live ammunition made it onto the set of *Rust*</u>

As relevant to this Motion, Defendants Hancock, Poppell, and Brandle, law enforcement personnel employed by the Santa Fe County Sherrif's Office ("SFSO"),[2] worked "collectively" as

---

[1] The facts contained herein are limited to those relevant to Defendants Hancock, Poppell, Brandle, and the Santa Fe County Board of County Commissioners. To the extent facts about other defendants are included, they are recited only to add context to the instant Defendants' Motion.

[2] Defendant Hancock is a Lieutenant employed by SFSO. ***Id.*** **¶ 6**. She took over as lead detective "within days" of the shooting. ***Id.*** **¶¶ 72–3**. Defendant Brandle is also a Lieutenant employed by

a "team" with state prosecutors from the First Judicial District Attorney's Office ("FJDA") to investigate and prosecute Plaintiff's criminal case." ***Id.*** **¶ 74**. The involvement of these prosecutors shifted the focus of Defendants Hancock, Poppell, and Brandle's investigation from determining how live ammunition made it onto the set to blaming Plaintiff. ***Id.*** **¶¶ 72–77**. This focus influenced Defendants' decisions, including "ignoring critical evidence as to how live ammunition ended up on set." ***Id.*** **¶ 78**. "This shift occurred even as more evidence emerged that Seth Kenney, a third-party ammo supplier, may have been the source of the live round." ***Id.*** **¶ 77**.

As part of this allegedly willful ignorance, "SFSO waited six days before executing a search warrant on the prop truck—the vehicle where firearms and ammunition had been stored." ***Id.*** **¶ 79**. SFSO also "waited more than one month [until November 30, 2021] to execute a search warrant on Kenney's business . . . despite learning within hours of the incident that [his business] was *Rust*'s ammo supplier." ***Id.*** **¶ 81**.

On November 1, 2021, Defendant Hancock learned through a conversation she observed between Kenney and Joe Swanson, an ammunitions manufacturer, that hundreds of live rounds that matched the live rounds found on set had been sitting loose in an ammo can in Kenney's business' warehouse. ***Id.*** **¶ 82**. "Even though [Defendant] Hancock was present when Kenney realized that he may have been the person who had inadvertently supplied live ammunition to the set of *Rust*, . . . she indefensibly waited 30 days to search Kenney's business." ***Id.*** **¶ 83**. On November 1, SFSO also became aware that Troy Teske, a retired police officer, had a cache of ammunition that could have been the source of the live round. ***Id.*** **¶ 236**. Instead of investigating this lead, Defendant Hancock accepted a screenshot of a photograph depicting four bullets that

---

SFSO. ***Id.*** **¶ 6**. He [details]. Defendant Poppell is a crime scene technician employed by SFSO. ***Id.*** **¶ 19**. She [details].

Teske had sent to Kenney, even though she acknowledged that "testing at least a few [of the rounds] . . . would be important. ***Id.*** **¶ 237–38**. When SFSO conducted a search of Kenney's business, it was not done "proper[ly]." ***Id.*** **¶ 213**. The State failed to disclose lapel videos depicting the search to Plaintiff's counsel until May 14, 2024. ***Id***.

The Complaint alleges further that as part of their refusal to properly investigate how live rounds made it onto the set, SFSO "brushed off" witnesses and failed to follow-up on claims that "persons connected to the film were firing live ammunition [at a nearby ranch] the day of the accident." ***Id.*** **¶ 84**. SFSO did not seek fingerprint or DNA testing of the live rounds found on set. ***Id.*** **¶ 86**.

## II. <u>Ignoring Plaintiff's claim that the gun "just went off," SFSO's investigation into the gun caused it to be destroyed</u>

Plaintiff also contends that SFSO was responsible for destroying the gun that fired the live round by subjecting it to destructive testing without first documenting its internal components. ***Id.*** **¶¶ 87–97**. SFSO asked the FBI to test the gun by striking it with a substantial external force to "disprove" Plaintiff's theory that the gun "just went off." ***Id.*** **¶¶ 88–89**. According to the FBI, which tested the gun on behalf of SFSO, Defendant Hancock knew "that the requested testing w[ould] alter the firearm and it w[ould] no longer be in the same physical condition that it was seized in." ***Id.*** **¶ 90**. This test was requested in lieu of the "push-off" test, which applies manual pressure to the back of the hammer and would not have destroyed the gun. ***Id.*** **¶ 93**. This test would have been "more appropriate," according to Plaintiff, because no one claimed that the gun misfired due to a substantial external force. ***Id.*** Nevertheless, at the direction of SFSO, the FBI proceeded with a test that resulted in the mallet and other internal components breaking. ***Id.*** **¶ 92**. Only after the gun broke did the FBI try to do "what [it] should have done first: [t]ake the prop gun apart to examine it for modification or damage." ***Id.*** **¶ 94**. Defendant Hancock "fail[ed] to ask" the FBI "to

document the firearm's original condition before conducting destructive testing . . . ." ***Id.* ¶ 97**. This "deprived [Plaintiff] of critical information that would have allowed [him] to test a component of the prosecution's theory and his defense: whether the firearm was defective when the accident occurred and could have discharged a round without the trigger being pulled." ***Id***.

## III. Defendant Hancock gave false testimony before the grand jury[3]

After Defendant Special Prosecutor Kari Morrissey indicted Plaintiff, the Complaint alleges that Defendant Hancock gave false and misleading testimony before the grand jury. ***Id.* ¶¶ 170–76**. Among the untrue statements she made were that (1) all she knew when she arrived to the scene of the incident was that Plaintiff "had shot a revolver," even though she had been told by at least seven people that the gun had gone off accidentally, and (2) Plaintiff was required to do a safety check with the armorer but failed to do so in violation of movie set safety norms (it is true that Plaintiff did not do a safety check, but *that is the norm*). ***Id.* ¶¶ 171, 173–4**.

Both Defendants also offered knowingly false testimony at trial. Defendant Hancock testified that the six-day delay in executing a search warrant of the prop truck "occurred because SFSO 'didn't have information until later on that this prop truck had been involved in the props department.'" ***Id.* ¶ 79**. But the armorer, Hannah Gutierrez-Reed, had told Defendant Hancock "within hours of the incident" that the prop truck stored ammunition. ***Id.* ¶ 80**.

## IV. SFSO intentionally misfiled ammunition matching the live round that killed Hutchins

Even though Defendant Hancock had known since at least November 1, 2021, that Teske might have been the source of the live round that ended up on set via Kenney's warehouse, Teske did not deliver the ammunition to SFSO until March 6, 2024, when he entrusted it to

[3] The Complaint also identifies Defendant Poppell as testifying before the grand jury, **¶ 245**, but does not contain any allegations regarding the substance of her testimony, ***see id.* ¶¶ 167–203**. The Complaint makes no allegation that Defendant Brandle testified before the grand jury.

Defendant Poppell. ***Id.* ¶¶ 236, 238, 249**. Some of the rounds provided by Teske matched the live round that killed Hutchins. ***Id.* ¶ 240**. Upon receipt, however, SFSO did not inventory the evidence to the *Rust* case. ***Id.* ¶ 241**. Instead, Defendants Hancock, Poppell, and Brandle, along with Defendant Morrissey, decided to log the ammunition under a separate case number. ***Id***. This "decision to misfile the evidence was made deliberately, and jointly, between members of law enforcement and Morrissey." ***Id.* ¶ 242**. Defendants also failed to disclose the evidence to Plaintiff. ***Id.* ¶ 243**.

## V. <u>Defendants Hancock and Poppell provided inconsistent testimony at trial regarding their decision to withhold the ammunition evidence</u>

At trial, Defendant Poppell testified that the State did not disclose the rounds provided by Teske on March 6 because they did not match those from the set. ***Id.* ¶ 245**. But just the next day, Defendant Hancock testified that Defendant Poppell's testimony was false, admitting that the rounds did match those that made it onto the set. ***Id.* ¶ 246**. This forced Defendant Poppell to also admit as much the day after. ***Id.* ¶ 247**. Indeed, Defendant Poppell's initial testimony was belied by SFSO's own report, which indicated that the rounds given to SFSO by Teske matched those on set. ***Id.* ¶ 249**. Despite knowing that Teske's ammunition likely matched the live round that killed Hutchins,

> the State still tried to cover its tracks. It argued first that the evidence had been logged separately because it was not collected at the set. Then it argued that this occurred because the evidence was not collected by SFSO officers independently. And finally, the State claimed it was not logged to the *Rust* case because Teske had supposedly not returned that State's phone calls (notwithstanding his repeated offers to give a statement when he provided the ammunition, and his detailed account of its origin, that were captured on an SFSO lapel video played at trial).

***Id.* ¶ 250**. This cover up, including Defendant Morrissey's false testimony at trial, led the trial judge to conclude that "[g]iven the State's egregious discovery violations constituting misconduct

and the false testimony elicited during trial, dismissal with prejudice is the appropriate remedy." ***Id.* ¶ 254**.

**VI. <u>Plaintiff's instant case against Defendants</u>**

In January 2025, Plaintiff filed the Complaint in state court. **Not. of Removal, Doc. 1 ¶ 1**; **Am. Not. of Removal, Doc. 8 ¶ 1**. In his Complaint, Plaintiff alleges six claims against State and County Defendants for their misconduct while investigating and prosecuting his criminal case. **Compl. ¶¶ 256–310**. As relevant here, Plaintiff alleges:

- Count I: Violation of Rights Under 42 U.S.C. § 1983 for Conspiracy to Cause Malicious Prosecution and Deprivation of Civil Rights (Against all Defendants), and
- Count II: Violation of Rights Under 42 U.S.C. § 1983 for Suppression of Evidence and Deprivation of Civil Rights (Against Defendants Hancock, Poppell, and Brandle).

Regarding Count I, Plaintiff alleges that State Defendants' conspiratorial actions were "driven by ill motives and to accomplish illegitimate ends, including to harass or 'humble' [Plaintiff], to promote their political agendas . . . , or to further their own personal agendas or professional ambitions." ***Id.* ¶ 260**. Plaintiff alleges further that these actions violated Defendant's rights under the United States and New Mexico constitutions. ***Id.* ¶ 261**. Due to Defendants' "unreasonable and unlawful conduct," Plaintiff alleges that "he has suffered and continues to suffer substantial past and future damages, . . . including, but not limited to, legal expenses, loss of income, severe emotional distress, mental anguish, and embarrassment." ***Id.* ¶ 268**.

With respect to Count II, Plaintiff alleges that, while acting under color of state law, Defendants intentionally caused and/or agreed to cause exculpatory evidence not to be inventoried in the *Rust* case file and failed to disclose this evidence to Plaintiff. ***Id.* ¶ 271**. And that these "actions were not undertaken in good-faith and were in violation of clearly established law." ***Id.***

**¶ 273**. As a result of this conduct, Plaintiff alleges that that "he has suffered and continues to suffer substantial past and future damages, . . . including, but not limited to, legal expenses, loss of income, severe emotional distress, mental anguish, and embarrassment." ***Id.*** **¶ 275**.

About one week after Defendants accepted service of the Complaint, Defendants removed Plaintiff's case to this Court. ***See*** **Doc. 1 ¶ 2**. Eight months later, State Defendants filed this Motion for Partial Judgment on the Pleadings.

## LEGAL STANDARD

Federal Rule of Civil Procedure ("Rule") 12(b)(6) permits a court to dismiss a complaint that fails to state a claim upon which relief can be granted. A Rule 12(c) motion is evaluated under the same standard as that of a Rule 12(b)(6) motion. *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1223–24 (10th Cir. 2009). Therefore, to survive a Rule 12(c) motion, a complaint must have sufficient factual allegations that, if true, state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible if a plaintiff pleads factual content that allows a court to reasonably infer that the defendant is liable for the misconduct alleged. *Id.* A court must assume the truth of all well-pleaded facts in the complaint and draw all reasonable inferences therefrom in the light most favorable to the plaintiff. *Kay v. Bemis*, 500 F.3d 1214, 1217 (10th Cir. 2007).

In ruling on a motion for judgment on the pleadings, a court should disregard conclusory statements of law and consider whether the factual allegations plausibly suggest the defendant is liable. *See Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (indicating the standard for evaluating a motion to dismiss). While a court must draw all reasonable inferences in favor of the plaintiff, *Kay*, 500 F.3d at 1217, mere "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action" will not suffice, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## DISCUSSION

The Court considers four distinct issues within this Motion. With respect to Count I, Defendants argue that (1) Count I does not apply to the Santa Fe County Board of County Commissioners (the "Board"), (2) Defendants Hancock, Poppell, and Brandle are entitled to absolute immunity for any claims based on their grand jury and trial testimonies, and (3) Defendants Hancock, Poppell, and Brandle are entitled to qualified immunity on the malicious prosecution claim. **Defs.' Mot. Partial J. Pleadings at 2–3, Doc. 48**. Respecting Count II, Defendants argue that (4) Defendants Hancock, Poppell, and Brandle are entitled to qualified immunity on the suppression of evidence claim. ***Id.* at 4**.

In his Response, Plaintiff concedes that "[t]o the extent that Count I purports to state claims against all defendants, it misspeaks," and that the Board "is therefore entitled to judgment on that count." **Pl.'s Response Mot. Partial J. Pleadings at 2, Doc. 49** (internal citation omitted). Accordingly, the Court **GRANTS** this Motion with respect to the Board. The other three issues are contested, and the Court will address them in turn.

### I. <u>Defendants Hancock, Poppell, and Brandle are entitled to absolute immunity for giving allegedly false testimonies before the grand jury and at trial</u>

Defendants Hancock, Poppell, and Brandle are immune from civil damages under § 1983 for the allegedly false testimony that they gave before the grand jury or at trial. State Defendants argue that Defendants Hancock, Poppell, and Brandle are entitled to absolute immunity for "any claim" based on their grand jury and trial testimonies. **Doc. 48 at 8–9**. They argue that under *Rehberg v. Paulk*, 566 U.S. 356 (2012), absolute immunity from any civil claim attaches to Defendant Hancock's grand jury testimony. **Doc. 48 at 8–9**. And that, under *Briscoe v. Lahue*, 460 U.S. 325 (1983), all three defendants are absolutely immune "from *any* claim" based on their trial testimonies. **Doc. 48 at 9** (emphasis in original). Plaintiff responds by "caution[ing]" the Court not

to extend the scope of absolute immunity so far as to protect all conduct derivative of grand jury and trial testimony. **Doc. 49 at 3–7**. Because the Supreme Court is clear that law enforcement officers are immune from damages under § 1983 for giving perjured testimony, the Defendants are entitled to immunity for allegedly perjuring themselves before the grand jury and at trial.

Section 1983 does not allow recovery of damages against a law enforcement officer for testimony in a judicial proceeding. *Briscoe*, 460 U.S. at 336. If a police officer appears as a private witness, then he is not embraced by § 1983's requirement that the action be taken under color of law. *Id.* at 336–37. If, instead, a police officer is "regarded as an official performing a critical role in the judicial process, . . . he may seek the benefit [of absolute immunity] afforded to other governmental participants [such as judges and prosecutors] in the same proceeding." *Id.* at 336. At bottom, however the Supreme Court views the officer—as private witness or as an official performing a judicial function—the Court is clear: the officer cannot be sued for damages under § 1983. This immunity applies to officers testifying before grand juries. *Rehberg*, 566 U.S. at 369. And it applies to "claim[s] that [the officer] conspired to present such testimony." *Id.* at 360–61.

Accordingly, Defendants Hancock, Poppell, and Brandle are immune from civil damages under § 1983 for the allegedly false testimony that they gave before either the grand jury or at trial or both. They are also immune for allegedly conspiring with Defendant Morrissey to provide false testimony. The Court grants Defendants' Motion insofar as it goes this far.[4]

---

[4] The Court is not sure what to make of Defendants Hancock, Poppell, and Brandle's claim that they are immune from *any* claim based on trial testimony, for which they cite to *Briscoe*. ***See*** **Doc. 48 at 9**. *Briscoe* limits its holding to granting immunity for the trial testimony itself, not necessarily for any derivative claim. *See generally* 460 U.S. 325. For example, Plaintiff correctly points out that the Tenth Circuit has held that "state and federal officers are liable under § 1983 when they conspire to procure groundless state indictments and charges against a citizen based upon fabricated evidence or false, distorted, perjurious testimony presented to official bodies in order to maliciously bring about a citizen's trial or conviction." *Bledsoe v. Carreno*, 53 F.4th 589, 609 (10th Cir. 2022). To the extent that making such a claim requires Plaintiff to demonstrate what

## II. **Defendants Hancock, Poppell, and Brandle are entitled to qualified immunity on the conspiracy to cause malicious prosecution and suppression of evidence claims**

Defendants Hancock, Poppell, and Brandle are each entitled to qualified immunity on the malicious prosecution and suppression of evidence claims. Plaintiff has failed to properly allege that his statutory rights against malicious prosecution and suppression of evidence were violated by Defendants.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When state officials assert a qualified immunity defense in a judgment on the pleadings, a plaintiff must show that (1) each "defendant[s]' alleged conduct violated a constitutional or statutory right" and that (2) "the right was clearly established at the time of the violation." *Moya v. Garcia*, 895 F.3d 1229, 1232 (10th Cir. 2018) (cleaned up). "Failure at either step requires [the Court] to grant qualified immunity." *Paugh v. Uintah County*, 47 F.4th 1139, 1153 (10th Cir. 2022) (citing *Grissom v. Roberts*, 902 F.3d 1162, 1167 (10th Cir. 2018)). The Court "may address either step of the qualified immunity analysis first." *Id.*

At the first step, the Court considers whether the plaintiff adequately alleged the violation of a constitutional or statutory right and whether the defendants' alleged conduct deprived the plaintiff of that right. *Moya*, 895 F.3d at 1232. At the second step, "[a] Government official's

---

officers said before a grand jury or at trial, *Briscoe* does not prevent Plaintiff from doing so. Accordingly, Plaintiff may use the trial testimony to support other claims, even if he cannot sue Defendants for having made those claims. The Court does not interpret Defendants Motion as arguing otherwise. It makes only cursory citations to *Rehberg* and *Briscoe* and provides no support for the contention that the Complaint's testimonial allegations cannot be used to support other claims.

conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The Tenth Circuit does not consider a law clearly established unless there is "'a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'" *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001) (quoting *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992)). In making this evaluation, the Court must not "'abstract [the Tenth Circuit's] holdings to the situation here' too much." *Tachias v. Sanders*, 130 F.4th 836, 844 (10th Cir. 2025) (quoting *Estate of Smart v. City of Wichita*, 951 F.3d 1161, 1174 (10th Cir. 2020)). "Doing so may 'define the qualified immunity inquiry at too high a level of generality.'" *Tachias*, 130 F.4th at 844 (quoting *Mullenix v. Luna*, 577 U.S. 7, 16 (2015)). "It is not necessary, however, for plaintiffs to find a case with exact corresponding factual circumstances; defendants are required to make 'reasonable application of the prevailing law to their own circumstances.'" *Currier*, 242 F.3d at 923 (quoting *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1251 (10th Cir. 1999)).

**A. Defendants are entitled to qualified immunity on the conspiracy to cause a malicious prosecution claim because Plaintiff has failed to allege that Defendants maliciously prosecuted him**

Here, where the Plaintiff has alleged that Defendants Hancock, Poppell, and Brandle engaged in a conspiracy with prosecutors to cause malicious prosecution under § 1983, the Court considers first whether Plaintiff has properly alleged a violation of his statutory right against malicious prosecution. *Moya*, 895 F.3d at 1232, and second whether the "official's conduct violates clearly established law." *al-Kidd*, 563 U.S. at 741. Plaintiff has failed to allege that Defendants maliciously prosecuted him. But even if he properly alleged such a violation, it was

not clearly established at the time that the officers' conduct constituted malicious prosecution. Therefore, Defendants are entitled to qualified immunity under § 1983.

1. Defendants did not maliciously prosecute Plaintiff, who failed to allege that they lacked probable cause to charge him with a crime

To prove his § 1983 malicious prosecution claim, Plaintiff must show that "(1) the defendant caused [Plaintiff's] continued confinement or prosecution; (2) the original action terminated in favor of [Plaintiff]; (3) no probable cause supported the arrest, confinement, or prosecution; (4) the defendant acted maliciously; and (5) [Plaintiff] sustained damages." *Coones v. Bd. of Cnty. Comm'rs Unified Gov't.*, 166 F.4th 1, 25 (10th Cir. 2026). Here, Defendants do not dispute that Plaintiff has pled sufficient facts to show that elements (2), (4), and (5) are met. ***See* Doc. 48 at 14–21**. Instead, Defendants focus on elements (1) and (3). They argue that because Plaintiff failed to allege that Defendants "pressured or misled the prosecutor[s]," that Defendants did not cause Plaintiff's arrest, confinement, or prosecution. ***Id.* at 14**. They also contend that the facts alleged in the Complaint—namely that (1) Plaintiff held a gun in Hutchins' direction and cocked it when it discharged a bullet; (2) Plaintiff was familiar with guns and had received gun training at other movie sets; and (3) against the advice of gun training, he never checked the gun himself—gave Defendants probable cause to suspect Plaintiff of involuntary manslaughter, the crime with which he was eventually charged. ***Id.* at 15–16**.

Plaintiff disagrees. He argues that the causation element does not require him to prove that officers pressured or misled prosecutors, but merely that they "acted in cahoots with the prosecutors to concoct a criminal case against [Plaintiff]." **Doc. 49 at 8**. Defendants lacked probable cause, according to Plaintiff, because they were aware of significant exculpatory

evidence which, viewed alongside inculpating evidence, clearly exonerated Plaintiff. ***Id.* at 11**.[5] Because Defendants are correct that they had probable cause to charge Plaintiff with involuntary manslaughter, they did not maliciously prosecute Plaintiff and are entitled to qualified immunity under § 1983.

As an initial matter, the Court does not treat all three Defendants the same. While the Complaint makes many allegations respecting Hancock, it alleges very few facts about Poppell and Brandle that could conceivably support a malicious prosecution claim. With respect to Poppell, the Complaint says only that (1) she gave testimony before the grand jury, **Compl. ¶ 2**; (2) Teske entrusted her with the ammunition he delivered to SFSO on March 6, 2024, ***id.* ¶ 239**; (3) she participated in a discussion with Defendants Hancock, Brandle, and Morrissey where it was determined the ammunition evidence would be logged under a separate case number, ***id.* ¶ 241**; and that (4) she gave false testimony at trial, ***id.* ¶¶ 245–254**. And the only factual allegation made of Defendant Brandle is that he participated in the discussion with Defendants Hancock, Poppell, and Morrissey where they determined the ammunition would be logged under a separate case number. ***Id.* ¶ 241**. Every allegation that SFSO ignored evidence of how live ammunition made it onto the set, knowingly subjected the gun to destructive testing, and gave false grand jury testimony is attributable to Defendant Hancock only, not to Defendants Poppell and Brandle. The Court keeps Defendants' respective conduct in mind throughout the following analysis.

[5] Plaintiff argues that "these [inculpating] facts did not begin to establish probable cause . . . given what investigators also knew—namely, that [Plaintiff] was an actor handling a prop gun . . . that property masters or armorers and directors (rather than actors) are responsible for ensuring that live ammunition is never loaded into prop guns, that the announcement of a 'cold gun' by one of the individuals provides further assurance that the gun contains dummy ammunition, that the armorer on the day of the shooting loaded the gun herself, that the assistant director announced a 'cold gun' and that Hutchins . . . directed Baldwin to cock the gun and point it in her direction . . . ." **Doc. 49 at 11–12**.

*a. Defendant Hancock caused Plaintiff's prosecution but Defendants Poppell and Brandle did not*

First, Plaintiff has sufficiently alleged that Defendant Hancock caused Plaintiff's prosecution, but not that Defendants Poppell and Brandle caused it. The Tenth Circuit made clear in *Bledsoe v. Carreno* that a law enforcement officer causes a prosecution when a prosecutor's decision to prosecute is "based on evidence of [a defendant's] guilt that [officers] fabricated or conspired to fabricate, and [made] without exculpatory evidence . . . that [officers] suppressed or conspired to suppress." 53 F.4th 589, 614 (10th Cir. 2022) (citing *Pierce v. Gilchrist*, 359 F.3d 1279, 1292–93 (10th Cir. 2004)). Here, the Complaint alleges that, from the start of the investigation, Defendant Hancock failed to search for or suppressed potentially exculpatory evidence. She allegedly failed to timely search Kenney's warehouse despite credible information that it was the source of the live ammunition. **Compl. ¶ 83**. The eventual search of the warehouse was done poorly, and SFSO decided to withhold the lapel video. ***Id.* ¶ 213**. When Teske turned in ammunition to SFSO, it was intentionally misfiled by Defendants Hancock, Poppell, and Brandle. ***Id.* ¶ 241**. The alleged purpose of these decisions was to prevent the focus of the state's investigation from turning towards Kenney and/or Teske, and it prevented evidence from being uncovered that would have undermined the State's case that Plaintiff, as a producer, was responsible for live ammunition arriving on set. Defendant Hancock also allegedly greenlighted destructive testing on the gun that made it impossible to corroborate Plaintiff's theory that the gun "just went off." ***Id.* ¶¶ 87–92**. Had testing revealed that Plaintiff's theory was credible, he would have been able to lodge a more effective defense. But Defendant Hancock allowed the gun to be destroyed, stripping Plaintiff of the opportunity to uncover potentially exculpatory evidence. Therefore, she caused his prosecution.

On the other hand, the Complaint alleges that Poppell and Brandle first became involved in decisions affecting Plaintiff's prosecution on March 6, 2024, more than two years after the initial incident. ***Id.* ¶¶ 239, 241**. By this point, the State had dropped its producer theory of liability and the only issue set for trial was whether Plaintiff was guilty of involuntary manslaughter. Defendants Poppell and Brandle's decision to incorrectly file Teske's ammunition evidence did not cause Plaintiff's continued prosecution for the involuntary manslaughter charge, which did not depend on Plaintiff being at fault for live ammunition making it onto the set. In other words, even if Teske and/or Kenney were to blame for the live ammunition's presence on the set, Plaintiff might still have possessed the requisite "subjective knowledge of the danger or risk to others posed by his decision" to point the gun at Hutchins and cock it. *State v. Skippings*, 2011-NMSC-021, ¶ 18, 258 P.3d 1008 (defining the mental state required for a conviction of involuntary manslaughter). Whatever malicious motivations, if any, Defendants Poppell and Brandle may have had for misfiling the ammunition evidence, the decision ultimately did not cause the prosecution against Plaintiff to proceed to trial. Accordingly, they are entitled to qualified immunity.

*b. Defendant Hancock is entitled to qualified immunity because Plaintiff's allegations do not plausibly state a lack of probable cause to charge Plaintiff with a crime*

The next question therefore is whether no probable cause supported Plaintiff's prosecution. "Probable cause 'is not a high bar.'" *Morphew v. Chaffee County*, 172 F.4th 802, 817 (10th Cir. 2026) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). The Tenth Circuit understands probable cause as "something more than a bare suspicion but less than a preponderance of the evidence at hand." *United States v. Johnson*, 43 F.4th 1100, 1107 (10th Cir. 2022). "Probable cause is measured by considering whether, 'without the falsified inculpatory evidence, or with the withheld exculpatory evidence, there would be no probable cause for [Plaintiff's] continued . . . prosecution.'" *Bledsoe*, 53 F.4th at 614–15 (quoting *Pierce*, 359 F.3d at 1295).

Here, where the Complaint alleges that (1) Plaintiff held the gun in Hutchins' direction and cocked it before it discharged a bullet; (2) Plaintiff was familiar with guns and had received gun training at other movie sets; and (3) Plaintiff never checked the gun himself, there was probable cause that Defendant was guilty of involuntary manslaughter, the charge for which he was eventually tried. In New Mexico, involuntary manslaughter is defined as the "unlawful killing of a human being without malice . . . committed in the commission of . . . a lawful act which might produce death in an unlawful manner or without due caution and circumspection." NMSA 1978, § 30-2-3(B); *see also State v. Salazar*, 1997-NMSC-044, ¶ 54, 945 P.2d 996. Given that Plaintiff pointed the gun at Hutchins and cocked it before it discharged, there was more than bare suspicion that Plaintiff acted without the requisite due caution and circumspection required of someone pointing a gun at another person—even though he believed the gun was loaded with a blank. The allegation that Plaintiff failed to check the gun was even more reason to believe Plaintiff acted without the requisite care. Plaintiff argues that his conduct was not criminally negligent since the armorer is responsible for ensuring that live ammunition is not loaded into the gun and because multiple people made the announcement that the gun was cold. **Doc. 49 at 11**; *see also supra* Section II.A.1 n. 5 (listing all of Plaintiff's reasons why he does not believe probable cause existed). Plaintiff is incorrect that evidence suggesting he believed the gun was cold nullified probable cause for an involuntary manslaughter charge. In New Mexico, a person may be convicted of involuntary manslaughter when he fires a loaded gun, even if he did not think the gun was loaded. *See State v. Young*, 2021-NMCA-049, ¶¶ 9, 15–29, 495 P.3d 1189 (determining that the district court erred when it failed to instruct the jury on involuntary manslaughter where the defendant "repeatedly testified that he believed the gun was not loaded"). Therefore, there was probable cause to charge Plaintiff with involuntary manslaughter when it is undisputed that he

pointed the gun at Hutchins and cocked it before it discharged, notwithstanding the dispute about whether it discharged on its own.

Defendant Hancock's alleged decision to subject the gun to testing that destroyed it, making it impossible to ascertain whether it was possible that the gun "just went off," as Plaintiff claimed, does not disturb the Court's conclusion. Even if testing had uncovered that the gun could have discharged on its own, that alone would not exonerate Plaintiff, for the question whether he in fact fired it would be left up to the jury. To be sure, Defendant Hancock's "failure to ask" the FBI "to document the firearm's original condition before conducting destructive testing . . . deprived [Plaintiff] of critical information that would have allowed [him] to test a component of the prosecution's theory and his defense: whether the firearm . . . could have discharged a round without the trigger being pulled." **Compl. ¶ 97**. This information was material to the ultimate disposition of the case. Without it, Plaintiff could not lodge his most fulsome defense.

But that is not the question here. Instead, the question is whether "with the withheld exculpatory evidence, there would be no probable cause for [Plaintiff's] continued . . . prosecution.'" *Bledsoe*, 53 F.4th at 614–15 (quoting *Pierce*, 359 F.3d at 1295). The answer to that is no. "The *legal* standard for an arrest does not require the same level of certainty as that for a conviction." *Morphew*, 172 F.4th at 818) (internal citation omitted) (emphasis in original). Even if testing revealed that the gun might have discharged on its own, that evidence would not be "significant enough to vitiate probable cause" for involuntary manslaughter, not to mention other crimes that SFSO might have charged. *Pierce*, 359 F.3d at 1296. The inculpatory facts contained in the Complaint—that Plaintiff did not check the gun before cocking it as he pointed it at the victim—were sufficient to establish probable cause. *Young*, 2021-NMCA-049, ¶¶ 9, 15–29.

Finally, the allegations that Defendant Hancock ignored evidence of how live ammunition made it onto the set also does not dissuade the Court—exactly how the gun came to be loaded with a real bullet was not dispositive of whether to charge Plaintiff with a crime. Even if Defendant Hancock had timely and properly searched Kenney's warehouse, and even if that search had uncovered that he was to blame for the live ammunition, Plaintiff could still be guilty of recklessness with respect to Hutchins' safety. Without personally verifying that the gun was cold, he pointed it at her and cocked it before it discharged.

Accordingly, Defendant Hancock is entitled to qualified immunity because Plaintiff has not plausibly stated that probable cause was lacking. And she, along with Defendants Poppell and Brandle, is entitled to qualified immunity on Plaintiff's § 1983 conspiracy to cause malicious prosecution claim.[6]

2. Even if Defendants conspired to cause Plaintiff's malicious prosecution, it was not clearly established at the time that their conduct constituted malicious prosecution

Even if Plaintiff's right against malicious prosecution was violated because Defendants lacked probable cause to charge him, this right was not clearly established at the time. At step two of a qualified immunity defense, the Tenth Circuit asks, "whether there was *arguable* probable

---

[6] The Court is aware that this conclusion may appear to be strange. On one hand, the Court acknowledges that Defendants acted in a manner sufficiently similar to the officers in *Bledsoe* that Defendants, especially Defendant Hancock, should "'have understood that what [they] were doing violate[d] [Plaintiff's] right'" against malicious prosecution. *al-Kidd*, 563 U.S. at 741 (quoting *Anderson*, 483 U.S. at 640). Normally, such a finding would suffice to deny Defendants qualified immunity. However, the important difference between *Bledsoe* and the instant case is the effect on probable cause of the respective suppressions of evidence. In *Bledsoe*, the suppressed evidence, if revealed, would have "vitiate[d] probable cause." *Pierce*, 359 F.3d at 1296. Here, however, officers illegally suppressed ammunition evidence that, if uncovered, would not have precluded them from determining probable cause existed to charge Plaintiff with involuntary manslaughter. This difference is the reason why *Bledsoe* was maliciously prosecuted, but Plaintiff was not. And even though Defendants allegedly suppressed the ammunition evidence for fear that its revelation would undermine their case against Plaintiff, their mistaken belief in the importance of this evidence to their case does not change that they had probable cause without it.

cause for the challenged conduct." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (internal quotations omitted) (emphasis mine). "Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Id.* (internal citation omitted). Accordingly, even if officers were mistaken that probable cause existed, that mistake was reasonable in light of *Young*. 2021-NMCA-049, ¶ 9 (reversing a trial court for failing to instruct a jury on involuntary manslaughter in a case where the defendant maintained that he did not believe the gun was loaded).

Moreover, Plaintiff has not pointed to any case—and the Court cannot find any binding precedent—where law enforcement officers were liable for malicious prosecution based on suppressing evidence that was not dispositive to whether probable cause existed. Plaintiff relies on *Bledsoe*, the closest analog the Court can find, to assert that "the pertinent constitutional principle at the proper level of abstraction is [that] 'a § 1983 conspiracy claim for using fabricated or false evidence was clearly established before 1999.'" **Doc. 49 at 15** (citing *Bledsoe*, 53 F.4th at 609). In *Bledsoe*, officers were liable for malicious prosecution for knowingly suppressing evidence that exculpated the defendant and inculpated a different person. 53 F.4th at 610. Had the evidence not been suppressed, probable cause to charge the defendant would not have existed. *Id.* at 615. That is not what happened here, however. In this case probable cause for the involuntary manslaughter charge at least arguably existed based solely on the few undisputed allegations—that Plaintiff pointed the gun at Hutchins and cocked it before it discharged, having failed to check whether it was loaded.

This case is similar to *Bledsoe* only insofar as Defendants (particularly Defendant Hancock) suppressed evidence of how live ammunition made it onto the set. ***See* Compl. ¶¶ 83, 241** (explaining that Defendants intentionally failed to timely investigate Kenney's warehouse and

then intentionally misfiled and withheld ammunition evidence provided to them by Teske). But because this evidence was not material to the involuntary manslaughter charge, which could be levied irrespective of how live ammunition made it onto the set, the officers are entitled to qualified immunity under § 1983.

Defendants did not maliciously prosecute Plaintiff because they had probable cause to prosecute him. And even if they did not, they arguably had probable cause under *Young*. Accordingly Defendant Hancock is entitled to qualified immunity.

**B. Defendants are entitled to qualified immunity for their role in the State's alleged suppression of evidence because such suppression did not result in a constitutional injury**

State Defendants argue that Defendants Hancock, Poppell, and Brandle are entitled to qualified immunity for suppressing evidence. **Doc. 48 at 22–23**. Under *Brady v. Maryland*, law enforcement officers violate an accused's due process when they suppress evidence favorable to the accused upon request. 373 U.S. 83, 87 (1963). This is commonly known as a *Brady* violation. Defendants point out that in the Tenth Circuit, "a plaintiff may not prevail on a *Brady* claim 'unless the case goes to trial and the suppression of exculpatory evidence affects the outcome.'" **Doc. 48 at 22** (citing *Becker v. Kroll*, 494 F.3d 904, 924 (10th Cir. 2007)). Stated otherwise, the Tenth Circuit requires "a conviction resulting in the loss of liberty" to establish "the requisite threshold of a constitutional injury." *Becker*, 494 F.3d at 924 (quoting *Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000))). Defendants argue that because Plaintiff was not convicted, he cannot establish a *Brady* violation. **Doc. 48 at 22**. And they conclude that, in the absence of a *Brady* violation, Plaintiff cannot satisfy the first step of the qualified immunity analysis and show that his constitutional or statutory rights were violated. ***Id.***

In Response, Plaintiff concedes that the Tenth Circuit requires "a conviction resulting in the loss of liberty" to establish a *Brady* violation." **Doc. 49 at 16** (internal citations omitted). But

he argues that the correct standard to apply when evaluating whether a *Brady* violation occurred is a more general "prejudice" standard. ***Id.*** (citing *Banks v. Dretke*, 540 U.S. 668, 691 (2004)). Plaintiff contends that he has "suffered plenty of" prejudice, pointing to "legal expenses, loss of income, severe emotional distress, mental anguish, and embarrassment," as well as a "loss of liberty" from the "jurisdiction of the criminal court, from the conditions it imposes, [and] from the attention its process demands." **Doc. 49 at 16–17**.

Because Defendants are correct that a *Brady* violation has not occurred unless the suppression of evidence affects the outcome of the case, they are entitled to qualified immunity. *See Becker*, 494 F.3d at 924 (citing *United States v. Bagley*, 473 U.S. 667, 678 (1985)). The Court resolves the issue of qualified immunity at the first step of the analysis, *Paugh*, 47 F.4th at 1153 (citing *Grissom*, 902 F.3d at 1167 (10th Cir. 2018)), which requires Plaintiff to properly allege a violation of his constitutional or statutory rights, *Moya*, 895 F.3d at 1232. To establish a constitutional violation for suppression of evidence, Plaintiff must show that his case went to trial, and the suppression of evidence prejudiced the outcome. *Becker*, 494 F.3d at 924 (citing *Bagley*, 473 U.S. at 678). Here, Plaintiff cannot show that the outcome of his trial was negatively affected by the suppression of evidence. If anything, the trial judge's awareness that Defendants had suppressed evidence led to Plaintiff's acquittal. ***See* Compl. ¶ 254** ("Given the State's egregious discovery violations constituting misconduct and the false testimony elicited during trial, dismissal with prejudice is the appropriate remedy.").

Plaintiff's rebuttal does not dissuade the Court from its conclusion. The Tenth Circuit is clear that the prejudice required for a *Brady* violation is a "conviction resulting in the loss of liberty," *Becker*, 494 F.3d at 924 (quoting *Jean*, 221 F.3d at 663), or, more generally, an "affect[] [on] the outcome" of the case, *Becker*, 494 F.3d at 924 (citing *Bagley*, 473 U.S. at 678). Loss of

income, legal expenses, emotional distress and the like do not rise to that level, as difficult as those may have been for Plaintiff to endure.

Accordingly, Defendants Hancock, Poppell, and Brandle are entitled to qualified immunity for their role in the State's suppression of exculpatory evidence.

**CONCLUSION**

**IT IS THEREFORE ORDERED** that Defendants' Alexandria Hancock, Marissa Poppell, Brian Brandle, and the Santa Fe County Board of County Commissioners' Motion for Partial Judgment on the Pleadings on Plaintiff's § 1983 Claims for Conspiracy to Cause Malicious Prosecution and Deprivation of Civil Rights (Count I) and Suppression of Evidence and Deprivation of Civil Rights (Count II) **(Doc. 48)** is hereby **GRANTED** for reasons described in this Memorandum Opinion and Order.

____/S/________________________________
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE