**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

---

ALEXANDER R. BALDWIN III,

Plaintiff,

v. Case No. 1:25-cv-01052-KWR-LF

KARI T. MORRISSEY, MARY CARMACK-ALTWIES,
ANDREA REEB, JENNIFER PADGETT MACIAS,
THE FIRST JUDICIAL DISTRICT ATTORNEY'S OFFICE,
ALEXANDRIA HANCOCK, MARISSA POPPELL, BRIAN BRANDLE, and
SANTA FE COUNTY BOARD OF COUNTY COMMISSIONERS,

Defendants.

**MEMORANDUM OPINION AND ORDER GRANTING SANTA FE COUNTY BOARD OF COUNTY COMMISSIONERS' MOTION TO DISMISS COUNT VI**

**THIS MATTER** comes before the Court on Santa Fe County Board of County Commissioners' Motion to Dismiss Plaintiff's Deprivation of Civil Rights in violation of the New Mexico Civil Rights Act ("NMCRA") claim for Failure to State a Claim **(Doc. 51)**.

Having reviewed the parties' pleadings, briefing, and relevant law, the Court finds that Defendants' Motion is well-taken and, therefore, is **GRANTED in Part**. The Court **requests supplemental briefing** on the issue whether Plaintiff's right to due process under Article 2, Section 18 of the New Mexico Constitution was violated. Finally, Plaintiff's request to amend his Complaint is **DENIED without prejudice**.

## BACKGROUND

For the purposes of this Motion, the Court accepts Plaintiff's well-pled factual allegations as true and draws all reasonable inferences in his favor. *Ullery v. Bradley*, 949 F.3d 1282, 1287 (10th Cir. 2020). As alleged in the Complaint, this case arises from the criminal investigation and

prosecution of Alexander R. Baldwin III ("Plaintiff") after a gun he was holding discharged and killed cinematographer Halyna Hutchins during the *Rust* film production. **Compl. ¶ 2, Doc. 1**.

Santa Fe County Board of County Commissioners ("Defendant") is a political subdivision of the State of New Mexico and all suits against Santa Fe County are to be brought in the name of Defendant. ***Id.*** **¶ 22** (citing NMSA 1978, § 4-46-1 (2026)). At all times during the State and County's criminal investigation and prosecution of Plaintiff, Defendant was a government entity and a local public body liable for the acts and omissions of persons acting on its behalf. ***Id.*** **¶¶ 22, 297**.[1] At all relevant times described herein, Defendant employed individual Defendants Alexandria Hancock, Marissa Poppell, and Briand Brandle, law enforcement officers at the Santa Fe County Sheriff's Office ("SFSO").[2] ***Id.*** **¶¶ 18–20**. Defendant did not employ individual Defendants, state prosecutors Kari T. Morrissey, Mary Carmack-Altwies, Andrea Reeb, and Jennifer Padgett Macias, who were employed by New Mexico. ***Id.*** **¶¶ 14–17**.

## I. The shooting

The shooting occurred on October 21, 2021, while Plaintiff, Hutchins, writer-director Joel Souza, and crew were setting up a close-up camera shot of Plaintiff pointing and cocking the pistol, which required the use of dummy rounds. ***Id.*** **¶¶ 24, 46–49**. While preparing for the shot, a crew member handed the prop gun to Plaintiff and "announced" that there was a "cold gun"—an inspected gun incapable of firing—on set. ***Id.*** **¶ 51**. Plaintiff never checked the gun himself. ***Id.*** **¶¶ 50–52**. In fact, the pistol held by Plaintiff and fired on set was loaded with live rounds instead

[1] For this reason, this Background Section includes acts committed by state prosecutors which the Complaint alleges were done in concert with Defendant's employees as part of a conspiracy to violate Plaintiff's rights.

[2] Defendant Hancock is a Lieutenant employed by SFSO. ***Id.*** **¶ 6**. She took over as lead detective "within days" of the shooting. ***Id.*** **¶¶ 72–3**. Defendant Brandle is and was at all relevant times a Lieutenant employed by SFSO. ***Id.*** **¶ 6**. Defendant Poppell is and was at all relevant times a crime scene technician employed by SFSO. ***Id.*** **¶ 19**.

of "dummy" rounds, inert bullets designed to look like real bullets. ***Id.*** **¶¶ 35, 56**. As Plaintiff was rehearsing the shot, Hutchins, who was standing near the camera, directed him to point the gun her way and cock the gun. ***Id.*** **¶¶ 54–55**. Suddenly, the gun "just went off," and a live round unexpectedly discharged from the gun, striking Hutchins and Souza. ***Id.*** **¶¶ 56, 88**. Hutchins died from her injuries. ***Id.*** **¶ 62**.

## II. SFSO's initial investigation, led by Defendant Hancock, ignored evidence pertaining to how live ammunition made it onto the set of *Rust*

During the investigation and throughout the prosecution Defendants Hancock, Poppell, and Brandle, worked "collectively" as a "team" with state prosecutors from the First Judicial District Attorney's Office ("FJDA") to investigate and prosecute Plaintiff's criminal case." ***Id.*** **¶ 74**. The involvement of these prosecutors shifted the focus of Defendants Hancock, Poppell, and Brandle's investigation from determining how live ammunition made it onto the set to blaming Plaintiff. ***Id.*** **¶¶ 72–77**. This focus influenced Defendants' decisions, including "ignoring critical evidence as to how live ammunition ended up on set." ***Id.*** **¶ 78**. "This shift occurred even as more evidence emerged that Seth Kenney, a third-party ammo supplier, may have been the source of the live round." ***Id.*** ¶ 77.

As part of this allegedly willful ignorance, "SFSO waited six days before executing a search warrant on the prop truck—the vehicle where firearms and ammunition had been stored." ***Id.*** **¶ 79**. SFSO also "waited more than one month [until November 30, 2021] to execute a search warrant on Kenney's business . . . despite learning within hours of the incident that [his business] was *Rust*'s ammo supplier." ***Id.*** **¶ 81**.

On November 1, 2021, Defendant Hancock learned through a conversation she observed between Kenney and Joe Swanson, an ammunitions manufacturer, that hundreds of live rounds that matched the live rounds found on set had been sitting loose in an ammo can in Kenney's

business' warehouse. ***Id.* ¶ 82**. "Even though [Defendant] Hancock was present when Kenney realized that he may have been the person who had inadvertently supplied live ammunition to the set of *Rust*, . . . she indefensibly waited 30 days to search Kenney's business." ***Id.* ¶ 83**. On November 1, SFSO also became aware that Troy Teske, a retired police officer, had a cache of ammunition that could have been the source of the live round. ***Id.* ¶ 236**. Instead of investigating this lead, Defendant Hancock accepted a screenshot of a photograph depicting four bullets that Teske had sent to Kenney, even though she acknowledged that "testing at least a few [of the rounds] . . . would be important. ***Id.* ¶ 237–38**. When SFSO conducted a search of Kenney's business, it was not done "proper[ly]." ***Id.* ¶ 213**. The State failed to disclose lapel videos depicting the search to Plaintiff's counsel until May 14, 2024. ***Id***.

The Complaint alleges further that as part of their refusal to properly investigate how live rounds made it onto the set, SFSO "brushed off" witnesses and failed to follow-up on claims that "persons connected to the film were firing live ammunition [at a nearby ranch] the day of the accident." ***Id.* ¶ 84**. SFSO did not seek fingerprint or DNA testing of the live rounds found on set. ***Id.* ¶ 86**.

## III. <u>Irrespective of Plaintiff's claim that the gun "just went off," SFSO's investigation into the gun caused it to be destroyed</u>

Plaintiff also contends that SFSO was responsible for destroying the gun that fired the live round by subjecting it to destructive testing without first documenting its internal components. ***Id.* ¶¶ 87–97**. SFSO asked the FBI to test the gun by striking it with a substantial external force to "disprove" Plaintiff's theory that the gun "just went off." ***Id.* ¶¶ 88–89**. According to the FBI, which tested the gun on behalf of SFSO, Defendant Hancock knew "that the requested testing w[ould] alter the firearm and it w[ould] no longer be in the same physical condition that it was seized in." ***Id.* ¶ 90**. This test was requested in lieu of the "push-off" test, which applies manual

pressure to the back of the hammer and would not have destroyed the gun. ***Id.*** **¶ 93**. This test would have been "more appropriate," according to Plaintiff, because no one claimed that the gun misfired due to a substantial external force. ***Id.***

Nevertheless, at the direction of SFSO, the FBI proceeded with a test that resulted in the mallet and other internal components breaking. ***Id.*** **¶ 92**. Only after the gun broke did the FBI try to do "what [it] should have done first: [t]ake the prop gun apart to examine it for modification or damage." ***Id.*** **¶ 94**. Defendant Hancock "fail[ed] to ask" the FBI "to document the firearm's original condition before conducting destructive testing . . . ." ***Id.*** **¶ 97**. This "deprived [Plaintiff] of critical information that would have allowed [him] to test a component of the prosecution's theory and his defense: whether the firearm was defective when the accident occurred and could have discharged a round without the trigger being pulled." ***Id***.

## IV. Defendant Hancock gave false testimony before the grand jury[3]

After Defendant Special Prosecutor Kari Morrissey indicted Plaintiff, the Complaint alleges that Defendant Hancock gave false and misleading testimony before the grand jury. ***Id.*** **¶¶ 170–76**. Among the untrue statements she made were that (1) all she knew when she arrived to the scene of the incident was that Plaintiff "had shot a revolver," even though she had been told by at least seven people that the gun had gone off accidentally, and (2) Plaintiff was required to do a safety check with the armorer but failed to do so in violation of movie set safety norms (it is true that Plaintiff did not do a safety check, but *that is the norm*). ***Id.*** **¶¶ 171, 173–4**.

[3] The Complaint also identifies Defendant Poppell as testifying before the grand jury, **¶ 245**, but does not contain any allegations regarding the substance of her testimony, ***see id.*** **¶¶ 167–203**. The Complaint makes no allegation that Defendant Brandle testified before the grand jury.

Both Defendants also offered knowingly false testimony at trial. Defendant Hancock testified that the six-day delay in executing a search warrant of the prop truck "occurred because SFSO 'didn't have information until later on that this prop truck had been involved in the props department.'" ***Id.* ¶ 79**. But the armorer, Hannah Gutierrez-Reed, had told Defendant Hancock "within hours of the incident" that the prop truck stored ammunition. ***Id.* ¶ 80**.

## V. SFSO intentionally misfiled ammunition matching the live round that killed Hutchins

Even though Defendant Hancock had known since at least November 1, 2021, that Teske might have been the source of the live round that ended up on set via Kenney's warehouse, Teske did not deliver the ammunition to SFSO until March 6, 2024, when he entrusted it to Defendant Poppell. ***Id.* ¶¶ 236, 238, 249**. Some of the rounds provided by Teske matched the live round that killed Hutchins. ***Id.* ¶ 240**. Upon receipt, however, SFSO did not inventory the evidence to the *Rust* case. ***Id.* ¶ 241**. Instead, Defendants Hancock, Poppell, and Brandle, along with Defendant Morrissey, decided to log the ammunition under a separate case number. ***Id***. This "decision to misfile the evidence was made deliberately, and jointly, between members of law enforcement and Morrissey." ***Id.* ¶ 242**. Defendants also failed to disclose the evidence to Plaintiff. ***Id.* ¶ 243**.

## VI. Defendants Hancock and Poppell provided inconsistent testimony at trial regarding their decision to withhold ammunition evidence

At trial, Defendant Poppell testified that the State did not disclose the rounds provided by Teske on March 6 because they did not match those from the set. ***Id.* ¶ 245**. But just the next day, Defendant Hancock testified that Defendant Poppell's testimony was false, admitting that the rounds did match those that made it onto the set. ***Id.* ¶ 246**. This forced Defendant Poppell to also admit as much the day after. ***Id.* ¶ 247**. Indeed, Defendant Poppell's initial testimony was belied by SFSO's own report, which indicated that the rounds given to SFSO by Teske matched those on

set. ***Id.* ¶ 249**. Despite knowing that Teske's ammunition likely matched the live round that killed Hutchins,

> the State still tried to cover its tracks. It argued first that the evidence had been logged separately because it was not collected at the set. Then it argued that this occurred because the evidence was not collected by SFSO officers independently. And finally, the State claimed it was not logged to the *Rust* case because Teske had supposedly not returned that State's phone calls (notwithstanding his repeated offers to give a statement when he provided the ammunition, and his detailed account of its origin, that were captured on an SFSO lapel video played at trial).

***Id.* ¶ 250**. This cover up, including Defendant Morrissey's false testimony at trial, led the trial judge to conclude that "[g]iven the State's egregious discovery violations constituting misconduct and the false testimony elicited during trial, dismissal with prejudice is the appropriate remedy." ***Id.* ¶ 254**.

## VII. The acts of state prosecutors allegedly performed in concert with Defendant's employees

Count VI lists additional acts taken by state prosecutors that it imputes onto Defendant's employees (and therefore onto Defendant) by alleging that they were taken as part of a conspiracy to violate Plaintiff's rights.

These acts are (1) that Defendant Morrissey "knowingly failed to disclose exculpatory evidence that she had received from the State's expert witnesses (including but not limited to the Third Haag Report) to deprive the grand jury of information that undermined the case against [Plaintiff]," and (2) that Defendant Morrissey and Defendant Carmack-Altwies conspired with Defendant's employees to intentionally cause exculpatory evidence to be misfiled and undisclosed to Plaintiff. ***Id.* at ¶ 298(d), (e)**. The latter is detailed in the preceding two sections. With respect to the first act, the Complaint alleges that after Carmack-Altwies appointed Defendant Kari Morrissey as Special Prosecutor in the case against Plaintiff, Defendant Morrissey retained firearm experts Lucien Haag and Michael Haag "to interpret the FBI's findings about the prop gun and

conduct further analysis, notwithstanding the FBI's destruction of the gun." **Id. ¶ 137–39**. The Haags issued three reports in August 2023. **Id. ¶¶ 140–41**. Although Defendant Morrissey disclosed the first report, she did not disclose the second and third reports until much later. **Id. ¶¶ 208, 215.**

In early October 2023, Defendant Morrissey notified Plaintiff that she intended to bring the Rust shooting case to a grand jury. **Id. ¶ 144**. Defendant Morrissey then allegedly engaged in misconduct as she prepared for and presented evidence to the grand jury. **Id. ¶ 167**. Specifically, Plaintiff alleges that Defendant Morrissey did not make certain witnesses and documents "readily available" to the grand jury, in violation of a court order. **Id. ¶¶ 157–58, 166–67**. She "withheld over a dozen exculpatory documents," and failed to inform the grand jury that the witnesses and documents were available for testimony and review. **Id. ¶¶ 197, 198, 202**. Defendant Morrissey also misled the grand jury by "eliciting false and contradictory testimony from State's witnesses" and preventing the grand jury from receiving any exculpatory evidence or hearing statements that may be favorable to Plaintiff. **See id. ¶ 167**.

In January 2024, the grand jury returned the indictment against Plaintiff. ***Id.* ¶ 202**. In February 2024, the state court issued a scheduling order setting trial for July 2024 and outlining pre-trial deadlines. ***Id.* ¶ 205**. The scheduling order stated that "[f]ollowing initial discovery disclosures, the parties have a continuing duty to disclose and make available supplemental discovery within seven (7) days of the receipt of such information." ***Id.*** Yet, Defendant Morrissey did not comply with the order and did not disclose the second and third Haag reports, as well as other exculpatory documents, communications, recordings, and ammunition in the FJDA's possession, until May to June 2024. ***Id.* ¶¶ 206–24**.

## VIII. Plaintiff's instant case against Defendant

In January 2025, Plaintiff filed the Complaint in state court. **Not. of Removal, Doc. 1 ¶ 1**; **Am. Not. of Removal, Doc. 8 ¶ 1**. In his Complaint, Plaintiff alleges six claims against State and County Defendants for their misconduct while investigating and prosecuting his criminal case. **Compl. ¶¶ 256–310**. As against Defendant, Plaintiff alleges Count VI: Violation of the New Mexico Civil Rights Act ("NMCRA") for the deprivation of civil rights in violation of the New Mexico Constitution, Article 2, Sections 4, 18, and 19. **Compl. ¶¶ 296–310**.

Specifically, the claims contained within Count VI that Plaintiff alleges against Defendant are a (1) violation of Plaintiff's inalienable rights guaranteed by Article 2, Section 4 of the New Mexico Constitution; (2) violation of Plaintiff's right to due process under Article 2, Section 18 of the New Mexico Constitution; (3) violation of Plaintiff's right to equal protection under Article 2, Section 18 of the New Mexico Constitution; (4) violation of Plaintiff's right against *ex post facto* laws under Article 2, Section 19 of the New Mexico Constitution; and (5) claim for punitive damages under the NMCRA. ***Id.*** In addition, in his Response, Plaintiff requested leave to amend his Complaint to add a claim for violation of Plaintiff's right against unreasonable searches and seizures under Article 2, Section 10 of the New Mexico Constitution. ***See*** **Doc. 52 at 11 n.2**.

## LEGAL STANDARD

Federal Rule of Civil Procedure ("Rule") 12(b)(6) permits a court to dismiss a complaint that fails to state a claim upon which relief can be granted. A complaint must have sufficient factual allegations that, if true, state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible if a plaintiff pleads factual content that allows a court to reasonably infer that the defendant is liable for the misconduct alleged. *Id.* A court must assume the truth of all well-pleaded facts in the complaint and draw all reasonable inferences

therefrom in the light most favorable to the plaintiff. *Kay v. Bemis*, 500 F.3d 1214, 1217 (10th Cir. 2007).

In ruling on a motion to dismiss, a court should disregard conclusory statements of law and consider whether the factual allegations plausibly suggest the defendant is liable. *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). In addition to the complaint, a court may consider attached exhibits and documents incorporated into the complaint by reference. *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). While a court must draw all reasonable inferences in favor of the plaintiff, *Kay*, 500 F.3d at 1217, mere "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action" will not suffice, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The NMCRA creates a cause of action for deprivations of rights secured pursuant to the State's Bill of Rights. NMSA 1978, § 41-4A-3 (2021). And it erases qualified and sovereign immunities applicable under federal law. *Id.* at §§ 41-4A-4, 9. NMCRA claims are brought exclusively against public bodies, which may be vicariously liable for individuals acting on behalf of, under color of, or within the course and scope of their authority. *Id.* at §§ 41-4A-3(B), (C). Among the state constitutional rights to which an NMCRA cause of action applies are the rights to due process, equal protection, and against the enactment of *ex post facto* laws. N.M. Const. art. 2 §§ 18, 19.

Generally, a party must make a motion for leave to amend a complaint, and the Court need not offer leave to amend *sua sponte*. Local rule 15.1 requires that "a proposed amendment to a pleading must accompany the motion to amend." D.N.M.LR-Civ. 15.1. The Tenth Circuit has held that the federal rules also require a motion to be filed. *Serna v. Denver Police Dep't*, 58 F.4th 1167, 1172 (10th Cir. 2023). Rule 7 requires a request for relief to be made by a motion that (1) is in

writing, (2) "states with particularity the grounds for seeking the order," and (3) specifies the relief sought. Fed. R. Civ. P. 7(b)(1). "We have recognized the importance of Fed. R. Civ. P. 7(b) and have held that normally a court need not grant leave to amend when a party fails to file a formal motion." *Calderon v. Kansas Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186 (10th Cir. 1999).

The Tenth Circuit has also held that it is not arbitrary or capricious for a district court to deny leave to amend where a motion for leave to amend was not filed. *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1283 (10th Cir. 2021) ("We have long held that bare requests for leave to amend do not rise to the status of a motion and do not put the issue before the district court."); *Albers v. Bd. of Cnty. Comm'rs*, 771 F.3d 697, 706 (10th Cir. 2014) (court did not abuse discretion in denying leave to amend where party did not file a motion); *Calderon*, 181 F.3d at 1186 ("We have recognized the importance of Fed. R. Civ. P. 7(b) and have held that normally a court need not grant leave to amend when a party fails to file a formal motion."); *Glenn v. First Nat. Bank in Grand Junction,* 868 F.2d 368, 369–72 (10th Cir. 1989) ("Appellant did not move the court for leave to amend the complaint and therefore the district judge committed no error in not ruling thereon.").

## DISCUSSION

Count VI states many claims against Defendant and fails to make another that Plaintiff now requests leave to add. The claims fall into three buckets: (1) those Plaintiff concedes lack either legal or factual support; (2) the omitted claim for which Plaintiff asks leave to amend his Complaint; (3) Plaintiff's Article 2, Section 18 claims: (A) a due process claim for which the Court requests additional briefing; and (B) an equal protection claim, which is contested by the parties. The Court addresses each of these claims below.

## I. <u>Plaintiff concedes that his Section 4 and Section 19 claims should be dismissed</u>

In his Response, Plaintiff concedes that Section 4 does not "serve[] as a standalone damages provision," clarifying that it is cited in Count VI only because it is partly responsible for the "greater breadth of protection" Section 18 affords compared to the U.S. Constitution. **Pl.'s Response Mot. Dismiss at 9–10 n. 1, Doc. 52**. He also concedes that his Section 19 claim does not apply to Defendant because "none of [Plaintiff's] conspiracy allegations implicate the County's employees in the prosecutors' decision to charge [Plaintiff] under a subsequently enacted statute in violation of *ex post facto* principles." **Doc. 52 at 17 n.3** (emphasis added). Finally, he concedes further that the NMCRA does not make punitive damages available. ***Id***. The Court agrees with the foregoing and **GRANTS** Defendants' Motion with respect to Plaintiff's Sections 4 and 19 claims and his request for punitive damages.

## II. <u>The Court denies without prejudice Plaintiff's request for leave to amend his Complaint</u>

Count VI fails to make an Article 2, Section 10 claim against unreasonable searches and seizures. ***See generally*** **Compl. ¶¶ 296–310**. Plaintiff's Response argues in passing that the Court should grant leave to amend his Complaint to include this claim. ***See*** **Doc. 52 at 11 n.2**. Because Plaintiff's request was not made in a motion in accordance with Local Civil Rule 15.1 and Federal Rule of Civil Procedure 7, the Court **DENIES it without prejudice**. *See* D.N.M.L.R-Civ. 15.1; Fed. R. Civ. P. 7; *Serna*, 58 F.4th at 1172; *Calderon*, 181 F.3d at 1186; *Brooks*, 985 F.3d at 1283.

## III. <u>The Court requests additional briefing on Plaintiff's due process claim and dismisses his equal protection claim</u>

That leaves Plaintiff's Section 18 due process and equal protection claims, each contested by the parties. As an initial matter, the parties agree that the NMCRA "preserves absolute immunity to the same extent as federal law," **Def.'s Reply Mot. Dismiss at 1, Doc. 53**, and that Defendant's absolute immunity is coextensive with the absolute immunity enjoyed by its

employees, **Doc. 52 at 17 n. 3**. The Court again concurs—Defendant is entitled to absolute immunity for Defendant Hancock's grand jury and trial testimonies and Defendant Poppell's trial testimony.[4] None furnishes a basis for liability under either Section 18 claim.

But the Complaint alleges much more conduct committed by Defendant's employees and state prosecutors—the latter of which Plaintiff claims is imputable to Defendant to the extent it was part of a conspiracy between Defendant's employees and state prosecutors—that Plaintiff argues violates his Section 18 rights to due process and equal protection. ***See* Compl. ¶¶ 296–310**; *supra*, Background Section. If Plaintiff is correct, Defendant is subject NMCRA liability for those violations. The Section 18 disputes are addressed below.

### A. The Court requests supplemental briefing on the issue whether Plaintiff's Section 18 right to due process was violated

The Court requests supplemental briefing on Plaintiff's due process claim. Specifically, the Court requests the parties to more fully brief the issue whether, assuming Plaintiff's asserted due process right is not protected by an analogous provision of the federal constitution, "'flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics' require divergence from established federal precedent in determining whether the New Mexico Constitution protects the right." *Morris v. Brandenburg*, 2016-NMSC-027, ¶ 19, 376 P.3d 836 (quoting *State v. Gomez*, 1997-NMSC-006, ¶¶ 19, 932 P.2d 1).

---

[4] As discussed in this Court's Memorandum Opinion and Order Granting State Defendants Hancock, Poppell, and Brandle's Motions for Judgment on the Pleadings, Defendants are immune for giving perjured testimony before the grand jury and at trial. **Doc. 61 at 9–10**. Under *Rehberg v. Paulk*, absolute immunity from any civil claim attaches to Defendant Hancock's grand jury testimony. 566 U.S. 356 (2012). And under *Briscoe v. Lahue*, Defendants Hancock and Poppell are entitled to absolute immunity for their allegedly false trial testimonies. 460 U.S. 325 (1983). Here, where Defendant is entitled under the NMCRA to the same absolute immunity enjoyed by its employees under federal law, it too is absolutely immune for their allegedly perjurious testimonies.

In the instant briefing, the parties focus extensively on whether the Court should apply New Mexico courts' interstitial method of state constitutional analysis when analyzing Plaintiff's due process claim.[5] ***See*** **Doc. 51 at 11; Doc. 52 at 3**. They also focus on whether, assuming interstitial analysis is applied, analogous federal provisions to the Section 18 Due Process Clause protect Plaintiff's asserted right to due process. However, they neglect to fully address whether, assuming the federal constitution does not protect Plaintiff's asserted right, the Court is required to diverge from federal precedent and find that New Mexico's constitution provides Plaintiff with greater protection. Accordingly, the Court requests supplemental briefing on this specific question only.

### B. Plaintiff fails to sufficiently plead a violation of his Section 18 right to equal protection

On the other hand, the Court is able to dispense with Plaintiff's equal protection claim in the instant Order and finds that Plaintiff's Section 18 right to equal protection was not violated.

---

[5] "When analyzing a state constitutional provision with a federal analogue, [New Mexico's courts] employ[] the interstitial approach." *Morris*, 2016-NMSC-027, ¶ 19. Under interstitial analysis, courts first determine whether an asserted state right is protected under an equivalent provision of the federal constitution. *Id.* (citing *Gomez*, 1997-NMSC-006, ¶¶ 19, 20). For courts to be able to answer this question, the federal protection cannot be "undetermined." *Grisham v. Van Soelen*, 2023-NMSC-027, ¶ 15, 539 P.2d 272. "[C]larity as to the existence [or lack thereof] of federal protection [is] a prerequisite to reaching the second stage of interstitial analysis." *Id.* at 16. If the federal protection is "undetermined," then courts apply state law. *Id.* (applying state law to a partisan gerrymandering challenge brought under Section 18's Equal Protection Clause, where federal Equal Protection Clause jurisprudence in partisan gerrymandering was "undetermined"). If, instead, it is possible to determine whether federal protection exists, courts move to the second stage of interstitial analysis. At this stage, if the right is protected by federal law, then the claim is not reached under the New Mexico Constitution, only on federal grounds. *Morris v. Brandenburg*, 2016-NMSC-027, ¶ 19 (citing *Gomez*, 1997-NMSC-006, ¶ 19). But if the right asserted is not protected by federal law, "then the Court must determine whether 'flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics' require divergence from established federal precedent in determining whether the New Mexico Constitution protects the right." *Morris*, 2016-NMSC-027, ¶ 19 (quoting *Gomez*, 1997-NMSC-006, ¶ 19).

Under New Mexico common law, when a party "fails to present argument that the state constitution provides greater protection than the federal constitution, New Mexico's courts assume protection is the same under both." *State v. Harbison*, 2007-NMSC-016, ¶ 9, 156 P.3d 30, 33 (internal citation omitted). Here, where Plaintiff has explicitly equated the federal and state equal protection clauses, ***see*** **Doc. 52 at 13**, the Court treats the clauses as providing him with equivalent rights.

Plaintiff asserts a "class of one" equal protection claim. ***See*** **Doc. 52 at 13**. "Equal protection jurisprudence has traditionally been concerned with governmental action that disproportionately burdens certain classes of citizens." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215–16 (10th Cir. 2011). Plaintiff does not allege discrimination based on membership in a protected class, however. Instead, he claims Defendant's employees treated him differently from similarly situated criminal defendants for "malicious," "not merely irrational" reasons. **Doc. 52 at 13–14**. This claim is a "class of one" claim. *Kan. Penn Gaming*, 656 at 1216 (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)).

A class of one claim may be sustained "where [1] the plaintiff alleges that she has been intentionally treated differently from others similarly situated and [2] that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564; *see also Kan. Penn Gaming*, 656 at 1216.[6] "The paradigmatic 'class of one' case, . . . is one in which a public official, with no conceivable basis for his action other than spite or some other improper motive (improper because unrelated to his public duties), comes down hard on a hapless private citizen." *Kan. Penn Gaming*, 656 at 1216.

[6] Similarly, New Mexico's courts recognize a class of one equal protection claim, which requires Plaintiff to show "(1) that a public official inflicts a cost or burden on one person without imposing it on those who are similarly situated in material respects, and (2) that there is no conceivable basis other than a wholly illegitimate motive for the official's actions." *Gentry v. Shrug*, 2012-NMCA-019, ¶ 9, 270 P.3d 1286 (internal quotation omitted).

Plaintiff bears a "substantial burden" to prove his case, *id.* at 1217, and must "'provide a specific and detailed account of the nature of the preferred treatment of the favored class.'" *Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1239–40 (10th Cir. 2016) (quoting *Jennings v. City of Stillwater*, 383 F.3d 1199, 1214 (10th Cir. 2004)).

Plaintiff has failed to meet his burden. He has not alleged "actual differential treatment in materially similar situations." *Id.* at 1240 (citing *Jennings*, 383 F.3d at 1215). The Complaint provides no specific and detailed account of the preferred treatment received by other criminal defendants. In *Zia Shadows*, the Tenth Circuit rejected a plaintiff's class of one claim even where it "identifie[d] three areas" of differential treatment much more specific and detailed than Plaintiff has alleged here. *Zia Shadows*, 829 F.3d at 1240. There, the plaintiff showed that (1) it was "the only mobile home park that was required to comply with the new zoning ordinance," (2) it's "PUD application was subjected to greater financial scrutiny and conditions of approval," and (3) "the new owner of the mobile-home park previously operated by [the plaintiff] has not been required to comply with the requirements the City imposed on [the plaintiff]." *Id.* The Court reasoned that "the crux" of the first two areas "is that the City failed to demonstrate that others were subjected to the same requirements as [the plaintiff]." *Id.* The Court noted that this improperly flipped the burden from the plaintiff onto the defendant, and rejected the plaintiff's claim. *Id.* Even more so here, Plaintiff's Complaint and Response place the burden on Defendant to show that its employees treated other criminal defendants better. Plaintiff merely alleges that Defendant's employees—and the state prosecutors with whom they allegedly conspired to maliciously prosecute Plaintiff—"impair[ed]" his defense by "purposefully neglecting to search for evidence that would implicate [another person]," and "suppressing evidence that would tend to exculpate [Plaintiff]." **Doc. 52 at 14** (internal citations omitted). Plaintiff says nothing about how others similarly situated were

treated. That is not Defendant's burden. It is Plaintiff's. And his failure to meet it vitiates his class of one claim.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Santa Fe County Board of County Commissioners' Motion to Dismiss Plaintiff's Deprivation of Civil Rights in violation of the New Mexico CRA Claim for Failure to State a Claim **(Doc. 51)** is **GRANTED in part**. The Court requests **SUPPLEMENTAL BRIEFING** on the remaining due process claim. The parties shall submit briefing on this issue within fourteen (14) days of the entry of this order.

____/S/________________________________
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE