**IN THE UNITED STATE DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**Alexander R. Baldwin III,**

Plaintiff,

vs. Case No. CIV-25-01052 KWR/LF

**Kari T. Morrissey, Mary Carmack-Altwies, Andrea Reeb, Jennifer Padgett Macias, The First Judicial District Attorney's Office, Alexandria Hancock, Marissa Poppell, Brian Brandle, and Santa Fe County Board of County Commissioners,**

Defendants.

**STATE DEFENDANTS' MOTION TO DISMISS NO. VII:**
**COUNT I OF THE COMPLAINT AGAINST JENNIFER PADGETT**
**MACIAS BASED ON THE APPLICATION OF QUALIFIED IMMUNITY**

State Defendants, through their attorney, Robles, Rael and Anaya, P.C. (Luis Robles), state the following for their Motion to Dismiss No. VII: Count I of the Complaint Against Jennifer Padgett Macias Based on the Application of Qualified Immunity:[1]

## INTRODUCTION

This case arises from the criminal proceeding and subsequent dismissal of charges against Plaintiff Alexander Baldwin III ("Baldwin" or "Plaintiff"). The charges stem from the October 21, 2021 shooting death of cinematographer Halyna Hutchins ("Hutchins") when the firearm being used

---

[1] The undersigned counsel did not seek concurrence from Plaintiff's counsel as they are not required to seek concurrence on this dispositive motion.

to film a movie scene was erroneously loaded with live ammunition instead of dummy rounds by Armorer Hannah Gutierrez. *Complaint*, ¶¶ 36, 50 [Doc. 1] ("*Compl.*").

Baldwin, Hutchins, writer-director Joel Souza, and crew were setting up to film a close-up camera shot of Baldwin pointing and cocking the pistol, which required the use of dummy rounds. See id., ¶¶ 24, 46-49. While preparing for the shot, a crew member handed the gun to Baldwin and "announced" there was a "cold gun" on set, meaning the gun had been inspected and was incapable of firing. Id., ¶ 51. Baldwin never personally inspected the gun even though he was familiar with guns, having received gun training throughout his career and again after he arrived on the *Rust* set. See id., ¶¶ 42-43. As Baldwin was rehearsing the shot, Hutchins, who was standing near the camera, directed him to point the gun her way and cock it. Id., ¶¶ 54-55. According to Baldwin, the gun "just went off," and a live round discharged from the gun, striking Hutchins and Souza. Id., ¶¶ 56, 88. Hutchins died from her injuries. Id., ¶ 62.

Relevant to this motion, personnel from the Santa Fe County Sheriff's Office ("SFSO") worked "collectively" as a "team" with prosecutors from the First Judicial District Attorney's Office ("FJDA") to investigate and prosecute Baldwin's criminal case. Id., ¶ 74. "Defendant Jennifer Padgett Macias is an Assistant District Attorney" ("ADA Padgett Macias") for the FJDA. Id., ¶ 17. The only allegation against ADA Padgett Macias in the 73-page Complaint is as follows: "Defendants [Mary] Carmack-Altwies, [ADA] Padgett Macias, and other members of the FJDA directed law enforcement to de-prioritize the investigation into the source of live ammunition on the *Rust* set and into key suspects related to that inquiry, and to focus instead on obtaining witness statements and evidence that prosecutors could use to manufacture probable cause to charge Baldwin with a crime." Id., ¶ 258(a);

see also id., ¶¶74-76. Other general allegations claim that, "[d]riven by the prosecutors' agenda, SFSO began to ignore critical evidence as to how live ammunition ended up on the set." Id., ¶ 78. "This shift occurred even more as more evidence emerged that Seth Kenney ("Kenney"), a third-party ammo supplier, may have been the source of the live round[.]" Id., ¶ 77.[2] The Complaint does not allege any further involvement by ADA Padgett Macias in the investigation. Moreover, the Complaint does not allege any personal involvement by ADA Padgett Macias in prosecuting Baldwin. The criminal charges against Baldwin were ultimately dismissed with prejudice due to the State's discovery violations and false testimony elicited at trial by Special Prosecutor Kari Morrissey ("Special Prosecutor Morrissey"). Id., ¶ 254; see also id., ¶¶ 245, 250-252.

Baldwin subsequently filed the present civil case. Relevant to this motion, Count I asserts a single claim against all Defendants for conspiracy to cause malicious prosecution under the Fourteenth Amendment pursuant to 42 U.S.C. §1983. See id., ¶¶ 256-269. Baldwin has already conceded that Count I should be dismissed with prejudice against the FJDA and the prosecutors in their *official* capacities because these defendants are not "persons" amenable to suit under § 1983. See *Plaintiff's Response in Partial Opposition to State Defendants' Motion to Dismiss No. II*, p. 2, ¶ 4 [Doc. 36].

Based on the foregoing, Baldwin's malicious prosecution conspiracy claim against ADA Padgett Macias in her *individual* capacity is based on allegations regarding her limited pretrial actions. Because this claim is based only on ADA Padgett Macias' pretrial actions, it must be analyzed under the Fourth Amendment, not the Fourteenth Amendment. The claim fails under a Fourth Amendment

---

[2] SFSO also became aware that a retired police officer, Troy Teske, had a cache of ammunition that could have been the source of the live round. See id., ¶¶ 236-238.

analysis. Baldwin was not seized and ADA Padgett Macias had probable cause to believe Baldwin had committed a crime, negating required elements of a malicious prosecution conspiracy claim. Alternatively, ADA Padgett Macias is entitled to qualified immunity because the law was not clearly established at the time of her actions. Thus, the Court should dismiss Baldwin's malicious prosecution conspiracy claim (Count I) against ADA Padgett Macias with prejudice.

## APPLICABLE LEGAL STANDARDS

### I. Motion to Dismiss Standard

Motions to dismiss under Fed. R. Evid. 12(b)(6) test the "legal sufficiency of the allegations contained within the four corners of the complaint." Jojola v. Chavez, 55 F.3d 488, 494 (10th Cir. 1995) (citation omitted). As the United States Supreme Court has phrased it, a complaint must contain sufficient factual allegations to show that the plaintiff has a plausible, not merely possible, claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Determining whether a complaint states a plausible claim for relief, is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 663. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Further, "[i]n the context of a § 1983 action against multiple individual governmental actors, it is particularly important ... that the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her." Bledsoe v. Carreno, 53 F.4th 589, 607 (10th Cir. 2022) (citation modified).

As a rule, when a court reviews a motion to dismiss, it must accept all well-pleaded factual

allegations as true, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006); see Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016), as revised (May 24, 2016) (stating "the plaintiff must clearly ... allege facts demonstrating each element.") (citation modified). A court is under no mandate to accept a plaintiff's conclusory allegations or legal conclusions couched as factual allegations. See Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991) ("conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based."); Papasan v. Allain, 478 U.S. 265, 286 (1986) (stating "we are not bound to accept as true a legal conclusion couched as a factual allegation.").

Finally, "in assessing whether a plaintiff has stated a claim for relief, a court must restrict its review to only the allegations within the four corners of the complaint, and cannot consider other pleadings or external allegations." Brown v. City of Tulsa, 124 F.4th 1251, 1263 (10th Cir. 2025) (citation modified). But there are exceptions to this rule. These "[e]xceptions ... are limited to: (1) documents attached to the complaint as exhibits, (2) documents referenced in the complaint that are central to the plaintiff's claims, provided their authenticity is undisputed, and (3) matters subject to judicial notice." Id. at 1264. Therefore, a federal court presiding over a §1983 case may take judicial notice of a state court order issued in the underlying criminal case for purposes of a motion to dismiss. See Cox v. Civ. Courthouse State Judges & Staff, 544 F. Supp. 3d 1180, 1183 (D.N.M. 2021) (taking judicial notice of official New Mexico court records accessed through the New Mexico Supreme Court's Secured Online Public Access (SOPA) system in a Section 1983 case, relying on U.S. v. Ahidley, 486 F.3d 1184, 1192, fn. 5 (10th Cir. 2007) for the proposition that a court may take judicial

notice of publicly filed records in other courts concerning matters that bear directly upon the disposition of the case at hand).

## II. Qualified Immunity Standard

Qualified immunity "is an *immunity from suit* rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis in original). "Public officials are immune from suit under 42 U.S.C. § 1983 unless they have 'violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."' City & Cty. of San Francisco, Calif. v. Sheehan, 575 U.S. 600, 611 (2015) (quoting Plumhoff v. Rickard, 572 U.S. 765, 778-779 (2014)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that *every 'reasonable official would [have understood] that what he is doing violates that right.'*" Ashcroftv. al-Kidd, 563 U.S. 731, 741 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (emphasis added).

More specifically, "[w]hen a § 1983 defendant asserts qualified immunity, this ... creates a presumption that [the defendant is] immune from suit." Est. of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1168 (10th Cir. 2020) (citation modified). As a result, "the burden shifts to the plaintiff to show the defendant is *not* entitled to immunity." Roska ex rel. Roska, v. Sneddon, 437 F.3d 964, 971 (10th Cir. 2006) (emphasis added). A plaintiff can rebut this presumption "only by show[ing] that (1) the officers' alleged conduct violated a constitutional right, and (2) it was clearly established at the time of the violation, such that every reasonable official would have understood, that such conduct constituted a violation of that right." Reavis Estate of Coale v. Frost, 967 F.3d 978, 984 (10th Cir. 2020) (citation modified). "If the plaintiff fails to satisfy either part of the two-part inquiry, the court

must grant the defendant qualified immunity." Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001). The sequential two-step analysis for resolving an official's qualified immunity claims is not mandatory. Pearson v. Callahan, 555 U.S. 223, 236 (2009). Judges may use their discretion to decide "which of the two prongs" should be addressed first "in light of the circumstances in the particular case at hand." Id.

Addressing the second prong, the Supreme Court has repeatedly cautioned lower courts that "'clearly established law' should not be defined 'at a high level of generality.'" White v. Pauly, 580 U.S. 73, 79 (2017) (quoting Ashcroft, 563 U.S. at 742). Rather, "the clearly established law must be 'particularized' to the facts of the case." White, 580 U.S. at 79 (quoting Creighton, 483 U.S. at 640). "The relevant precedent must define the right with a 'high degree of specificity,' so that 'every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'" Zorn v. Linton, 607 U.S. 568, 571 (2026) (per curiam) (quoting Dist. of Columbia v. Wesby, 583 U.S. 48, 63 (2018)); see Mullenix v. Luna, 577 U.S. 7, 12 (2015) ("The dispositive question is whether the violative nature of *particular* conduct is clearly established.") (citation modified). "In short, [§ 1983 defendants] receive qualified immunity unless they could have 'read' the relevant precedent beforehand and 'know[n]' that it proscribed *their specific conduct*." Zorn, 607 U.S. at 572 (citation modified). Where a plaintiff "failed to identify a case where [a § 1983 defendant] taking similar actions in similar circumstances was held to have violated the Constitution," that defendant is entitled to qualified immunity. Id. at 574 (citation modified); see Mullenix, 577 U.S. at 18 (reversing the Fifth Circuit after finding that the cases it relied on were "simply too factually distinct to speak clearly to the specific circumstances here."); Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001) ("Ordinarily,

in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."); Coones v. Bd. of Cnty. Comm'rs of Unified Gov't of Wyandotte Cnty./Kansas City, Kan., 166 F.4th 1, 16 (10th Cir. 2026) (same). Moreover, "[i]n conducting a qualified immunity analysis, ... courts do not merely ask whether, taking the plaintiff's allegations as true, the plaintiff's clearly established rights were violated. Rather, courts must consider as well whether *each* defendant's alleged conduct violated the plaintiff's clearly established rights." Dodds v. Richardson, 614 F.3d 1185, 923 (10th Cir. 2010) (emphasis added and citing Hope v. Pelzer, 536 U.S. 730, 751 fn. 9 (2002) (Thomas, J., dissenting)). Lastly, "[t]he Supreme Court has clarified that qualified immunity's clearly established prong is a very high burden for the plaintiff[.]" McGarry v. Bd. of Cnty. Comm'rs for Cnty. of Lincoln, 294 F. Supp. 3d 1170, 1186-87 (D.N.M. 2018) (citing Ashcroft, 563 U.S. at 741); Reichle v. Howards, 566 U.S. 658, 664 (2012)).

## LEGAL ARGUMENT

### I. Count I Asserts a Single Fourteenth Amendment Malicious Prosecution Conspiracy Claim, Which Is the Only Claim Analyzed in this Motion.

"The first inquiry in any § 1983 suit" is "to isolate the precise constitutional violation with which [Defendants are] charged." Baker v. McCollan, 443 U.S. 137, 140 (1979). "The choice of amendment matters," Porro v. Barnes, 624 F.3d 1322, 1325 (10th Cir. 2010), because courts must judge the "validity of the claim ... by reference to the specific constitutional standard which governs that right," Graham v. Connor, 490 U.S. 386, 394 (1989). Further, it is neither the courts nor defense counsel's job to analyze all potential claims that could have been asserted when a plaintiff's complaint fails to articulate causes of action with sufficient specificity. See Glenn v. First Nat. Bank in Grand

Junction, 868 F.2d 368, 371-372 (10th Cir. 1989). The burden falls squarely on the plaintiff to articulate a claim with sufficient specificity. See Fed. R. Civ. P. 8(a)(2); Smith v. Alamogordo Police Dep't, No. 21-CV-1084 MV/SMV, 2022 WL 1262216, at *2 (D.N.M. Apr. 28, 2022), report and recommendation adopted, No. 21-CV-1084 MV/SMV, 2022 WL 2181413 (D.N.M. June 16, 2022).

Count I of Baldwin's Complaint *explicitly* asserts a single malicious prosecution conspiracy claim under the Fourteenth Amendment. See Compl, p. 58 (Count I Caption); see also id. ¶¶ 257, 259, 261. However, it also vaguely asserts that Baldwin has been deprived of his "civil rights" and "constitutional rights." See id., p. 58 (Count I Caption); ¶¶ 259, 261. While ADA Padgett Macias acknowledges that courts must liberally construe complaints filed by *pro se* plaintiffs – a status Baldwin does not hold – that obligation does not extend to acting as an advocate, constructing legal theories, or manufacturing claims not fairly presented in the pleadings. Hall, 935 F.2d at 1110. Accordingly, this motion addresses only the single explicit claim presented. It does not parse every hypothetical cause of action suggested by Baldwin's vague assertions about the deprivation of his "civil rights" and "constitutional rights." See *Compl*., p. 58 (Count I Caption); ¶¶ 259, 261; see also Proenza v. Greco, 3 F. App'x 742, 745 (10th Cir. 2001) ("Neither the defendants nor the district court should be required to sort through hundreds of paragraphs in an effort to identify the operative facts and theories of the complaint.").

## II. Baldwin's Malicious Prosecution Conspiracy Claim is Based on ADA Padgett Macias' Pretrial Conduct and Therefore Must be Analyzed under the Fourth Amendment, Not the Fourteenth Amendment.

To prove a malicious prosecution claim, a plaintiff must show: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the

plaintiff; (3) no probable cause supported the arrest, confinement or prosecution; (4) the defendant acted maliciously; and (5) the plaintiff sustained damages." Margheim v. Buljko, 855 F.3d 1077, 1085 (10th Cir. 2017) (citation modified). "A malicious-prosecution claim is not cognizable until all the elements are satisfied[.]" Id. at 1085 (citation modified). Further, alleging a conspiracy does not relax the requirements needed to plausibly demonstrate a malicious prosecution. Dixon v. City of Lawton, Okl., 898 F.2d 1443, 1449 (10th Cir. 1990) ("to recover under a § 1983 conspiracy theory, a plaintiff must plead and prove not only a conspiracy, but also an actual deprivation of rights; pleading and proof of one without the other will be insufficient."). Instead, a conspiracy requires specific facts showing an agreement on a common unconstitutional goal and concerted action, plus an actual constitutional deprivation. See Bledsoe, 53 F.4th at 609; Brooks v. Gaenzle, 614 F.3d 1213, 1227-1228 (10th Cir. 2010). "Conclusory allegations of conspiracy[, however,] are insufficient to state a valid § 1983 claim." Bledsoe, 53 F.4th at 609 (citation modified); Brooks, 614 F.3d at 1228 ("a plaintiff must show specific facts showing an agreement and concerted action among defendants[.]") (citation modified). Finally, in §1983 cases where plaintiff has sued multiple government entities and various individual actors, "it is particularly important ... that the complaint make clear exactly who is alleged to have done what to whom." Robbins v. Okla., 519 F.3d 1242, 1250 (10th Cir. 2008); Vasquez v. Davis, 882 F.3d 1270, 1275 (10th Cir. 2018) (stating that to recover damages from each named defendant under § 1983, a plaintiff must show that each such defendant personally participated in the alleged constitutional violation.).

Importantly, while the common law elements of malicious prosecution serve as the "starting point" for the analysis, the ultimate question is always whether the plaintiff has proven a constitutional

violation – specifically, an unreasonable seizure under the Fourth Amendment. See Becker v. Kroll, 494 F.3d 904, 913-915 (10th Cir. 2007); Taylor v. Meacham, 82 F.3d 1556, 1561 (10th Cir. 1996). The Tenth Circuit has "repeatedly recognized ... that, *at least prior to trial*, the relevant constitutional underpinning for a claim of malicious prosecution under § 1983 must be the Fourth Amendment's right to be free from unreasonable seizures." Becker, 494 F.3d at 914 (citation modified). This rule traces back to the Supreme Court's plurality decision in Albright v. Oliver, 510 U.S. 266, 269-270 (1994), which rejected a plaintiff's attempt to ground a § 1983 malicious prosecution claim in the substantive due process component of the Fourteenth Amendment. Applying the principle from Graham, 490 U.S. at 395 that "[b]ecause the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims," the Albright plurality concluded that the Fourth Amendment – not substantive due process – governs pretrial deprivations of liberty attendant to criminal prosecutions. Albright, 510 U.S. at 273.

In Becker, the Tenth Circuit extended Albright's reasoning beyond substantive due process to procedural due process as well, holding that "the more general due process considerations of the Fourteenth Amendment are not a fallback to protect interests more specifically addressed by the Fourth Amendment in this context." 494 F.3d at 919. Accordingly, a plaintiff "must allege a violation of the Fourth Amendment in order to proceed on a theory of § 1983 malicious prosecution." Id.

Here, the Complaint does not allege that ADA Padgett Macias had any involvement with the trial. See generally *Compl.*, pp. 1-73. The only allegation against ADA Padgett Macias in the 73-page

Complaint is as follows: "Defendants [Mary] Carmack-Altwies, [ADA] Padgett Macias, and other members of the FJDA directed law enforcement to de-prioritize the investigation into the source of live ammunition on the *Rust* set and into key suspects related to that inquiry, and to focus instead on obtaining witness statements and evidence that prosecutors could use to manufacture probable cause to charge Baldwin with a crime." Id., ¶ 258(a). Consequently, the only alleged misconduct relevant to this qualified immunity motion involves ADA Padgett Macias' limited pretrial involvement in law enforcement's investigation. Because the only allegations are based on pretrial conduct, Baldwin's malicious prosecution conspiracy claim (Count I) against ADA Padgett Macias is governed by the Fourth Amendment, not the Fourteenth Amendment. As such, Count I fails because the Complaint does not allege that Baldwin was seized or that ADA Padgett Macias lacked probable cause. Alternatively, Count I fails because her actions did not violate the clearly established law.

**A. Baldwin's Fourth Amendment malicious prosecution conspiracy claim fails because he was not seized.**

For a Fourth Amendment malicious prosecution claim to proceed, the plaintiff must have been actually seized – that is, subjected to an arrest, incarceration, or other direct physical control by the state. Becker, 494 F.3d at 914-915; see also Brower v. County of Inyo, 489 U.S. 593, 596 (1989) ("Violation of the Fourth Amendment requires an intentional acquisition of physical control."). The Fourth Amendment seizure requirement applies with equal force to claims against prosecutors. See Becker, 494 F.3d at 912-916; Margheim, 855 F.3d at 1085. Moreover, the court in Becker explicitly declined to adopt the broader "continuing seizure" theory advanced by Justice Ginsburg in her Albright concurrence, which would have treated pre-trial release conditions – such as requiring a person to post bond, compelling court appearances, or restricting interstate travel – as qualifying seizures. Id. at 915-

916 (and stating, "We thus agree with the courts that have also declined to accept Justice Ginsburg's invitation to expand Fourth Amendment liability in cases where the plaintiff has not been arrested or incarcerated."). The court reasoned that extending liability to cases without a traditional seizure "would expand the notion of seizure beyond recognition" and would mean that "every charging decision would support a § 1983 malicious prosecution-type claim no matter the context." Id. at 915 (also stating, "A groundless charging decision ... does not, in and of itself, violate the Fourth Amendment absent a significant restriction on liberty."). Most recently, in Chiaverini v. City of Napoleon, Ohio, 602 U.S. 556, 564 (2024), the Supreme Court reiterated that "a Fourth Amendment malicious-prosecution suit under § 1983 depends not just on an unsupported charge, but on that charge's causing a seizure[.]"

Here, the Complaint fails to allege that Baldwin was ever arrested, incarcerated, or otherwise placed under the direct physical control of the state. See *Compl.*, ¶¶ 1-255, 258(a)-(h). At most, the Complaint alleges that "Baldwin voluntarily drove himself to the SFSO station," sat for an interview during which he "spoke freely" with detectives "for over an hour, declining their invitation to have a lawyer present," and appeared for trial. Id., ¶ 68; see also generally id., ¶¶227, 245-254 (setting froth events that allegedly occurred during trial). Voluntarily speaking to law enforcement is not a seizure in the traditional sense as there was no suggestion that he was physically restrained or that the interview was anything other than consensual encounter that does not implicate the Fourth Amendment. See U.S. v. Werking, 915 F.2d 1404, 1407 (10th Cir. 1990) (defining consensual encounter as the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer.). Likewise, appearing for trial is not considered a seizure. See Mata v.

Anderson, 685 F.Supp.2d 1223, 1278 (D.N.M. 2010), aff'd, 635 F.3d 1250 (10th Cir. 2011) (where the only deprivation of liberty the plaintiff alleged was "the necessity of attending his trial" and that he could not leave the county nor enter a liquor store while the charges were pending, the court concluded that those deprivations alone were not "a traditional seizure" recognized under the Fourth Amendment.). Thus, Baldwin cannot state a viable Fourth Amendment malicious prosecution conspiracy claim based on ADA Padgett Macias' pretrial conduct, even to the extent the Complaint alleges that she had some involvement in law enforcement's investigation.

### B. Count I should also be dismissed against ADA Padgett Macias because the Complaint's own factual allegations demonstrate that probable cause supported Baldwin's prosecution.

#### *1. The probable cause standard.*

Additionally, the absence of probable cause is a threshold requirement for a malicious prosecution claim. Thompson v. Clark, 596 U.S. 36, 43 (2022) (stating "the gravamen of the Fourth Amendment claim for malicious prosecution ... is the wrongful initiation of charges without probable cause."); Margheim, 855 F.3d at 1085 (same). Probable cause is a concept "incapable of [a] precise definition or quantification into percentages." Maryland v. Pringle, 540 U.S. 366, 371 (2003). However, it is established that probable cause is not based on proof beyond a reasonable doubt or by a preponderance of the evidence. Florida v. Harris, 568 U.S. 237, 243 (2013); U.S. v. Ludwig, 641 F.3d 1243, 1252 (10th Cir. 2011) ("probable cause doesn't require an officer's suspicion about the presence of contraband to be 'more likely true than false.'") (quoting Texas v. Brown, 460 U.S. 730, 742(1983) and citing cases). The Tenth Circuit has likewise "understood probable cause as something more than a bare suspicion but less than a preponderance of the evidence at hand." Morphew v.

Chaffee Cnty., Co., 172 F.4th 802, 817 (10th Cir. 2026) (citation modified); see also St. John v. Justmann, 771 F.2d 445, 448 (10th Cir. 1985) ("we must remember that in order to establish probable cause, the prosecution need not establish a prima facie case."). Further, the "[f]ormulation of probable cause does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands[.]" Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs, 962 F.3d 1204, 1220 (10th Cir. 2020) (citation modified).[3] In sum, the probable cause standard does not set "a high bar." Kaley v. U.S., 571 U. S. 320, 338 (2014). And a court can determine if a prosecutor had probable cause by applying the Fourth Amendment standard to the identified elements of a crime based on state law. Hinkle, 962 F.3d at 1224 (citation omitted).

***2. Application of the probable cause standard to the Complaint's allegations.***

Here, the Complaint fails to allege specific facts that plausibly show a lack of probable cause for Baldwin's prosecution for the charge of involuntary manslaughter. "A crime generally consists of two elements, a physical, wrongful deed (the 'actus reus'), and a guilty mind that produces the act (the 'mens rea')." State v. Young, 2021-NMCA-049, ¶ 15, 495 P.3d 1189 (citation modified). "Manslaughter is an unintentional killing: the defendant's conduct results in death, but the defendant *did not intend* the victim's death." Id. (citations omitted and emphasis added); see also NMSA 1978, § 30-2-3(B) ("Involuntary manslaughter consists of manslaughter committed in the commission of an unlawful act not amounting to felony, or in the commission of a lawful act which might produce death

[3] In Romero v. Fay, for example, the Tenth Circuit rejected plaintiff's argument that the officer's failure to investigate the plaintiff's purported alibi witnesses in itself negated probable cause and amounted to a constitutional violation where the plaintiff had failed to show that the officer's initial probable cause determination was itself unreasonable. 45 F.3d 1472, 1477-78 (10th Cir. 1995). The Tenth Circuit cited with approval cases holding that a police officer, having once determined that there is probable cause to arrest, is not required to investigate every claim of innocence. See id. at 1477-78 & n.3.

in an unlawful manner or without due caution and circumspection."). The mens rea required for involuntary manslaughter is recklessness – specifically, subjective knowledge by the defendant of the danger or risk to others posed by his or her actions. State v. Ward, No. S-1-SC-40503, 2026 WL 732160, ¶ 45 (N.M. Mar. 16, 2026) (unpublished).

Here, the shooting occurred on October 21, 2021, while Baldwin, Hutchins, Souza, and crew were setting up for a close up-camera shot of Baldwin pointing and cocking the pistol which required the use of dummy rounds. *Compl.*, ¶¶ 24, 46-49. While preparing for the shot, a crew member mistakenly loaded the gun with live ammunition instead of dummy rounds. See id., ¶¶ 48-50, 56. A second crew member handed the gun to Baldwin and "announced" that there was a "cold gun" on set, meaning the gun had been inspected and did not contain live ammunition. Id., ¶ 51. Thereafter, Baldwin aimed the gun in the direction of Hutchins and cocked it. See id., ¶¶ 53-56, 62, 67, 88. According to Baldwin, the gun "just went off," discharging a live round that killed Hutchins and struck Souza in the shoulder. See id. Before aiming the gun towards Hutchins and cocking it, Baldwin did *not* inspect it for live rounds himself. See id., ¶¶ 47-51, 69 (indicating that others inspected the gun, but Baldwin did not). Baldwin did not personally inspect the gun even though he was familiar with guns, having received gun training throughout his career and again after he arrived on the *Rust* set. See id., ¶¶ 42-43. These allegations demonstrate probable cause to believe that Baldwin committed a physical, wrongful deed (the 'actus reus') by aiming the gun in the direction of Hutchins and handling it such that it discharged. These allegations also demonstrate probable cause to believe that Baldwin had the requisite mens rea. Given Baldwin was familiar with guns and had received gun training throughout his career, it would be objectively reasonable for ADA Padgett Macias to believe that Baldwin had subjective knowledge of the danger or risk to others posed by his pointing and cocking

the gun without first inspecting it himself to ensure it was loaded with only dummies and not live ammunition. See Ward, 2026 WL 732160, ¶ 45; see also Young, 2021-NMCA-049, ¶ 28 (concluding that a reasonable jury could convict the defendant of negligent use of a firearm even though he was friends with the victim and claimed he did not know the gun was loaded when he pulled the trigger because he had previously observed his roommate eject the bullet from the chamber and remove the magazine); see also State v. Goss, 1991-NMCA-003 at ¶ 17, 807 P.2d 228 ("Where the evidence is conflicting it is for the trial court to resolve disputed factual issues.") (citation omitted).[4] Accordingly,

[4] Additionally, a grand jury found probable cause and returned an indictment for Baldwin, charging: Count I: Involuntary Manslaughter (Negligent Use of a Firearm) and Alternative Count I: Involuntary Manslaughter (Without Due Caution or Circumspection). *Compl.*, ¶ 202; see also [Doc. 58-1] (*Order Denying Defendant Alec Baldwin's Motion to Dismiss the Indictment*, p. 4, filed in State v. Baldwin, No. D-101-CR-2024-00013 (filed May 24, 2024), setting forth the counts in the indictment). The indictment itself demonstrates the existence of probable cause to prosecute Baldwin. See Ex parte U.S., 287 U.S. 241, 250 (1932) ("an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer."). Although the Complaint alleges that Special Prosecutor Morrissey misled the grand jury by not providing favorable or exculpatory testimony and documents, see *Compl.*, ¶¶ 202-203, this does not invalidate the grand jury's probable cause determination. As the Tenth Circuit has stated, "in considering whether the government has shown probable cause to indict, grand juries need not hear the defendant's side of an argument, any cross-examination of the prosecution's witnesses, or any exculpatory evidence[.]" Hinkle, 962 F.3d at 1220 (citation modified). Because a grand jury's return of an indictment constitutes an independent judicial determination that probable cause exists, Ex Parte United States, 287 U.S. at 250, a reasonable prosecutor is entitled to rely on that determination as confirmation that probable cause supported the prosecution. Moreover here, Baldwin's criminal defense team filed a motion to dismiss the indictment raising the following arguments: (1) "the State exhibited bad faith in seeking the indictment;" (2) "the State withheld exculpatory and favorable evidence from the grand jury;" (3) "the State provided an inaccurate jury instruction to the grand jury;" (4) "the State failed to advise the grand jury of its authority to order the presentation of evidence and witnesses beyond those offered by the State;" (5) "the State failed to follow the instructions of the grand jury judge;" and (6) "the State's Response constitutes a waiver of many arguments and objections raised in Defendant's Motion to dismiss." See [Doc. 58-1], p. 5 (citation modified). The trial court denied the motion, concluding, in part, that Baldwin did not establish prosecutorial bad faith and that "the prosecution was not required to present, and the grand jury was not required to order, target-offered exculpatory evidence." Id., pp. 8-10. The trial court noted that the State read the target's evidence alert letter verbatim to the grand jury, concluding that "[o]ther than alerting the grand jury to the evidence, [New Mexico law did not] expressly require the prosecutor to provide additional instruction to the grand jury." Id., p. 15. The trial court also did not find error with respect to the contested jury instruction. Id., pp. 12-14. Finally, the trial court concluded that Special
(continued...)

the factual allegations in the Complaint are sufficient to establish probable cause that Baldwin committed the crime with which he was initially charged and for which he was later indicted, involuntary manslaughter. See *Compl.*, ¶¶ 124, 203.

***3. The Complaint does not allege facts that vitiate probable cause.***

The Complaint alleges several reasons why Baldwin was not criminally liable for Hutchins's death, but none vitiate probable cause. "Probable cause is measured by considering whether, without falsified inculpatory evidence or with the withheld exculpatory evidence, there would be no probable cause for [Baldwin's] continued ... prosecution." Bledsoe, 53 F.4th at 614-15 (citation modified).

Here, each reason Baldwin offers to deny criminal liability fails to recognize that the legal standard for a prosecution does not require the same level of certainty as that for a conviction. See Morphew, 172 F.4th at 818. First, Baldwin alleges that as an actor, it was not his job to check the gun for live ammunition and he relied on others whose responsibility it was to inspect the gun. See *Compl.*, ¶¶ 36, 37, 39, 44, 51. These assertions are based on film industry standards, not Tenth Circuit or New Mexico law. Id., ¶ 34; see also id., ¶ 38 (referring to "industry guidance."). He also alleges he did not know that the gun had been loaded with live rounds. Id., ¶¶ 3, 69. Law enforcement and prosecutors were not required to believe Baldwin. "Though officers may not ignore evidence that would dissipate probable cause, not all new evidence does so. For instance, a [suspect's] bare proclamations of innocence do not." Hinkle, 962 F.3d at 1221 (citing Romero, 45 F.3d at 1480 (citations omitted) ("Once Defendants concluded that the initially discovered facts established probable cause, they were

---

[4](...continued)
Prosecutor Morrissey was not required to make Baldwin's witnesses readily available *unless* the grand jury asked to hear from them which it did not, and New Mexico law did not require Special Prosecutor Morrissey to present exculpatory evidence on Baldwin's behalf. Id., pp. 16-18. Based on the foregoing, the indictment for Baldwin was fair upon its face and issued by a properly constituted grand jury, conclusively determining the existence of probable cause. See Ex parte U.S., 287 U.S. at 250.

under no obligation to forego arresting Plaintiff or release him merely because he said he was innocent."). Even if taken as true, this allegation fails to negate probable cause. In New Mexico, discharging a firearm under the mistaken belief that it is unloaded can still lead to an involuntary manslaughter conviction. See Young, 2021-NMCA-049, ¶ 28 (concluding that a reasonable jury could convict the defendant of negligent use of a firearm even though he was friends with the victim and claimed he did not know the gun was loaded when he pulled the trigger because he had previously observed his roommate eject the bullet from the chamber and remove the magazine).

Baldwin further alleges he did not pull the trigger and the gun just "went off." Id., ¶ 71. Again law enforcement and prosecutors are not required to believe Baldwin's "bare proclamations of innocence." Hinkle, 962 F.3d at 1221 (citation omitted). "Even a plausible explanation" for the gun just going off such as the toolmarks, *Compl.*, ¶ 142, does not render the probable cause "unfounded." See Hinkle, 962 F.3d at 1221 (citation modified). The toolmarks do not change the fact that Baldwin was handling the gun when it discharged and that he failed to inspect the gun for live ammunition before aiming it in Hutchins' direction and cocking it. Even if toolmarks could cause the gun to discharge on its own, their presence does not prove it actually did. See id. at 1220 (the "[f]ormulation of probable cause does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands[.]"). This is a disputed issue for the jury to resolve.

The same holds true for the Complaint's allegation that "[ADA] Padgett Macias, and other members of the FJDA directed law enforcement to de-prioritize the investigation into the source of live ammunition on the *Rust* set and into key suspects related to that inquiry, and to focus instead on obtaining witness statements and evidence that prosecutors could use to manufacture probable cause

to charge Baldwin with a crime." *Compl.*, ¶ 258(a); see also id., ¶¶74-78.[5] Regardless of who was the source of the ammunition, this does not vitiate the facts alleged in the Complaint that establish probable cause. Baldwin was handling the gun when it discharged, killing Hutchins and injuring Souza. Id., ¶¶ 54-56, 62, 67, 88. Though trained in firearms throughout his career, Baldwin failed to personally inspect the gun for live ammunition before aiming it in Hutchins' direction and cocking the hammer. See id., ¶¶ 42-43, 190. Thus, even if others were responsible for the live ammunition's presence on set, Baldwin may still have had the requisite "subjective knowledge of the danger or risk to others posed by his decision" to point the gun at Hutchins and cock it. State v. Skippings, 2011-NMSC-021, ¶ 18, 258 P.3d 1008 (defining mental state required for involuntary manslaughter conviction). Accordingly, ADA Padgett Macias' alleged role in de-prioritizing the investigation into the source of live ammunition does not vitiate probable cause. For all the foregoing reasons, ADA Padgett Macias had probable cause to believe that Baldwin committed the crime of involuntary manslaughter, thereby defeating his malicious prosecution conspiracy claim (Count I).

**4. *The Court already found that the Complaint sufficiently alleged probable cause; that ruling now binds the parties as the law of the case.***

In two prior opinions, this Court has determined that the Complaint sufficiently alleged probable cause to believe that Baldwin committed a crime. The Court's ruling on the issue of probable cause is law of the case which is binding on the parties here. See Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1251 (10th Cir. 2011) ("The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.") (citation modified).

---

[5] Of note, the allegations regarding the misfiled ammunition delivered by Troy Teske on March 6, 2024 is attributable to Special Prosecutor Morrissey only, not ADA Padgett Macias. *Compl.*, ¶¶ 239-242.

First, in its *Memorandum Opinion and Order Granting State Defendants' Motions to Dismiss*, p. 19 (filed Sept. 30, 2026) [Doc. 56], this Court stated:

> [A] fair inference of the Complaint is that Defendant Morrissey had probable cause to believe Plaintiff had committed a crime, even after she dropped the charges against him. Although the Complaint alleges that Defendant Morrissey lacked probable cause in August 2023, ***see*** **Doc. 35 at 9**, it also alleges that Plaintiff (1) did not check the gun, (2) held it in Hutchins' direction, and (3) cocked it before it discharged, **Compl. ¶¶ 50-55**. The Court need not take as true Plaintiff's legal conclusion that Defendant Morrissey lacked probable cause and may instead determine whether the alleged facts support the inference that probable cause existed. Kay [v. Bemis], 500 F.3d [1214,] 1217 [(10th Cir. 2007)]; [Bell Atlantic Corp. v.] Twombly, 550 U.S. [544,] 555 [(2007)]. With that in mind, *these facts support the inference that prosecutors had probable cause to believe that a crime had been committed, even if not for the crimes they eventually charged.*

[Doc. 56], p. 19 (emphasis added).

Next, in its *Memorandum Opinion and Order Granting State Defendants' Motion for Partial Judgment on the Pleadings*, p. 14 (filed Oct. 26, 2026) [Doc. 61], this Court similarly concluded that "[b]ecause Defendants are correct that they had probable cause to charge [Baldwin] with involuntary manslaughter, they did not maliciously prosecute [Baldwin] and are entitled to qualified immunity under § 1983." The Court reasoned as follows:

> Here, where the Complaint alleges that (1) Plaintiff held the gun in Hutchins' direction and cocked it before it discharged a bullet; (2) Plaintiff was familiar with guns and had received gun training at other movie sets; and (3) Plaintiff never checked the gun himself, there was probable cause that Defendant was guilty of involuntary manslaughter, the charge for which he was eventually tried. In New Mexico, involuntary manslaughter is defined as the "unlawful killing of a human being without malice . . . committed in the commission of . . . a lawful act which might produce death in an unlawful manner or without due caution and circumspection." NMSA 1978, § 30-2-3(B); see also State v. Salazar, 1997-NMSC-044, ¶ 54, 945 P.2d 996. Given that Plaintiff pointed the gun at Hutchins and cocked it before it discharged, there was more than bare suspicion that Plaintiff acted without the requisite due caution and circumspection required of someone pointing a gun at another person – even though he believed the gun was loaded with a blank. The allegation that Plaintiff failed to check the gun was even more reason to believe Plaintiff acted without the requisite care. Plaintiff argues that his conduct was not criminally negligent since the armorer

> is responsible for ensuring that live ammunition is not loaded into the gun and because multiple people made the announcement that the gun was cold. **Doc. 49 at 11**; see also supra Section II.A.1 n. 5 (listing all of Plaintiff's reasons why he does not believe probable cause existed). Plaintiff is incorrect that evidence suggesting he believed the gun was cold nullified probable cause for an involuntary manslaughter charge. In New Mexico, a person may be convicted of involuntary manslaughter when he fires a loaded gun, even if he did not think the gun was loaded. See State v. Young, 2021-NMCA-049, ¶¶ 9, 15-29, 495 P.3d 1189 (determining that the district court erred when it failed to instruct the jury on involuntary manslaughter where the defendant "repeatedly testified that he believed the gun was not loaded"). Therefore, there was probable cause to charge Plaintiff with involuntary manslaughter when it is undisputed that he pointed the gun at Hutchins and cocked it before it discharged notwithstanding the dispute about whether it discharged on its own.

[Doc. 61], pp. 17-18.

This Court also concluded that a Defendant's role in having the gun subjected to destructive testing by the FBI did not disturb its conclusion. Id., p.18. The Court reasoned that "[e]ven if testing had uncovered that the gun could have discharged on its own, that alone would not exonerate Plaintiff, for the question whether he in fact fired it would be left up to the jury." Id. (also stating that "[e]ven if testing revealed that the gun might have discharged on its own, that evidence would not be 'significant enough to vitiate probable cause' for involuntary manslaughter, not to mention other crimes that [Defendants] may have charged.") (citation modified).

Finally, this Court concluded that allegations that a Defendant "ignored evidence of how live ammunition made it onto the set also does not dissuade the Court – exactly how the gun came to be loaded with a real bullet was not dispositive of whether to charge Plaintiff with a crime." Id., p. 19. The Court explained that Baldwin "could still be guilty of recklessness with respect to Hutchins' safety" because he aimed the gun at her and cocked it "[w]ithout first personally verifying that the gun was cold." Id., p. 19. Based on the foregoing, the law of the case doctrine prevents Baldwin from relitigating the same probable cause issues against ADA Padgett Macias because the same legal issues

have already been resolved against her co-defendants based on the same set of facts. See U.S. v. Parada, 577 F.3d 1275, 1279-1280 (10th Cir. 2009) (applying law of the case doctrine when court had previously addressed "similar argument" with respect to identically situated co-defendant). Therefore, the Court should decline to consider Baldwin's arguments that ADA Padgett Macias lacked probable cause to believe he had committed involuntary manslaughter.

**III. Alternatively, ADA Padgett Macias' Actions Did Not Violate Clearly Established Law.**

As there was no constitutional violation here, there is no need to proceed to the second step of the qualified immunity analysis. Saucier v. Katz, 533 U.S. 194, 201 (2001). However, if the Court finds that ADA Padgett Macias violated Baldwin's Fourth Amendment right to be free from a malicious prosecution conspiracy, "[t]he plaintiff [still] carries the burden of convincing the court that the law was clearly established" at the time of the violation. Pueblo Neighborhood Health Centers, Inc. v. Losavio, 847 F.2d 642, 645 (10th Cir. 1988).

"When the second prong of the qualified immunity analysis is at issue ..., we "determine whether the plaintiff's rights were clearly established, which we approach by asking whether the officers arguably had probable cause.'" Coones, 166 F.4th at 25-26 (quoting Felders ex rel. Smedley v. Malcom, 755 F.3d 870, 879 (10th Cir. 2014)); see also Kaufman v. Higgs, 697 F.3d 1297, 1300 (10th Cir. 2012) ("If we conclude that probable cause was lacking, we then must determine whether [the plaintiff's] rights were clearly established, which we approach by asking whether the officers arguably had probable cause."). In the Tenth Circuit, the arguable probable cause standard is explicitly recognized as a lower, more favorable standard to government officials than the actual probable cause standard. See Cronick v. Pryor, 99 F.4th 1262, 1269 (10th Cir. 2024) (whether an officer had arguable probable cause is "a lower standard than actual probable cause."). Arguable probable cause requires

only that a reasonable officer in the same circumstances could have believed that probable cause existed, even if that belief was mistaken. Stonecipher v. Valles, 759 F.3d 1134, 1141 (10th Cir. 2014) (Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists."). The arguable probable cause standard is more liberal because it accommodates objectively reasonable errors of fact or law. Id. at 1142. Even in the absence of actual probable cause, officers are entitled to qualified immunity if they acted with arguable probable cause. Kaufman, 697 F.3d at 1300.

At the outset, State Defendants' research did not locate *any* Supreme Court or published Tenth Circuit applying the federal probable cause standard to New Mexico's involuntary manslaughter statute, NMSA (1978), § 30-2-3 (1994). The closest Tenth Circuit authority appears to be an unpublished decision, Sanchez v. Labate, 564 F. Appx. 371 (10th Cir. 2014), which further demonstrates that the law was not clearly established in Baldwin's favor. See Grissom v. Roberts, 902 F.3d 1162, 1168 (10th Cir. 2018) ("If we make the collegial, and quite legitimate, assumption that panels of this court render reasonable decisions, we would be hard pressed to say that a proposition of law was clearly established at a time when an unpublished opinion by a panel of this court said the opposite.").

In Sanchez, the plaintiff shot and killed a man who attacked him, immediately reported the shooting to a 911 dispatcher, and claimed self-defense. 564 F. Appx. at 371-372. Despite physical evidence and a 911 recording corroborating the self-defense claim, officers arrested him on an open count of murder under the applicable New Mexico statute. Id. at 372. A magistrate later ordered his discharge when a preliminary hearing failed to establish probable cause. Id.

Subsequently, the Tenth Circuit affirmed dismissal of the plaintiff's § 1983 unlawful arrest and

false imprisonment claims, holding that it was not clearly established in 2009 that officers must resolve a suspect's assertion of self-defense before arresting him where the suspect admitted killing another person. Id. at 371, 373-374. The court also noted that New Mexico law does not require officers to consider self-defense claims at the arrest stage, citing the New Mexico Court of Appeals' holding in State v. Augustin M., 2003-NMCA-065, ¶ 24, 68 P.3d 182 that a grand jury need not be instructed on a target's claim of self-defense before determining whether there is probable cause to charge the target with a crime. 564 Fed. Appx. at 374. Notably, the court in Sanchez also reiterated the principle, drawn from Adams v. Williams, 407 U.S. 143, 149 (1972), that "'probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.'" 564 F. Appx. at 373. This principle is particularly significant in the involuntary manslaughter context before this Court, where the mens rea element may be difficult to establish with certainty at the pre-trial stage.[6]

While the court in Sanchez did not analyze the specific elements of involuntary manslaughter under NMSA § 30-2-3, as the arrest was for an open count of murder, the Tenth Circuit's analysis supports the argument that the law was not clearly established in Baldwin's favor. Instead, Sanchez and the other authorities cited above demonstrate that, at a minimum, ADA Padgett Macias had arguable probable cause to believe that Baldwin committed involuntary manslaughter despite his protestations of innocence and asserted lack of requisite intent. See supra, Section II.B. Finally, this Court has already concluded that "even if officers were mistaken that probable cause existed [here],

---

[6] The United States Supreme Court and the Tenth Circuit have addressed these issues more broadly, though the cases arise primarily in the context of law enforcement officers rather than prosecutors specifically. The controlling rule, established by the Supreme Court in Baker, 443 U.S. at 145-146 and applied by the Tenth Circuit in Romero, 45 F.3d 1472, 1480-1481, is that law enforcement officers – and by analogy prosecutors – are not constitutionally required to investigate or resolve a suspect's alibi claim or a claim of lack of knowledge/intent before finding probable cause to arrest or charge.

that mistake was reasonable in light of Young, 2021-NMCA-049, ¶ 9 (reversing a trial court for failing to instruct a jury on involuntary manslaughter in a cased where the defendant maintained that he did not believe the gun was loaded)." [Doc. 61], p. 20 (also stating Baldwin "has not pointed to any case – and the Court cannot find any binding precedent – where law enforcement officers were liable for malicious prosecution based on supressing evidence that was not dispositive to whether probable cause existed.").[7] This Court's prior ruling likewise supports the conclusion that, at a minimum, ADA Padgett Macias had arguable probable cause based on the law of the case doctrine because the Court resolved the same legal issue against her co-defendants based on the same set of facts. See Parada, 577 F.3d at 1279-1280. For the foregoing reasons, ADA Padgett Macias did not violate the clearly established law and is entitled to qualified immunity on Baldwin's malicious prosecution conspiracy

---

[7] State Defendants acknowledge that, in Ward, No. S-1-SC-40503, 2026 WL 732160 (N.M. Mar. 16, 2026) (unpublished), decided in March 2026, the New Mexico Supreme Court clarified and refined the mens rea standard. The court held that the mens rea of involuntary manslaughter is recklessness – specifically, subjective knowledge by the defendant of the danger or risk to others posed by his or her actions – and overruled prior cases that used the term criminal negligence to describe the mens rea standard. Id. at ¶ 45. The court explained that while the substance of the standard had always required subjective awareness of risk, the prior terminology of criminal negligence was misleading because it could be read to permit conviction based on an objective standard (what the defendant should have known) rather than the required subjective standard (what the defendant actually knew). Id. The court also directed the UJI-Criminal Committee to revise the uniform jury instructions accordingly. Id. Ward thus demonstrates that the mens rea standard was not clearly established prior to its 2026 decision. The mens rea standard had not been clarified between 2021-2024, the time period when ADA Padgett Macias could have conceivably engaged in the alleged pretrial conduct related to Baldwin the mens rea standard.

Here, Baldwin did not inspect the gun himself before aiming it towards Hutchins and cocking it when it "just went off" killing Hutchins. See *Compl.*, ¶¶ 47-51, 69. These allegations demonstrate, at a minimum, arguable probable cause to believe that Baldwin – based on his familiarity with guns and the gun training he received throughout his career – knew or should have known of the danger or risk to others posed by him pointing the gun in the directions of others and cocking it without having first inspected it himself to ensure it was loaded with dummies instead of live ammunition. The New Mexico Supreme Court's clarification and refinement of the mens rea standard in 2026 in the Ward decision supports the conclusion that any mistakes of law or fact by ADA Padgett Macias were reasonable under the state of the law during the period of time she engaged in the pretrial conduct alleged in the Complaint. See Stonecipher, 759 F.3d at 1142 ("Qualified immunity applies equally to reasonable mistakes of law and fact.").

claim (Count I).

**CONCLUSION**

Because the limited allegations supporting Baldwin's malicious prosecution conspiracy claim (Count I) only involve pretrial conduct by ADA Padgett Macias, this claim must be analyzed under the Fourth Amendment. Under the Fourth Amendment, Baldwin's claim fails because he was not seized. This claim also fails because ADA Padgett Macias had probable cause to believe he committed the crime of involuntary manslaughter. Alternatively, the law was not clearly established at the time of her actions. Thus, Count I should be dismissed with prejudice against ADA Padgett Macias on the basis of qualified immunity.

Respectfully submitted,

**ROBLES, RAEL & ANAYA, P.C.**

By: /s/ Luis Robles
Luis Robles
*Attorney for State Defendants*
500 Marquette Ave., NW, Suite 700
Albuquerque, New Mexico 87102
(505) 242-2228
(505) 242-1106 (facsimile)
luis@roblesrael.com

I hereby certify that the foregoing was electronically filed through the CM/ECF on this 18th day of December 2026, which will cause service to all counsel of record.

/s/ Luis Robles
Luis Robles